## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

| | | |
|---|---|---|
| OPTIMUS STEEL, LLC | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| U.S. ARMY CORPS OF ENGINEERS, | § | |
| LIEUTENANT GENERAL TODD T. SEMONITE | § | |
| (in his official capacity as Chief of Engineers and | § | |
| Commanding General of the U.S. Army Corps of | § | |
| Engineers), COLONEL TIMOTHY R. VAIL (in his | § | |
| official capacity as U.S. Army Corps of Engineers | § | |
| Galveston District Commander), and JEFFERSON | § | |
| SOUTHERN STAR PIPELINE, LLC | | |
| | | |
| Defendants. | | |

### ORIGINAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND REQUEST FOR HEARING

Plaintiff, Optimus Steel, LLC ("Plaintiff") or ("Optimus") files this Original Complaint for Declaratory and Injunctive Relief and Request for Hearing ("the Complaint") to restrain, enjoin, and stop Defendants U.S. Army Corps of Engineers (the "Corps"), Lieutenant General Todd T. Semonite, Colonel Timothy R. Vail and Jefferson Southern Star Pipeline, LLC ("JSSP") (sometimes collectively, "Defendants") from certain acts contrary to law and requiring equitable and declaratory relief.

## INTRODUCTION[1]

1.      This case involves the U.S. Army Corps of Engineers' (the "Corps") 2017 improper re-authorization and re-issuance of Nationwide Permit 12 ("NWP-12"), a general permit issued for pipelines and other utility projects pursuant to section 404(e) of the Clean Water Act, and improper verification approval of the Jefferson Southern Star Pipeline, LLC ("JSSP") pipeline using NWP-12.  JSSP's project will cross several jurisdictional waters of the United States and discharge dredge and fill material into them.  At least fourteen (14) water body crossings will permanently impact more than the 1/2-acre allowed for each.  The project is proceeding under verification by the Corps issued under NWP-12. The Corps violated the National Environmental Policy Act ("NEPA"), the Clean Water Act ("CWA"), the Endangered Species Act ("ESA"), and the Administrative Procedure Act ("APA") by reauthorizing and re-issuing NWP-12 without assessing its significant direct, indirect, and cumulative environmental effects and by using the NWP-12 to approve the JSSP impacts to Waters of the United States including wetlands without accurately analyzing its project-specific impacts.

2.      In previous and other litigation, the U.S. District Court for the District of Montana in *Northern Plains Resource Council, et al. v. U.S. Army Corps of Engineers, et al.*, CV-19-44-GF-BMM, (April 15, 2020) ruled:[2]  (a) "NWP-12 is vacated pending completion of the ESA Section 7 consultation process with U.S. Fish & Wildlife under the ESA and compliance with all environmental statutes and regulations;" and (b) "the Corps is enjoined from authorizing any dredge or fill activities under NWP-12 pending completion of the consultation process and compliance with all

---

[1] Plaintiff incorporates herein by reference Plaintiff's *Appendix in Support of Application for Temporary Restraining Order, Preliminary Injunction, Permanent Injunction and Request for Hearing and Memorandum in Support* ("Appendix"), filed contemporaneously, for all purposes, as though fully set forth herein.
[2] Defective reauthorization and re-issuance of NWP-12 are also the subject of *Sierra Club v. U.S. Army Corps of Engineers*, et al., CA No. 1:20-cv-460, currently pending in the Western District of Texas, Austin Division.  On August 28, 2020, the Court denied Sierra Club's application for a preliminary injunction on irreparable harm grounds not applicable here.

environmental statutes and regulations."  On May 11, 2020, the Montana court amended its earlier ruling to authorize continued use of NWP-12, but only "in so far as it authorizes non-pipeline construction activities and routine maintenance, inspection, and repair activities on existing NWP-12 projects."  In the Montana court's May 11 ruling, the NWP-12 remained vacated as it related to the construction of new oil and gas pipelines like JSSP's.  Under its amended ruling, the Corps was enjoined nationwide from authorizing any dredge or fill activities for the construction of new oil and gas pipelines.[3]

3.       On June 15, 2020, the United States Solicitor General, on behalf of the Corps, filed an Application for Stay of the Montana Court's decision as amended in the United States Supreme Court.

4.       On July 6, 2020, Justice Kagan granted in part and denied in part the Application. The Montana Court's May 11, 2020 order granting a nationwide vacatur and injunction was stayed, except as to the Keystone XL pipeline, the pipeline at issue in the case.  By limiting the ruling to the project level, the Montana Court's analysis remains valid, and the Court's May 11 decision remains applicable at the project level here.

5.       The basis for the Montana trial court's ruling in each instance was the Corps' failure to engage in consultation with U.S. Fish and Wildlife Services under Section 7(a)(2) of the Endangered Species Act ("ESA") at the programmatic stage.

6.       Programmatic consultation proves appropriate when an agency's proposed action provides a framework for future proposed actions.  50 C.F.R. § 402.02.  Federal action subject to programmatic consultation include federal agency programs.  *See* 80 Fed. Reg. 26832, 26835 (May

---

[3] The decisions of the U.S. District Court for the District of Montana of April 15, 2020, and May 11, 2020, in *Northern Plains Resource Council, et al. v. U.S. Army Corps of Engineers*, CV-19-44-6F-BMM provide a road map for Plaintiff's First Claim for Relief, and are included in the Appendix at pp. 1-64.

11, 2015); 50 C.F.R. § 402.02.

7.       A federal agency may develop those programs at the national scale.  *Id.*  The Corps'
Nationwide Permit Program has specifically been listed as an example of the type of federal program
that provides a national – scale framework and that would be subject to programmatic consultation.
*See* 80 Fed. Reg. at 26835.  Programmatic consultation considers the effect of an agency's proposed
activities as a whole, rather than piecemeal, or at the local level.

8.       In vacating NWP-12 and enjoining the Corps' use of NWP-12 for new construction,
the Montana court found the Corps was required to engage in programmatic consultation at the
Nationwide level prior to, and as a part of, the reauthorization and re-issuance of NWP-12 in 2017.
In the Corps' December 21, 2016 Decision Document, Nationwide Permit 12 ("Decision
Document"), and as a part of the reauthorization and re-issuance of NWP-12, the Corps rejected the
need for programmatic consultation, instead electing to rely on "local" procedure.[4]  82 Fed. Reg.
1,874 (Jan. 6, 2017) ("the Corps has not changed its position, as articulated in the June 1, 2016,
proposed Rule, that the issuance or re-issuance of the NWPs by Corps Headquarters has "no effect"
on listed species or critical habitat.  Therefore, ESA Section 7 Consultation is not required whenever
Corps Headquarters issues or re-issues NWPs").[5]

9.       On October 3, 2019, the Galveston District of the Corps issued additional conditions
to Permit No. SWG-2018-00890 under NWP-12 to Jefferson Star Pipeline LLC ("the JSSP Permit")
as well as the Verification associated with it.[6]  The JSSP Permit authorized the installation of two (2)
pipelines: (1) a 24-inch diameter pipeline running 14.23 miles, and (2) a 10-inch diameter pipeline
running 5.78 miles ("the Project").  The pipelines are to be installed by horizontal directional drilling

---

[4] Appendix at pp. 127-131 (Decision Document 63-67)
[5] Appendix at p. 156.
[6] Appendix at pp. 186-189 (Verification at FOIA 1703-1706).

("HDD") and open-cut trenching.  The JSSP Permit authorizes temporary impacts to 68 palustrine emergent wetlands ("PEM") of 68.79 acres, and 19 palustrine scrub-shrub wetlands ("PSS") of 3.70 acres.  Twenty-two (22) palustrine forested ("PFO") wetlands totaling 20.04 acres would be permanently impacted and destroyed as a part of the their "conversion" to PEM wetlands.[7] Additional aspects of the Project will result in lesser, though permanent, impacts to wetlands at three (3) different valve sites and access points.  The Project proposes several temporary access roads, HDD workspaces, trenching workspaces, and "pipe laydown yards" in connection with installing the pipelines.

10.     The Project's site is located adjacent to the Neches River east of the City of Beaumont in Orange and Jefferson Counties, Texas.  Optimus owns property which JSSP seeks to take in condemnation, and which will be adversely impacted by the Project.  The largest forested wetland permanently impacted by JSSP's project is 7.343 acres.

11.     According to the Statement and Petition in Condemnation filed by JSSP, 5.197 acres of Optimus' property will be taken for the pipeline over a centerline link of 4,527.38 feet.  On its way between the Jefferson Energy Terminal at Motiva and Shell in Port Neches to Jefferson Energy's Beaumont Terminal, the pipeline will cross Optimus property both through a large marshy area containing wetlands and in uplands, underneath Optimus' steel mill.  Optimus has attempted to work with JSSP to move the project approximately 300-400 yards north.  JSSP rejected that possibility. Construction of the pipeline through Optimus's property has not yet begun; it constitutes new construction.

12.     Section 404(e) of the Clean Water Act ("CWA") allows the Corps to issue general

---

[7] The JSSP Permit fails to acknowledge the inevitable permanent destruction of some portion of the "temporarily" impacted 68.79 acres because of open-cut trenching, matting, and erosion.  In addition, the "conversion" of 20.03 acres from forested to emergent wetlands is actually the destruction of 20.03 acres of wetlands with insufficient mitigation. Among other misstatements, Section 3.4 of the Pre-Construction Notice ("PCN") for the Project provided by JSSP mischaracterizes all of the impacts as temporary.  *See* Complaint ¶ 168 *et seq*. Third Claim for Relief.

nationwide permits ("NWPs") only for activities that will cause "minimal adverse environmental effects" and have only "minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1). Projects using NWPs may proceed without undergoing the comprehensive and transparent project-level environmental review ordinarily required by CWA section 404(a). There is no public notice or opportunity for public involvement when projects are approved under NWPs.

13.    NWP-12 is a final permit authorizing the construction of pipelines and other utility projects nationwide, usually without any Corps review process. At the time of its issuance, the Corps estimated NWP-12 would be used for an estimated 11,500 projects per year over its five-year duration.[8]  The Corps does not prepare any project-level NEPA analysis for NWP-12 projects because it purports to have discharged all of its NEPA obligations upon issuance of an environmental assessment ("EA") / Finding of No Significant Impact (FONSI) for NWP-12 as a whole, as a part of the reauthorization and re-issuance (collectively, the "NWP-12 EA"). Thus, the NWP-12 EA constitutes the Corps' only NEPA analysis for projects permitted by NWP-12. An EIS was not performed in connection with the reauthorization and re-issuance of either the NWPs or NWP-12.

14.    The verification here is invalid for the additional reason it was issued without compliance with NEPA. The Corps' reauthorization and re-issuance of NWP-12 EA violates NEPA by failing to evaluate adequately the environmental impacts of pipelines and other utility projects permitted by NWP-12. The Corps' own Decision Document demonstrates reauthorization and re-issuance of NWP-12 and the other NWPs may significantly affect the environment, and thus, requires an EIS. The EA completely fails to evaluate the risks or impacts of oil spills into waterways. Nor does the EA adequately evaluate the direct, indirect, and cumulative impacts associated with approving major oil pipelines like the one authorized by the JSSP Permit under NWP-12, such as the

---

[8] Appendix at p. 134 (Decision Document at p. 70).

**ORIGINAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND REQUEST FOR HEARING                                                              – PAGE 6**

effects of significant water crossings, impacts from the creation of pipeline rights of ways such as the destruction or "conversion" of high-quality forested wetlands ("PFO").

15.     The Corps' failure to prepare an EIS in connection with the reauthorization and re-issuance of the Nationwide Permits violates NEPA in that reauthorization and re-issuance constitute major federal actions requiring NEPA analysis. *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 45-47 (D.C. Cir. 2015); 40 C.F.R. § 1508.18.  The Corps' violation of NEPA occurs, inter alia, because it failed to take the requisite "hard look" at the environmental impacts associated with reauthorization and re-issuance of NWP-12, and the issuance of the verification pursuant to it in this case.

16.     The Corps' reauthorization and re-issuance of NWP-12 in 2017 also violates CWA Section 404(e) by authorizing activities that will cause more than minimal adverse environmental effects, either individually or cumulatively.  According to the Corps, NWP-12 will be used 57,500 times over its 5-year life.  NWP-12 only authorizes the construction of pipelines and other utility lines that would result in no more than 1/2-acre of loss of waters of the United States; however, it allows linear utility lines such as pipelines to use NWP-12 repeatedly for each water crossing along a project's length.  There is no limit to the number of times a utility line can use NWP-12, nor is there a limit to the total number of acres of wetlands a utility can impact for what is really one project under one permittee.  This repeated use of NWP-12 either causes or likely causes more than minimal adverse environmental effects.  Moreover, here, the NWP-12 was not available for use on this particular project.  The Project at issue here results in the permanent destruction of 20.04 PFO wetlands (euphemistically classified as "converted"), far more than 1/2-acre of wetlands is impacted. NWP-12 is not available at the project level because the PCN mis-classifies the destruction of 20.04 acres of wetlands as a "temporary" impact.  The Project requires an individual permit for at least two reasons: NWP-12 is no longer valid for use by JSSP, and JSSP's Project does not qualify to use

NWP-12 because its permanent wetlands impacts exceed the 1/2-acre limit.

17.     The illegitimacy of the project specific analysis is compounded by the fact NWP-12 allows the Corps to artificially treat each water body crossed as a "single and complete project" – even though in aggregate the water bodies are part of only one project or activity, here, the JSSP Pipeline.   Even though wetland impacts far exceed 1/2-acre, for the entire, actual project, by classifying each water body as a single and complete project the full impact is not recognized.   By way of example, use of this method here results in JSSP destroying at least 20 acres – more than 40-times the 1/2-acre limit, such action is contrary to the CWA and NEPA.

18.     Even using the Corps' artificial calculation, the JSSP project fails to satisfy the NWP-12 standard each single and complete project (waterbody crossing) not result in the loss of greater than 1/2-acre.[9]   The Pre-construction Notice submitted by JSSP to the Corps, and relied on by it, establishes no less than fourteen (14) Waters of the United States will have a permanent loss of greater than 1/2-acre.   Accordingly, NWP-12 is not available to JSSP; JSSP cannot act under it, and must obtain an Individual Permit.[10]

19.     In the Montana case, the Corps attempted to justify this approach by relying on Corps' District Engineers to conduct project-level reviews to ensure projects would have no more than minimal adverse effects.   However, most projects permitted by NWP-12 can proceed without notification to the Corps at all, so the District Engineers have no opportunity to conduct any project-level review in those cases.   Even when applicants do notify the Corps, as here, the Corps' failure to conduct an appropriate project-level review prior to issuing its verification demonstrates a project-level minimal adverse effects analysis does not always occur.

---

[9] Appendix at pp. 65, 75 (Decision Document pp. 1, 11); Appendix at 190-193, 196 (2017 Nationwide Permits, General Conditions, District Engineer's Decision, Further Information, and Definitions pp. 7-10, 48).
[10] Appendix at p. 80 (Decision Document p. 16).

20.     Plaintiff, therefore, seeks a declaration that the Corps' reauthorization and re-issuance of NWP-12 violated the APA, the ESA, NEPA and the CWA, and that its use of NWP-12 to approve and verify the JSSP Permit violated the APA, CWA, the ESA and NEPA.  Plaintiff seeks vacatur of JSSP's NWP-12 Verification and of the Corps' approval of the JSSP Permit using NWP-12, as well as a temporary restraining order, and temporary and permanent injunctions prohibiting any construction by JSSP on Optimus Property or in Waters of the United States.

## JURISDICTION AND VENUE

21.     This case arises under the Clean Water Act, 33 U.S.C. §§ 1251 et seq., including § 1344(b) (application of Corps Guidelines in permit determinations), § 1344(c) (prohibition of discharge of dredged or fill material that will have an unacceptable adverse effect), and § 1344(e) (setting forth circumstances in which the Corps can issue nationwide permits); the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq.; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. Jurisdiction exists under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361 (mandamus), and 28 U.S.C. §§ 2201-02 ("creation of remedy" and "further relief" provisions establishing power to issue declaratory judgments in cases of actual controversy).

22.     The Defendants' improper and erroneous actions and/or inactions are expressly made actionable through the APA, or in the alternative, Mandamus and Venue Act, 28 U.S.C. § 1361 ("Mandamus Act").  The Corps' and JSSP's actions in permitting, verifying and constructing the Project are additionally redressable through this Court's powers to preserve its jurisdiction as codified in the All Writs Act (28 U.S.C. § 1651, or this Court's inherent powers).

23.     Venue is appropriate in this Court under 28 U.S.C. § 1391(b)(c) and § 1391(e)(1) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred here. The proposed route under the JSSP Permit is wholly within the counties of Jefferson and Orange, Texas, and the Eastern District of Texas, Beaumont Division.  The Galveston District of the Corps

has issued the NWP-12 and its verification of JSSP to proceed under NWP-12 in the Eastern District of Texas.

## PARTIES

### Plaintiff

24.     Plaintiff Optimus Steel, LLC is a Texas Limited Liability Company engaged in steel mill operations located at 100 Old Highway 90, West Vidor, Texas 77662.  Optimus produces a wide range of steel products for the construction, energy, and manufacturing industries.  The Optimus Mill occupies an approximately over 500-acre site containing freshwater emergent wetlands, freshwater forested/shrub wetlands and other Waters of the U.S.  The JSSP Pipeline will impact and destroy wetlands on Optimus Property.  Optimus has an interest in its property – its use and development.

25.     Optimus is presently a defendant in a condemnation brought by JSSP in the County Court at Law #2, Orange County, Texas, Cause No. 24572, and styled *Jefferson Southern Star Pipeline, LLC v. Optimus Steel, LLC*.  In that action, JSSP seeks to condemn certain portions of Optimus' property for JSSP's pipeline right of way (the "ROW").  The ROW pursued by JSSP traverses areas of wetlands, uplands, and marsh dedicated to the placement of dredged spoil by agreement with the Sabine Neches Navigation District of Jefferson County.  Many of the impacts caused by JSSP's current ROW could have been avoided by moving the location of the pipelines to the north.  Because of the invalidity of NWP-12 and the verification, JSSP's current ROW is unauthorized and cannot be utilized.  Consequently, JSSP's condemnation of Optimus property within the ROW is not available to JSSP.

26.     The Project threatens Optimus' use and enjoyment, and the economic value, of its property, as well as the waters used and enjoyed both as a resource and for the habitat they provide for plants and animals.

27.     The real property, recreational, aesthetic, business, and/or environmental interests of

Optimus have been, and are being, and will be, adversely affected by the actions of the Defendants as set forth herein.

28.     Optimus monitors the use of the Waters of the United States, tests them for water quality certification, and requires compliance with the law respecting these water bodies. Optimus has educated its relevant representatives concerning the management of these waters bodies and engages in conduct designed to protect these water bodies.

29.     Optimus will suffer concrete injury from the construction and operation of the JSSP Pipeline and its impacts on jurisdictional waters without adequate environmental review or adequate opportunities for public notice and comment. Optimus' use and enjoyment of its waters, including jurisdictional waters, would be diminished by the JSSP Pipeline project. Optimus' steel mill will be crossed by the pipeline and will be subjected to all of the impacts associated both with wetlands, and uplands pipeline construction.

30.     Optimus will be injured as a result of the Corps' authorization of the project and reauthorization and re-issuance of NWP-12 without the preparation of appropriate environmental analyses required by NEPA. By this failure, Optimus is deprived of its procedural rights and protections to which it would otherwise be entitled. Optimus uses, enjoys and depends upon water bodies affected by the Corps' NWP-12 as well as the verification of the JSSP project. It relies on those waters for clean, healthy, and usable water, healthy aquatic and upland ecosystems, the presence of wildlife including fish, birds, and other species. In particular, in connection with the area known as Baird's Bayou, Optimus and/or the public rely on waters that would be impacted for bird watching, fishing, boating, nature study, and general recreating. Optimus' protectable health, recreational, aesthetic, procedural, informational and organizational interests have been and continue to be harmed by the Corps' failure to halt discharge and dredge and fill materials by JSSP; and its failure to fulfill its legal obligation to fully consider the environmental and public health impacts of

JSSP's construction, dredge and fill activities in jurisdictional waters under an invalid NWP-12; and illegal verification.  If the Corps vacates JSSP's NWP-12 complies with NEPA, and withdraws its verification, as the law requires, it would redress Optimus' injuries.  By so doing, the Corps would not be permitting the use of a defectively reauthorized and re-issued NWP-12, would prevent the unlawful discharge of dredge and fill material into jurisdictional waters, and would permit Optimus and the public the opportunity to participate in a proper NEPA process.

31.     The Defendants' actions at issue in this case pose an imminent risk of irreparable harm and in some instances, complete loss of Plaintiff's procedural rights.  Optimus has no administrative remedies required to be exhausted.   The action and inaction of the Corps described herein are either final actions or actions unlawfully withheld subject to jurisdictional review under the APA.  An actual, jurisdictional controversy exists between Optimus and Defendants.

32.     The Corps' unlawful issuance of NWP-12 and approval of JSSP using NWP-12 threaten the health, recreational, economic, professional, scientific, and aesthetic interests of Optimus.

33.     For example, the Corps' NWP-12 EA did not adequately address the risk of oil spills from pipelines such as JSSP.  A spill on Optimus property would interfere with the use and enjoyment of the property, harm those species present there and threaten Optimus' operations and water supply, and decrease property values.

34.     The use of the "single and complete" water body crossing doctrine, along with the methodology and calculations used to "permanently convert" one kind of wetland to another, together, and separately violate the CWA.

35.     Allowing use of NWP-12 by JSSP when impacts to at least fourteen (14) Waters of the United States exceed the NWP-12 threshold of 1/2-acre.

36.     By refusing to prepare and publish an adequate and complete environmental review

for NWP-12 or JSSP's Project, the Corps failed to analyze and address the Project's negative impacts on and threats to the interests of Plaintiff.

37.     Authorization of the Project to proceed under an invalid Nationwide Permit is illegal; construction of the pipeline pursuant to it is also illegal.  Optimus has standing to bring this action.[11]

38.     The declaratory and injunctive relief Plaintiff seeks in this lawsuit will redress its injuries by setting aside the Corps' approvals and requiring the Corps to comply with the APA, the CWA, and NEPA.  This relief will give Plaintiff, more comprehensive and complete information regarding JSSP's impacts to valued resources.  It will allow Plaintiff, to advocate more effectively for denial of the project or changes to its design and operation that would help mitigate its adverse impacts (including but not limited to measures designed to protect wetlands and waterways and reduce the impacts of oil spills). And it will give federal, state, and local decision-makers the chance to make better-informed decisions about whether and on what terms to approve the project.

**Defendants**

39.     Defendant U.S. Army Corps of Engineers (the "Corps") is an agency within the United States Department of the Army which in turn is a department within the United States Department of Defense, a Department of the Executive Branch of the United States of America.  It is the federal agency delegated authority to issue and administer permits under section 404 of the CWA for discharge of dredged or fill material into the waters of the United States.  The Corps is headquartered in Washington, D.C.  The Corps' Galveston Texas District oversees the regulatory program in Orange and Jefferson Counties, Texas.

40.     Defendant Todd T. Semonite is Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers headquartered in Washington, D.C., and is designated to act for the

---

[11] Optimus incorporates the Affidavit of Terese Finn filed contemporaneously for all purposes, as though fully set forth herein.

Secretary of the Army.  Plaintiff brings this action against Lieutenant General Semonite in his official capacity only under 5 U.S.C. 702.  Lieutenant General Semonite is the Federal Officer personally responsible for compliance with the laws and regulations at issue here, and any injunction that this Court may issue.

41.     Colonel Timothy R. Vail is the Galveston District Commander and is the highest ranking officer in the Galveston District.  Plaintiff brings this action against Colonel Vail in his official capacity only under 5 U.S.C. 702.  Colonel Vail is the federal officer responsible for the issuance of JSSP's Permit No. SWG-2018-00890 under NWP-12.

42.     Defendants Corps, General Semonite, and Colonel Vail may be served by:  (1) sending a copy of this Original Complaint by certified mail to the United States Attorney General, Department of Justice, 950 Pennsylvania Ave., N.W., Washington, D.C. 20530-0001; (2) sending a copy of this Original Complaint by certified mail to the Civil-Process Clerk, United States Attorney's Office, 350 Magnolia Street, Suite 150, Beaumont, Texas  77701; (3) sending a copy of this Original Complaint by certified mail to the United States Army Corps of Engineers, 441 G. Street, N.W., Washington, D.C. 20314-1000; and (4) sending a copy of this Original Complaint by certified mail to Colonel Timothy R. Vail, USACE, Galveston District, 2000 Fort Point Road, Galveston, Texas 77550.

43.     Defendant Jefferson Southern Star Pipeline, LLC is a Delaware Limited Liability Company registered with the Texas Secretary of State as doing business in Texas.  JSSP may be served with process by serving its registered agent, C T Corporation System, at its registered address of 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136.

## LEGAL BACKGROUND

### The Clean Water Act

44.     The CWA was enacted by Congress in 1972 to "restore and maintain the chemical,

physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  To achieve this goal, Section 404 of the CWA prohibits the discharge of any pollutant, including dredged soil or other fill material, into navigable waters unless authorized by a permit.  *Id.* §§ 1311, 1344.

45.     Section 404 of the CWA gives the Corps primary responsibility for permitting construction activities that involve dredge and fill of U.S. waters.  *Id*. § 1344(a), (d).

46.     The Corps issues a permit under Section 404 of the CWA either on a class-wide ("general permit") or a case-by-case ("individual permit") basis.  A general permit may be issued on a regional or nationwide basis.  33 U.S.C. § 1324(a)(e).  Here, Nationwide Permit 12 is at issue.

47.     An alternative to the comprehensive, transparent individual permit process is the Nationwide Permit Program.  "Nationwide permits (NWPs) are a type of general permit issued by the Chief of Engineers and are designed to regulate with little, if any, delay or paperwork certain activities having minimal impacts."  *Id.* § 330.1(b).

48.     Section 404(e) allows the Corps to, after notice and opportunity for public hearing, issue general permits on a State, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material if the Corps determines the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment.  33 U.S.C. § 1344(e)(1).  NWPs can last up to five years, at which point they must be reissued or expire.  *Id.* § 1344(e)(2); 33 C.F.R. §§ 330.5, 330.6(b).

49.     Once an NWP is issued, specific projects that meet the terms and conditions of the specific NWP may proceed without obtaining an individual section 404 permit.  Projects permitted pursuant to an NWP are not subject to public participation, and do not go through the more comprehensive, site-specific environmental and public interest review individual section 404 permits require.  *See* 33 C.F.R. § 323.3(a).

50.    In most cases, permittees may proceed with activities authorized by NWPs without notifying the Corps.  *Id.* § 330.1(e)(1).

51.    In some cases, as here, however, permittees must notify Corps District Engineers of their projects through submission of a preconstruction notification (PCN) and await verification before the project may proceed under the NWP.  *Id.* §§ 330.1(e)(1), 330.6(a).

52.    Here, under General Condition 18(c) to the Corps' Nationwide Permits, non-federal permitees or applicants such as JSSP must submit a preconstruction notification to the District Engineer if the activity "might affect" any listed species or designated critical habitat, and "shall not begin work" on the activity until notified by the District Engineer that the requirements of the ESA have been satisfied.  82 Fed. Reg. at 1,999-2,000.[12]  The preconstruction notification "must include the name(s) of the endangered or threatened species that might be affected by the proposed activity or that utilized the designated critical habitat that might be affected, "and the District Engineer will then" determine whether the proposed activity 'may affect' or will have 'no effect' [on] listed species and designated critical habitat."  82 Fed. Reg. at 1,999.[13]  If a "may affect" determination is made, the Corps must undertake Section 7 Consultation with Fish & Wildlife Service or National Marine Fishery Services or both as appropriate.

53.    Regardless: to use an NWP, the permittee must comply with all its term.  *U.S. v. Cumberland Farms of Connecticut, Inc.*, 826 F.2d. 1151, 1157 (1st Cir. 1987); (Party seeking to use NWP has burden of showing its applicability).  *See Riverside Irrigator District v. Andreas*, 758 F.2d. 508, 514 (10th Cir. 1985).  JSSP has not complied and NWP-12 is unavailable to it.

54.    If, upon receiving a PCN, the District Engineer decides an activity does not comply

---

[12] Appendix at p. 194 (2017 Nationwide Permits, General Conditions, District Engineer's Decision, Further Information, and Definitions p. 42); Appendix at 161-162.
[13] Appendix at p. 161.

with the terms or conditions of an NWP, the District Engineer must deny verification and require an individual section 404 permit.  *Id.* § 330.6(a)(2).

55.     If the District Engineer determines an activity does comply with the terms and conditions of an NWP, the District Engineer will notify the applicant that the project is verified under the NWP.  *Id.* § 330.6(a)(3).  Also as here, the District Engineer may add conditions to the verification on a case-by-case basis in an effort to ensure the activity will have only minimal individual and cumulative adverse effects on the environment and will not be contrary to the public interest.  *Id.* § 330.6(a)(3)(i).

56.     Ordinarily, once a permittee has submitted a PCN for a project under an NWP, it may presume the project qualifies for the NWP unless otherwise notified by the District Engineer within a 45-day period.  *Id*. § 330.1(e)(1).

57.     The Corps does not issue any public notice or allow any opportunity for public involvement when a PCN is submitted, or when a project is verified, under an NWP. *See id*. § 330.1(e).

58.     Corps regulations provide two or more different NWPs can be combined to authorize a project, but that "the same NWP cannot be used more than once for a single and complete project." *Id*. § 330.6(c).

59.     Corps Division Engineers may prepare supplemental documentation for NWPs, make modifications, and add regional conditions.  *Id*. § 330.5(c).

60.     On September 5, 1979, Attorney General Benjamin R. Civiletti issued an Opinion, the Administrator of US EPA ("Administrator") has the ultimate authority under the CWA to determine the geographic jurisdictional scope of Section 404 Waters of the United States and the Application of Section 404(f) exemptions.  43 Op. Att'y. Gen. 197 (1979).  Two precise issues were resolved under the Civiletti Memorandum: that the Administrator of the Environmental Protection

Agency, rather than the Secretary of the Army, has ultimate administrative authority to construe the jurisdictional term "navigable waters" under Section 404 of the Clean Water Act, and the Administrator, rather than the Secretary of the Army, has ultimate administrative authority to construe Section 404(f) of the Clean Water Act.

61.     It is pursuant to this overreaching authority, the Corps is allowed to oversee the Section 404 Permit process.  *See* generally 40 C.F.R. Part 230 subparts B though J, and 40 C.F.R. § 230.1(c).

62.     In overseeing the 404 permit process the Corps must comply with Guidelines promulgated by the U.S.  Environmental Protection Agency (EPA), which are incorporated into the Corps' own regulations.  *Id.* § 1344(b)(1); 33 C.F.R. §§ 320.4(b)(4), 325.2(a)(6), and can also be found at 40 C.F.R. § 230 et seq.  The objective of the "Guidelines" is to prevent unacceptable adverse impacts to the nation's aquatic ecosystems from the discharge of dredged or fill material.  40 C.F.R. § 230.1(c).

63.     Responsibility for the day-to-day administration of permitting falls to the Corps' district and division engineers.  33 C.F.R. 320.1(a)(2).

64.     The Guidelines provide no discharge of dredged or fill material shall be permitted under an individual permit: (1) if there is a practicable alternative to the proposed discharge; (2) if the discharge causes or contributes to violations of applicable state water quality standards; (3) if the discharge causes or contributes to significant degradation of the environment; and (4) unless all appropriate and practicable steps have been taken to minimize potential adverse impacts.  *Id.* § 230.10.  "Practicable alternatives" include "not discharging into the waters of the U.S. or discharging into an alternative aquatic site with potentially less damaging consequences."  *Id.* § 230.5(c); *see id.* § 230.10(a).  The Corps' regulations also require destruction of wetlands be avoided to the extent practicable.  33 C.F.R. § 320.4(b), (r).

65.     The Guidelines also address general permits such as NWP-12.  In addition to noting the Guidelines have been developed by the EPA and the Corps (40 C.F.R. § 230.2(a), they also establish it must be demonstrated "a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probably impacts of other activities affecting the ecosystems of concern."  (40 C.F.R. § 230.1(c)).  And that the overriding principle of the Guidelines "should be that degradation or destruction of special sites [such as wetlands] may represent an irreversible loss of aquatic resources."  (40 C.F.R. § 230.1(d)).

66.     40 C.F.R. § 230.2(c) specifically states:

> "no modifications to the basic application, meaning, or intent of these Guidelines will be made without rulemaking by the Administrator under the Administrative Procedure Act (5 U.S.C. § 551 *et. seq.*)."

67.     The Guidelines establish various evaluations that must be made in order to authorize a General Permit and those evaluations must "be performed at the time of General Permit issuance." (40 C.F.R. § .6(d)).  40 C.F.R. § 230.7(a) sets forth the conditions required to be met by the Corps to issue a general permit.  Among them are that pursuant to the evaluations to be performed by the Corps to issue NWPs, the Corps must demonstrate activities under the Permit "will have only minimal adverse effects" when performed separately, and "will have only minimal cumulative adverse effects on water quality in the aquatic environment."  (40 C.F.R. § 230.7(a)(2)(3)).

68.     Among many other requirements required to predict the cumulative effects of a General Permit, the evaluation "shall include the number of individual discharge activities likely to be regulated under a General Permit until its expiration, including repetitions or individual discharge activities at a single location."  (40 C.F.R. § 230.7(3)).  Discharges under a General Permit are not allowed unless it can be demonstrated they will not jeopardize the continued existence of species listed as endangered or threatened under the Endangered Species Act of 1973, as amended, or results in likelihood of the destruction or adverse modification of a habitat . . .  "Determined . . . to be a

critical habitat under the Endangered Species Act of 1973 as amended."

69.     Specific determinations, based on required evaluations in 40 C.F.R. § 230.11 must be made concerning physical sub-strata, water circulation, fluctuation and salinity, suspended particulate/turbidity, contaminate determinations, and proposed disposal site determinations.

70.     The Corps' reauthorization and re-issuance of NWP-12 fails to satisfy the requirements of the Guidelines set forth above.  The Decision Document fails to include many of the evaluations required.

71.     The Corps' reauthorization and re-issuance of NWP-12 including, and in particular, its use of the "single and complete project" method of determining wetlands acreage impacts, fails to satisfy the Guidelines.  At the project level, classification of the destruction of forested wetlands as "temporary" because the wetlands will be "converted" to lesser wetlands likewise prevents an impact analysis that satisfies the Guidelines.  The Corps' Verification permitting loss of Waters of the United States of greater than 1/2-acre at fourteen (14) separate water bodies, also fails to satisfy the Guidelines.  Use of these methods constitutes a "modification to the basic application, meaning or intent of" the Guidelines and require APA approval by the Administration.   In addition to failing to satisfy the requirements of 40 C.F.R. § 230, use of these methods to calculate impacts to Waters of the U.S. is arbitrary, capricious and not in accordance with law.

72.     The Corps' verification and JSSP's use of NWP-12 are explicitly conditioned on compliance with the terms and conditions of the NWP-12.[14]  Because NWP-12 should be vacated as to this project, any underlying safeguards or conditions incorporated into in NWP-12 are invalidated and unenforceable.[15]  Loss of these protections, inadequate though they are, requires consultation be

---

[14] Appendix at p. 186 (FOIA 1703).
[15] By way of example. the Water Quality Certification provided by the State under Section 401 of the CWA as a part of NWP-12 would not be available to JSSP.

**ORIGINAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**AND REQUEST FOR HEARING**                                          **– PAGE 20**
4844-2990-5085v.19

instituted, or reinstituted, between the Corps and U.S. Fish & Wildlife pursuant to 50 C.F.R. § 402.16.

## The National Environmental Policy Act

73.     NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).  Congress enacted it in 1969 "to promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321.

74.     NEPA seeks to ensure "that environmental information is available to public officials and citizens before decisions are made and before actions are taken" and to "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(b), (c).  When the federal government acts before fulfilling its NEPA obligations, courts may set the action aside if and until the government complies with NEPA.

75.     The Council on Environmental Quality (CEQ) is an agency created by NEPA and housed within the Executive Office of the President.  42 U.S.C. § 4342. CEQ has promulgated general regulations implementing NEPA.  40 C.F.R. §§ 1500-1508.

76.     To achieve its objectives, NEPA requires all federal agencies to prepare a "detailed statement" for any "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  Major Federal actions include ". . . actions approved by permit or other regulatory decision."  40 C.F.R. § 1508.18.  The term "major" references but does not have a meaning independent of significantly 40 C.F.R. § 1508.18.  This statement—an Environmental Impact Statement or EIS—must describe the environmental impacts of the proposed action.  *Id.* § 4332(2)(C)(i), (ii).  The EIS is an "action-forcing device" designed to ensure NEPA's goals "are infused into the ongoing programs and actions" of the federal government.  40 C.F.R. § 1502.1.

77.     To determine whether a proposed action significantly affects the environment, and whether an EIS is required, the lead federal agency often first prepares an EA.  *Id*. §§ 1501.4(b), 1508.9.

78.     An EA must provide sufficient evidence and analysis to determine whether to prepare an EIS. *Id.* § 1508.9.  The lead agency must take a "hard look" at the relevant environmental concerns and alternatives to the proposed action.  The agency must consider both the context and intensity of the proposed action, including whether the project will take place in wetlands or other "ecologically critical areas," whether the project will affect endangered species, and "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." *Id*. § 1508.27 (a), (b).

79.     If the agency concludes in an EA a project may have significant environmental impacts, then it must prepare an EIS.  *Id*. § 1501.4.  If an EA concludes there are no potentially significant impacts to the environment, the federal agency must describe why the project's impacts are insignificant and issue a FONSI.  *Id*. § 1508.13.

80.     An EIS or EA must include a "full and fair discussion" of the "direct," "indirect," and "cumulative" effects of the action, as well as a discussion of "[m]eans to mitigate adverse environmental impacts."  *Id*. §§ 1502.1, 1502.16(a), (b) & (h), 1508.25(c).  Direct impacts are "caused by the action and occur at the same time and place."  *Id*. § 1508.8(a).  Indirect impacts are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id*. § 1508.8(b).  Cumulative impacts are the "incremental impact[s] of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  *Id.* § 1508.7.  "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

81.     Agencies must include analysis of any "[c]onnected" actions in the same EIS or EA. *Id.* § 1508.25(a)(1).  Connected actions are those actions that "[a]utomatically trigger other actions which may require environmental impact statements," "[c]annot or will not proceed unless other actions are taken previously or simultaneously," or "[a]re interdependent parts of a larger action and depend on the larger action for their justification." *Id.*[16]

82.     The EIS or EA must also inform federal agency decision-makers and the public of the "reasonable alternatives" that would "avoid or minimize adverse impacts or enhance the quality of the human environment." *Id.* § 1502.1.  This analysis of alternatives is the "heart" of the document— i.e., where the agency should "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options." *Id.* § 1502.14.  The EIS or EA must "[r]igorously explore and objectively evaluate all reasonable alternatives," including the alternative of "no action." *Id.* § 1502.14(a), (d).

83.     The CEQ regulations require the federal agency to provide an opportunity for public participation.  *See id.* § 1500.1(b) ("public scrutiny [is] essential"), § 1500.2(d) (the agency must "[e]ncourage and facilitate public involvement"), § 1506.6 (the agency must "[m]ake diligent efforts to involve the public" in preparing environmental documents, give "public notice of . . . the availability of environmental documents so as to inform those persons . . . who may be interested or affected," and "[s]olicit appropriate information from the public.").[17]  CEQ regulations require federal agencies to give the public as much information as is practicable, so that the public has a sufficient basis to assess those areas that the agency must consider in conducting the environmental review.  *See id.* § 1501.4.

---

[16] Connected actions here would be other federally permitted action and other related action associated with the Port of Beaumont Terminal Expansion.

[17] Section 5.0 of the PCN reveals Optimus is not listed as an Affected Property Owner.  Rather, Optimus' predecessor, Gerdau Ameristeel US Inc., was given notice under the PCN and is listed at an address in Tampa, Florida.  Optimus did not receive written notice under the PCN – though clearly an affected property owner.

84.     In the Montana District Court Opinion vacating NWP-12, the trial court held it would be necessary for the Corps to supplement its Decision Document for NWP-12 after a new or reinstituted ESA Section 7 Consultation was completed.  *Northern Plains Resource Council, et al.*, No. 19-44-GF-BMM at 22-23; *see also* 40 C.F.R. § 1502.9(v)(ii) (requiring supplemental environmental impact statements for "significant new circumstances or information"); *see also* 50 C.F.R. § 402.16 ("reinitiation of consultation is required and shall be requested" where "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered.").

## The Administrative Procedure Act

85.     The APA provides for judicial review of agency actions such as those at issue here. A reviewing court shall "hold unlawful and set aside" any Corps actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

86.     The Corps' failure to reauthorize and reissue NWP-12 properly constitutes agency "inaction" or "action" unlawfully withheld within the meaning of, an actionable under, the APA. The reauthorization and re-issuance of NWP-12 constitutes action; the failure to reauthorize and re-issue NWP-12 is inaction.

87.     The Corps' decision not to engage in programmatic consultation with U.S. Fish & Wildlife Service under Section 7 of the Endangered Species Act, likewise, constitutes both agency action and inaction unlawfully withheld within the meaning, of and actionable through, the APA.

88.     The Corps' decision to verify Permit No. SWG-2018-00890 to JSSP on October 3, 2019, constitutes agency action within the meaning of, and actionable through, the APA.

89.     The decision of the Corps to issue Permit No. SWG-2018-00890 and its corresponding nationwide permit verification while utilizing the policy that each crossing of a single Water of the United States at "separate and distant" location constitutes its own single and complete

linear project, thus allowing up to 1/2-acre of impact at each Water of the United States so crossed, constitutes both agency action and inaction unlawfully withheld within the meaning of an actionable through the APA.

90.     The Corps' decision to issue Permit No. SWG-2018-00890 and its corresponding nationwide permit verification by determining impacts based on conversion of palustrine forested wetlands to palustrine emergent wetlands (and thereby exceeding the 1/2-acre threshold for use of NWP-12) constitutes both agency action and inaction unlawfully withheld within the meaning of, and actionable through, the APA.

91.     The Corps' decision to issue Permit No. SWG-2018-00890 and its corresponding verification allowing JSSP to permanently destroy more than 1/2 –acre of Waters of the United States at fourteen (14) different water bodies constitutes agency action and is actionable under the APA.

92.     The issuance of Permit No. SWG-2018-00890 and its corresponding nationwide permit verification constitutes final agency action and makes this action ripe because Plaintiff has exhausted administrative remedies.[18]

93.     Section 702 of Title V of the United States Code provides:

> "an action in the Court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein denied on the ground that it is against the United States or that the United States is an indispensable party."

94.     Any person suffering a legal wrong or adversely affected or aggrieved by agency action, such as that taken here, is entitled to judicial review of that agency action.[19]

95.     The court can hold unlawful and set aside agency action, findings, and conclusions

---

[18] *Sierra Club v. U.S. Army Corps of Engineers*, 446 F.3d 808, 816 (8th Cir. 2006).
[19] 5 U.S.C. § 702.  In addition, and with respect to agency inaction, 5 U.S.C. § 706(1) states:  ". . . a reviewing court shall . . . compare agency action unlawfully withheld . . . ."

that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."

5 U.S.C. § 706(2)(A).  Therefore, this Court, pursuant to the APA should set aside:

a. The 2017 reauthorization and re-issuance of NWP-12 as it applies to the JSSP project;

b. The decision of the Corps not to engage in Section 7 consultation with U.S. Fish & Wildlife Service prior to re-issuance or reauthorization of NWP-12, or any other nationwide permit;

c. The decision of the Corps to issue the Verification of JSSP Permit pursuant to an invalid NWP-12;

d. The decision by the Corps, contrary to 33 U.S.C. § 1344 and the Guidelines to allow the use of Permit No. SWG-2018-00890 and associated nationwide permit verification because the determination of impacts under the Permit was underestimated and treated each crossing of a single Water of the United States at a specific location as a single and complete linear project; and

e. The decision of the Corps, contrary to 33 U.S.C. § 1344 and the Guidelines to allow the use of Permit No. SWG-2018-00890 and associated nationwide permit verification even though the determination of impacts used the conversion of palustrine forested wetlands to palustrine emergent wetlands.

f. The Corps' decision to issue Permit No. SWG-2018-00890 and its corresponding verification allowing JSSP to permanently destroy more than 1/2 –acre of Waters of the United States at fourteen (14) different water bodies constitutes agency action and is actionable under the APA.

The decision to issue NWP-12, Permit No. SWG-2018-00890 and corresponding verification without APA approval by the Administrator and contrary to 40 C.F.R. § 230.2(c), was arbitrary, capricious, an abuse of discretion, and not in accordance with law.

96.     To assure any ultimate relief, Plaintiff may obtain against Defendants will not be rendered meaningless, and to preserve this Court's ability to adjudicate the impropriety of the Corps conduct, Plaintiff is entitled to equitable relief in the form of a temporary restraining order, preliminary and permanent injunctions against the Corps prohibiting use of the NWP-12 for any new construction by JSSP; and against JSSP to prevent commencement or continuing of construction on Optimus Property or in Waters of the United States, using its Verification of NWP-12 Permit as authority.  Such relief is available to Plaintiff under the APA, the All Writs Act, or in the alternative,

this Court's inherent powers.

## FACTS

### The Corps' Reauthorization and Re-issuance of NWP-12

97.     On June 1, 2016, the Corps published a proposal to reauthorize 50 existing NWPs and add two new NWPs. 81 Fed. Reg. 35,186-88 (Jun. 1, 2016).  The Corps also proposed to reissue the general conditions and definitions for all NWPs, with some modifications, and to add one new general condition.  *Id*. at 35,186.  The Corps invited public comment for a period of 60 days, ending on August 1, 2016.  *Id.*

98.     By August 1, 2016, numerous parties submitted comments to the Corps that focused on NWP-12 and outlined violations of the CWA, NEPA, and ESA associated with its use.  The comments addressed included, among other issues, the Corps' failure to engage in Section 7 ESA consultation, the Corps' Stream Crossing Doctrine and the conversion of forested wetlands to wetlands of an inferior type.[20]

99.     On January 6, 2017, the Corps published a final decision ("Final Decision") reissuing 50 NWPs, general conditions, and definitions (with some modifications), and issuing two new NWPs and one new general condition. 82 Fed. Reg. at 1,860.[21]  The NWPs took effect on March 19, 2017 and expire on March 18, 2022.  *Id*.

100.     The Final Decision included the re-issuance of NWP-12 for utility projects with up to a half-acre loss of waters of the United States.  *Id*. at 1985.  The general conditions, *id*. at 1998-2008, and definitions, *id*. at 2005-06, discussed herein apply to all NWPs, including NWP-12.   The Guidelines found at 40 C.F.R. § 230, and more particularly, at 40 C.F.R. § 230.7, apply to the issuance of all NWPs under 33 U.S.C. § 1344.

---

[20] *See* Appendix at pp. 75, 85, 107, and 121. (Decisional Document at 11, 21, 43, and 57).
[21] Appendix at p. 153.

101.    NWP-12 authorizes "discharges of dredged or fill material into waters of the United States . . . associated with the construction, maintenance, or repair of utility lines," "provided the activity does not result in the loss of greater than ½- acre of waters of the United States for each single and complete project."  *Id*. at 1985.  The definition of "utility line" includes "any pipe or pipeline for the transportation of any gaseous, liquid, liquescent, or slurry substance," which includes oil pipelines.  *Id.*

102.    NWP-12 also authorizes discharges into waters of the United States for the construction of related substation facilities, access roads, and overhead utility lines.  *Id.*

103.    Although NWP-12 is limited to utility projects with impacts of 1/2-acre of loss of U.S. waters for each "single and complete project," for linear projects the Corps defines that term as "that portion of the total linear project . . . that includes *all crossings of a single water of the United States (i.e., a single waterbody) at a specific location*."  *Id.* at 2007 (emphasis added).  In other words, NWP-12 allows pipelines and other linear utility projects to use NWP-12 separately at each location where the project crosses a river, stream, or wetland.  By contrast, non-linear projects can invoke NWP-12 only once for the overall project, unless the separate components of the project would have "independent utility" (i.e., if the components could function as stand-alone projects).  *Id.* at 2006.

104.    NWP-12 thus allows the Corps to treat numerous water crossings along a proposed linear utility project—which in larger pipeline projects can number in the hundreds-as separate "single and complete projects" that each qualify separately under the same NWP-12.  The wetlands impacts in the aggregate, and for the complete project are not considered in determining if impacts are great than 1/2-acre.

105.    Despite the putative 1/2-acre limitation, there is no limit to the number of times a single linear utility project can use NWP-12, nor is there a maximum number of acres of water that a linear project can impact while still being authorized under NWP-12.  Because the Corps treats

each crossing separately, it does not use the total amount of lost acreage attributable to a project to determine whether the half-acre threshold has been met.  Even though, throughout submissions made by JSSP, "the Project" is defined to be the construction and operation its pipelines (2), for purposes of NWP-12, each separate water crossing is defined to be its own project.  JSSP's obligation to obtain an individual permit is consumed by this definitional artifice.

106.     The Corps rationalizes this practice by claiming water crossings on a linear pipeline are usually at "separate and distant" locations and/or separate watersheds along a pipeline route such that cumulative effects are dissipated.  For example, the Final Decision states:

> We do not agree that the [½-acre] limit should apply to the entire utility line because the separate and distant crossings of waters of the United States are usually at separate waterbodies scattered along the length of the utility line, and are often in different watersheds . . . . For utility lines that cross the same waterbody (e.g., a river or stream) at separate and distant locations, the distance between those crossings will usually dissipate the direct and indirect adverse environmental effects so that the cumulative adverse environmental effects are no more than minimal.

*Id.* at 1885.

The explanation for the Corps' action in the Final Decision makes no sense; it merely expresses the Corps' failure to satisfy 33 U.S.C. § 1344, and the Guidelines.

107.     NWP-12 does not actually require multiple crossings along a linear project be "separate and distant" or in separate watersheds: it does not define the phrase "separate and distant" or impose any spacing requirements, and it does not require District Engineers to make a "separate and distant" finding.  In fact, linear projects permitted by NWP-12, often have multiple water crossings within them.  Worse, there are no limits.  Multiple crossings would add up to tens or hundreds of acres of impacts, and yet NWP-12 is still available as though no more than 1/2-acre will be affected.  Indeed, because of the relative lack of oversight under NWP-12, the Corps cannot even calculate the total acres of Waters of the U.S. impacted by its use.  Here, using the single water body

/single and complete project methodology, the admitted total permanent impacts to forested wetlands, alone (20.04 acres) are over 40 times as great as the 1/2-acre limit.

108.    The Corps further claims District Engineers, upon receipt of a PCN for an NWP-12 project, will conduct a project-level review to ensure all of its water crossings "will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment," as required by 33 U.S.C. § 1344(e)(1).  82 Fed. Reg. at 1,870; *see also id.* at 1,885 ("If the District Engineer determines after reviewing the PCN that the cumulative adverse environmental effects are more than minimal . . . he or she will exercise discretionary authority and require an individual permit.").[22]  Environmental impacts greater than 1/2-acre are by definition "more than minimal."

109.    However, NWP-12 requires a permittee to submit a PCN *only if* the proposed project meets certain criteria.  *See, e.g.*, *id.* at 1986, 1999, 2000, 2003-04.  If none of these criteria is met, a project proponent may commence with the activity under NWP-12 without notifying the Corps or the public at all.

110.    In fact, although JSSP submitted a PCN here, many project applicants proceed under NWP-12 without ever submitting a PCN or notifying the Corps, and thus the Corps District Engineers lack the opportunity to keep track of all projects (and all uses of Waters of the U.S. impacted) to determine cumulative impacts or to evaluate the environmental effects of those projects in any way.

111.    When an applicant does submit a PCN, the PCN must include a listing of not only the water crossings that triggered the PCN requirement, but also all water crossings along the project. *Id.* at 1986 (Note 8) (stating that the PCN must include "*other separate and distant crossings that require Department of the Army authorization but do not require pre-construction notification*"

---

[22] Appendix at pp. 155, 157.

(emphasis added)).  The District Engineer must then "evaluate the PCN in accordance with Section D, 'District Engineer's Decision,'" and "may require mitigation to ensure the authorized activity results in no more than minimal individual and cumulative adverse environmental effects."  *Id.*  In turn, Section D, "District Engineer's Decision," states "the District Engineer will determine whether the activity authorized by the NWP will result in more than minimal individual or cumulative adverse environmental effects or may be contrary to the public interest."  *Id.* at 2004.  "For a linear project, this determination will include an evaluation of the individual crossings of waters of the United States to determine whether they individually satisfy the terms and conditions of the NWP(s), *as well as the cumulative effects caused by all of the crossings authorized by NWP.*"[23]  *Id.* at 2004- 05 (emphasis added).  Any legitimate review of the PCN by the District Engineer would have required JSSP to obtain an individual permit.

112.    Here, even using the water crossing identified JSSP still fails to satisfy the 1/2-acre loss limit required by NWP-12 at fourteen (14) different water crossings.

113.    Section 1.0 of NWP-12 makes clear it may be used only when "the activity does not result in the loss of greater than 1/2-acre of Waters of the United States for each single and complete project."[24]  As a result of the reauthorization of NWP-12 the Corps concluded:

> "We are retaining the 1/2-acre limit for this NWP because we believe it is an appropriate limit . . . ."[25]

---

[23] The same section provides additional detail about what that analysis should look like:  "When making minimal adverse environmental effects determinations the District Engineer will consider the direct and indirect effects caused by the NWP activity.  He or she will also consider the cumulative adverse environmental effects caused by activities authorized by NWP and whether those cumulative adverse environmental effects are no more than minimal.  The District Engineer will also consider site specific factors, such as the environmental setting in the vicinity of the NWP activity, the type of resource that will be affected by the NWP activity, the functions provided by the aquatic resources that will be affected by the NWP activity, the degree or magnitude to which the aquatic resources perform those functions, the extent that aquatic resource functions will be lost as a result of the NWP activity (*e.g.*, partial or complete loss), the duration of the adverse effects (temporary or permanent), the importance of the aquatic resource functions to the region (*e.g.*, watershed or ecoregion), and mitigation required by the District Engineer."  *Id.* at 2005.
[24] Appendix at p. 65 (Decision Document p. 1).
[25] Appendix at p. 75 (Decision Document p. 11).

The Corps added on the same page: "The 1/2-acre limit cannot be waived." *Id.*

114.     In its PCN at Section 3.4.1[26] in its chart entitled "Temporary Impacts to Wetlands," JSSP misrepresents the permanent destruction of 20.04 acres of Forested Wetlands as "Temporary." This misrepresentation, embraced by the Corps, is wrong for one important reason: the impacts are not temporary.

115.     JSSP, in its PCN, identifies the destruction to thirteen (13) forested wetlands as "permanent" at the acreage impacts set forth below.[27]  Each results in a loss of greater than 1/2-acre. They include:

> Wetland 201-7.343 acres, Forested; (on Optimus Property);
> Wetland 221-0.886 acre, Forested;
> Wetland 225-0.572 acre, Forested;
> Wetland 233-0.508 acre, Forested;
> Wetland 23400.643 acre, Forested;
> Wetland 235-0.725 acre, Forested;
> Wetland 240-2.85 acres, Forested;
> Wetland 245-0.902 acre, Forested;
> Wetland 248-0.915 acre, Forested;
> Wetland 250-1.096 acres, Forested;
> Wetland 253-0.620 acre, Forested;
> Wetland 290-0.533 acre, Forested;
> Wetland 401-1.537 acres, Forested

116.     JSSP identified one scrub-shrub wetland, Number 294a as being permanent impacts of 0.505 acre.[28]

117.     The Corps makes clear a party, like JSSP, that exceeds the 1/2-acre limit must obtain an individual permit.  The applicable language reads:

> "If one or more crossings of Waters of the United States for a proposed utility line do not qualify for authorization by NWP, then the utility line would require an individual permit because of 33 C.F.R. 330.6(d)."[29]

---

[26] Appendix at p. 171 (FOIA 829).
[27] Appendix at pp. 181-183 (FOIA 839-41).
[28] Appendix at pp. 181-183 (FOIA 839-41).
[29] Appendix at p. 80 (Decision Document p. 16).

118.   In the same manner, the definition of "Loss of Waters of the United States," makes clear JSSP's and the Corps' use of the euphemism "converted" to disguise permanent impacts is to no avail.[30]  It states:

> "The acreage of loss of Waters of the United States is a threshold measurement of the impact to jurisdictional waters for determining whether a project may qualify for an NWP; it is not a net threshold that is calculated after considering compensatory mitigation that may be used to offset losses of aquatic functions and services."

119.   NWP-12 is not available to JSSP here for three (3) other reasons:

(a)   The Verification[31] requires JSSP to obtain from the Corps a Real Estate approval, known as an outgrant, of the impacts potentially caused by JSSP's project to properties in which the Corps has an interest.  The Verification states:

> "If the requested project is approved, a signed outgrant by the Chief of Real Estate will be issued.  The executed outgrant is required before this project can begin."

The Response to Plaintiff's FOIA did not include a signed outgrant from the Corps' Chief of Real Estate.  Consequently, JSSP's project cannot yet begin;

(b)   NWP-12 may not be used for discharges into "tidal waters or in non-tidal waters adjacent to tidal waters."[32]  JSSP's PCN includes a submission concerning whether the activity offsets coastal, tidal or navigable waters.  JSSP stated "Yes," the project would offset such waters, and explained the waters involved:  "Neches River and tidally influenced wetlands associated with the river system."[33]  JSSP also admitted the Natural Resource Area that may be affected include, "Coastal Wetlands" and "Waters Under Tidal Influence."[34]  The same submission also addresses how JSSP will respond to "tidally influenced wetlands" that are impacted.

(c)   JSSP was required to provide a final "Drill Frac-Out and Contingency Plan" to use NWP-12.  It never provided a final plan, only a draft, to be "revised and finalized upon bid and award of construction contract."  The FOIA Response did not include the final Drill Frac-Out and Contingency Plan for HDD requirement.

120.   In the Decision Document, the Corps explains the purpose of the PCN requirements

---

[30] Appendix at p. 198 (2017 Nationwide Permits, General Conditions, District Engineer's Decision, Further Information, and Definitions p. 58).
[31] Appendix at p. 188 (FOIA 1705).
[32] Appendix at p. 133 (Decision Document p. 69).
[33] Appendix at p. 184 (FOIA 891).
[34] Appendix at p. 185 (FOIA 892).

included in Note 8 "is to remind users of the NWPs if a utility line includes crossings of waters of

the United States authorized by NWP but do not require PCNs, and one or more crossings of waters

of the United States requires pre-construction notification, then the PCN must include those non-

PCN crossings, in accordance with the requirements of paragraph (b)(4) of general condition 32."[35]

*See also* 82 Fed. Reg. 1,889.[36]

      121.    Likewise, general condition 32(b)(4) states the PCN must include "any other NWP(s),

regional general permit(s), or individual permit(s) used or intended to be used to authorize any part

of the proposed project or any related activity, including other separate and distant crossings for

linear projects that require Department of the Army authorization but do not require pre-construction

notification." *Id.* at 2003.

      122.    The requirement a PCN include all water crossings using NWP-12 (not only those

triggering the PCN requirement) is necessary to allow the District Engineer to evaluate the adverse

effects of an overall project and ensure they would be no more than minimal, either individually or

cumulatively, and to ensure that the project complies with all general and regional conditions for use

of NWP-12 before it can proceed. *See id.* at 2004.

---

[35] Appendix at p. 83 (Decision Document p. 19).
[36] Appendix at p. 157a.

## The Corps' NEPA Documents for NWP-12

123.    The Corps' re-issuance of NWP-12 is a major federal action that requires compliance with NEPA.  *See* 42 U.S.C. § 4332(2)(C).  The Corps issued an EA and FONSI for its re-issuance of NWP-12 on December 21, 2016.

124.    The NWP-12 EA is the Corps' only NEPA document for an estimated 11,500 uses of NWP-12 per year nationwide (57,500 for the life of the permit).[37]  The Corps will not prepare any additional NEPA analysis for individual projects that are permitted, verified, or authorized by NWP-12.  *See, e.g.*, 82 Fed. Reg. at 1,861 ("Corps Headquarters fulfills the requirements of NEPA when it finalizes the environmental assessment in its national decision document for the issuance or re-issuance of an NWP.  An NWP verification issued by a District Engineer does not require separate NEPA documentation.").[38]  In fact, for oil pipelines such as the JSSP, there is no guarantee any other federal agency will conduct any project-level NEPA review because there is no federal statute governing oil pipeline permitting.  In Texas, the state process is for all practical purposes nothing more than registration.

125.    To predict the cumulative effects of 57,500 uses of the NWP-12 Permit over its lifetime, the Corps was required, in connection with reauthorization and re-issuance of NWP-12 include in its analysis "the number of individual discharge activities likely to be regulated under a General Permit until its expiration, including repetitions of individual discharge activities at a single location."  (40 C.R.R § 230.7(b)(3)).  The Corps made no such analysis.

126.    The NWP-12 EA is narrowly limited to discussing the impacts of discharges of fill material into waterways.  It does not discuss the full range of direct, indirect, and cumulative impacts

---

[37] Appendix at p. 134 (Decision Document p. 70).  Although the Corps can estimate the astoundingly large number of uses of the NWP-12, it cannot estimate the total acreage impacted, because it does not have sufficient information to do so.

[38] Appendix at p. 154.

associated with oil pipelines or other utility projects permitted by NWP-12.

127.     For example, the NWP-12 EA does not evaluate the risks or impacts of pipeline oil spills into waterways, nor does it discuss the various types of crude oil or other product transported by pipelines permitted by NWP-12 or their respective characteristics, impacts, or spill response requirements.  Instead, the Corps' NWP-12 EA pronounces:  "We do not have the authority to regulate the operation of oil and gas pipelines, and we do not have the authority to address spills or leaks from oil and gas pipelines."[39]

128.     The NWP-12 EA does not evaluate the climate change impacts associated with NWP-12, including the potential for increased greenhouse gas emissions caused by pipeline construction and/or the lifecycle emissions associated with the oil transported by NWP-12 projects.  Instead, the NWP-12 EA states:  "The Corps does not have the legal authority to regulate the burning of fossil fuels that are transported by pipelines where the Corps authorized crossings of waters of the United States by NWP-12, other general permits, or individual permits.  Therefore, in its environmental documentation the Corps is not required to fully evaluate the burning of fossil fuels . . . ."[40]

129.     The NWP-12 EA also does not evaluate the impacts associated with the permanent conversion of forested wetlands to lesser quality wetlands associated with pipeline rights of way.  However, the EA does acknowledge, as here, forested wetland will be permanently converted.[41]

130.     The NWP-12 EA purports to contain a cumulative effects analysis, but that analysis fails to comply with the Guidelines set forth above, or NEPA.  It includes only a summary of historic and current causes of wetlands depletion in the United States; discusses U.S. waters and species or habitat loss generally; and estimates the total acreage and condition of wetlands in the United States.

---

[39] Appendix at p. 71 (Decision Document at p. 7).
[40] Appendix at p. 73 (Decision Document at p. 9).
[41] See, e.g., Appendix at p. 75 (Decision Document at p. 11 ("There is often conversion of wetland types within utility line rights-of-way and those conversions often need to be permanently maintained while the utility line is operational.")).

The NWP-12 EA does not discuss any cumulative impacts specifically associated with the construction, maintenance, operation, or repair of utility projects such as crude oil or natural gas pipelines; the cumulative effects associated with the creation and permanent maintenance of pipeline rights of way such as forest fragmentation, habitat degradation and loss, erosion and sedimentation, soil nutrient loss, aesthetic impairment, etc.; or, the cumulative effects from using NWP-12 hundreds of times, often in close proximity, to other projects using the same NWP.  In fact, the cumulative effects analysis in the NWP-12 EA is the identical language contained in the decision documents for each of the 52 NWPs.  A generic rather than, "hard," look required by NEPA.

131.    Rather than evaluate the full range of direct, indirect, and cumulative impacts associated with pipelines and other activities permitted by NWP-12, and perform the evaluations required by 40 C.F.R § 230.7, the NWP-12 EA defers much of its analysis to the project level.  For example, the EA states:  "Although the terms and conditions for this NWP have been established at the national level to authorize most activities that have no more than minimal individual and cumulative adverse environmental effects, division and District Engineers have the authority to impose case-specific conditions on an NWP authorization to ensure that the authorized activities will result in only minimal individual and cumulative adverse environmental effects. . . .  If the proposed activity will result in more than minimal adverse environmental effects, then the District Engineer will exercise discretionary authority and require an individual permit."[42]  This delegation, however, lacks meaning when neither the Corps Division Engineer nor the District Engineer performs any additional NEPA analysis when projects proceed under NWP-12, even upon issuance of verifications for specific projects, as here.

132.    The NWP-12 EA fails to take a sufficiently hard look to determine whether an EIS

---

[42] Appendix at pp. 91-92 (Decision Document at pp. 27-28).

should have been prepared.  In the same manner, the NWP-12 EA lacks sufficient analysis to determine a FONSI is appropriate.

133.    Because the NWP-12 EA fails to demonstrate significant impacts will not occur, an EIS is required.

134.    Since its reauthorization and re-issuance, NWP-12 has been in use throughout the Galveston District.

## FIRST CLAIM FOR RELIEF

**The Corps reauthorization and re-issuance of NWP-12 violated the Endangered Species Act, 16 U.S.C. § 1531 et seq., applicable regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706**

135.    Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

136.    The Corps' reauthorization and re-issuance of NWP-12 was a major federal action requiring compliance with NEPA.  *See* 42 U.S.C. § 4332(2)(C).

137.    Programmatic consultation proves appropriate when an agency's proposed action provides a framework for future proposed actions.  50 C.F.R. § 402.02.  Federal action subject to programmatic consultation include federal agency programs.  *See* 80 Fed. Reg. 26832, 26835 (May 11, 2015); 50 C.F.R. § 402.02.

138.    A federal agency may develop those programs at the national scale.  *Id*.  The Corps' Nationwide Permit Program has specifically been listed as an example of the type of federal program that provides a national – scale framework and that would be subject to programmatic consultation.  *See* 80 Fed. Reg. 26835.  Programmatic consultation considers the effect of an agency's proposed activities as a whole, rather than piecemeal, or at the local level.

139.    The Corps' action in reauthorizing and re-issuing NWP-12 authorized activities that "caused immediate and irrevocable impacts to the ecosystem functions of streams and adjacent

wetlands" and "adversely affect hundreds of listed species that rely on rivers, streams, and wetland habitats and other aquatic resources across the country."

140.   In its Decision Document reauthorizing and re-issuing NWP-12, the Corps determines NWP-12 would result in "no more than minimal individual and cumulative adverse effects on the aquatic environment" under the CWA.[43]   The Corps also concluded its re-issued NWP-12 complied with the ESA and did not require an EIS under NEPA.[44]   General Condition 18 of NWP-12 prohibits its use for activities that are likely to directly or indirectly jeopardize, threaten or endanger species under the ESA or destroy or adversely modify designated critical habitat for such species.[45]

141.   The ESA and NEPA require the Corps to consider the environmental impacts of its actions.   Section 7(a)(2) of the ESA requires the Corps to determine "at the earliest possible time" whether any action it takes "**may affect**" [emphasis added] listed species and critical habitat.   16 U.S.C. § 1536(a)(2); 50 CFR § 402.14(a).

142.   If the Corps' action "may affect" listed species or critical habitat, the Corps must enter into consultation with U.S. Fish & Wildlife Service ("FWS") under 16 U.S.C. § 1536(a)(2); 50 CFR § 402.14(a).

143.   Under NEPA, the Corps must produce an environmental impact statement unless it issues a finding of no significant impact ("FONSI").   42 U.S.C. § 4432(C); 40 CFR § 1508.9.

144.   The Corp did not consult with FWS based on its "no affect" determination.[46]

145.   As with the Montana court in 2020, a federal district court in 2005 concluded the Corps should have consulted with FWS when it re-issued NWP-12 in 2002.   *See, National Wildlife Federation v. Brownlee*, 402 F.Supp.2d 1, 9-11 (D.D.C. 2005).

---

[43] Appendix at p. 143 (Decision Document p. 79).
[44] Appendix at pp. 119, 143 (Decision Document pp. 55 and 79).
[45] Appendix at pp. 194-195 (2017 Nationwide Permits, General Conditions, District Engineer's Decision, Further Information, and Definitions pp. 42-43).
[46] Appendix at pp. 127-128 (Decision Document pp. 63-64).

146.     The Corps initiated formal programmatic consultation with FWS when it re-issued NWP-12 in 2007.

147.     The Corps continued the programmatic consultation when re-issued NWP-12 in 2012. *Id.*

148.     As the Montana court noted, there exists "resounding evidence" the Corps' re-issuance of NWP-12 in 2017 "may affect" listed species and their habitat.  The Corps, itself, has admitted the many risks associated with the discharges authorized by NWP-12 when released NWP-12 in 2017.[47]

149.     The Corps admitted activities authorized by past versions of NWP-12 "have resulted in direct and indirect impacts to wetlands, streams, and other aquatic resources."[48]

150.     The Corps likewise admitted discharges of dredged or fill material can have both permanent and temporary consequences, including the conversion of wetlands, streams and other aquatic resources to upland areas, resulting in permanent losses of aquatic resources, functions and services.  The Corps admitted:

> "the construction of utility line right-of-way through forested wetlands will often result in the conversion of forested wetlands to scrub-shrub or emergent wetlands.  These conversions are usually permanent to maintain the utility line in good, operational order."

> "forested wetlands will not be allowed to grow back in the utility line right-of-way so that the utility line will not be damaged and can be usually maintained.  Only shrubs and herbaceous plants will be allowed to grow in the right-of-way."[49]

151.     The Corps' actions and inaction in this regard were arbitrary, capricious, and abuse of discretion, and not in accordance with law.

---

[47] Appendix at pp. 107-127 (Decision Document pp. 43-63).
[48] Appendix at p. 109 (Decision Document p. 45).
[49] Appendix at p. 121 (Decision Document p. 57).

152.     As to endangered species, the Decision Document acknowledges "habitat destruction and degradation was the most common thread [to endangered species], a factor for 85% of the imperial species analyzed.[50]

153.     Habitat destruction caused by water development affected 91% of listed fish species and 99% of listed muscle species according to the Corps.

154.     In rejecting programmatic Section 7 Consultation with FWS, the Corps concluded "the issuance or re-issuance of an NWP, as governed by NWP General Condition 18 (which applies to every NWP and which relates to endangered and threatened species in critical habitat) and 33 CFR 330.4(f), results in "no effect" to listed species or critical habitat, because no activity that "may affect" listed species or critical habitat is authorized by the NWP."   Despite evidence of adverse impacts to the contrary, the Corps concluded "based on the safeguards discussed in this section, especially General Condition 18 and the NWP Regulations at 33 CFR 330.4(f), the Corps has determined that the activities authorized by this NWP will not jeopardize the continued existence of any listed threatened or endangered species or result in the destruction or adverse modification of designated critical habitat.

155.     The Corps' conclusion is unsupported by its own administrative record and fails to comply with the Endangered Species Act.

156.     The ESA provides a low threshold for Section 7(a)(2) Consultation:  an agency must initiate formal consultation for any activity that "may affect" listed species and critical habitat.  The Corps admits discharges authorized by NWP-12 "will result in minor incremental contribution to the cumulative effects to wetlands, streams and other aquatic resources in the United States."[51]

157.     Likewise, the Montana court concluded the types of discharges NWP-12 authorizes

---

[50] Appendix at p. 118 (Decision Document p. 54).
[51] Appendix at p. 116 (Decision Document 52).

"may affect" listed species and critical habitat, underlined as evidenced in the Corps own Decision Document.

158.    Because of this, the Corps should have initiated Section 7(a)(2) Consultation before it reauthorized and re-issued NWP-12 in 2017.

159.    The Corps' response, that it would engage in project by project determination of ESA impacts fails to address the programmatic impact of the NWP-12, on a practical level results in little, if any, protection of endangered species, and is an inadequate alternative to programmatic consultation.

160.    For the reasons set forth above, the Corps' reauthorization and re-issuance of NWP-12 should result in NWP-12 being vacated as it relates to the construction of new oil and gas pipelines (as here) pending completion of the consultation process under Section 7 of the Endangered Species Act proper re-issuance, and compliance with all environmental statutes and regulations.  The Corps should be enjoined from authorizing any additional dredged or fill activities in connection with the JSSP pipeline under NWP-12 pending completion of the consultation process and compliance with all environmental statutes and regulations.  Likewise, the verification of JSSP's use of NWP-12 for new construction, and JSSP's new construction, itself, when conducted on Optimus Property or in Waters of the United States, should be enjoined until such time as the NWP-12 is properly re-issued and reauthorized.[52]

---

[52] Justice Kagan's stay does not affect, and to some extent endorses, the injunction issued the Keystone XL Pipeline. The vitality of the Montana's court relief in the form of injunction at the project level was not stayed, remains, like any other case, persuasive authority, and the Montana court's analysis and project specific injunction is both available and warranted here.

## SECOND CLAIM FOR RELIEF

**The Corps' reauthorization and re-issuance of NWP-12 violated the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq., applicable regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706**

161.   Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

162.   The Corps' reauthorization and re-issuance of NWP-12 was a major federal action requiring compliance with NEPA.  *See* 42 U.S.C. § 4332(2)(C).

163.   The Corps issued an EA/FONSI for its reauthorization and re-issuance of NWP-12, which constitutes the Corps' only NEPA document for an estimated 11,500 projects per year (57.500 uses nationally over the 5-year life of NWP-12). The Corps will not prepare any additional NEPA analysis for individual projects that are permitted or authorized by NWP-12.

164.   The Corps' NWP-12 EA violated NEPA by failing to take the requisite hard look at the significant direct, indirect, and cumulative environmental effects of reissuing NWP-12 (i.e., the impacts of projects permitted or authorized by NWP-12).  *See* 40 C.F.R. §§ 1502.1, 1502.16(a), (b), 1508.25(c). Among other things, the NWP-12 EA failed to analyze adequately:

    a.    The risks and impacts of crude oil spills and leaks from pipelines approved by NWP-12, including but not limited to spills into Corps jurisdictional waters;

    b.    The various types of crude oil products transported by NWP-12 projects and their respective properties, characteristics, environmental impacts, or spill response requirements;

    c.    Potential adverse impacts that may affect Endangered Species;

    d.    The environmental impacts associated with the construction and maintenance of pipeline rights of way, both within and outside of Corps jurisdictional waterways, including but not limited to the permanent conversion of forested wetlands to lower quality wetlands, forest fragmentation, habitat loss, erosion and sedimentation, soil nutrient loss, and aesthetic impairment;

    e.    The climate change impacts of NWP-12, including but not limited to the potential for increased lifecycle greenhouse gas emissions resulting from oil and gas

pipelines approved by NWP-12; and

f.    The separate and cumulative impacts of NWP-12, including the effects of multiple uses of a single NWP-12 for multiple separate and distant crossings of water bodies totaling more than 1/2-acre of impacts to Waters of the U.S. by the same pipeline within particular watersheds, regions, or other sensitive areas; and the impacts of other past, future, and reasonably foreseeable projects.

g.    The impacts of allowing impacts to "converted" wetlands to be treated as temporary, when the process results in the permanent destruction of one kind of wetland; and by the artifice evades the requirements that an individual permit be obtained.

h.    The impacts of allowing NWP-12 to be used when permanent impacts of greater than 1/2-acre occur at fourteen (14) different waterbody crossings for the project; and,

i.    For failing to adequately access the damages to endangered species posed by failing to engage in programmatic consultation under Section 7 of the ESA.

165.    The Corps' FONSI for NWP-12 was arbitrary and capricious, not in accordance with law and fails to establish the impacts of issuing NWP-12 are not significant. The environmental impacts associated with the Corps' re-issuance of NWP-12 are "significant," 40 C.F.R. § 1508.27, and thus the Corps should have prepared an EIS.

166.    By preparing an EA/FONSI rather than an EIS for its NWP-12 reauthorization and re-issuance, the Corps violated NEPA, 42 U.S.C. § 4332(2)(C), and NEPA's implementing regulations, including but not limited to 40 C.F.R. §§ 1501.3, 1501.4, 1502.4, 1508.8, 1508.9, 1508.11, 1508.18, and 1508.27.

167.    For the reasons set forth above, the Corps' reauthorization and re-issuance of NWP-12 was inconsistent with CWA, ESA, NEPA and CEQ regulations. It was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, and contrary to the APA. *See* 5 U.S.C. § 706(2)(A).

**THIRD CLAIM FOR RELIEF**

**The Corps' issuance of NWP-12 verifications and other approvals for the Jefferson Southern Star Pipeline, LLC violated the Clean Water Act, 33 U.S.C. § 1344(e), applicable regulations, the terms and conditions of NWP-12, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 (Conversion of Wetlands)**

168.    Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

169.    The JSSP Permit and Verification authorize the installation of:

> ". . . a two-pipeline system by horizontal directional drilling (HDD) and open-cut trenching that will result in . . . 20.04 acres of 22 palustrine forested (PFO) wetlands to be permanently converted to PEM wetlands."

170.    The PCN at Section 3.4.1 mischaracterizes these permanent impacts as temporary; they are not. Through a sophistry of calculations, misapplied terms, and use of the euphemism "conversion," permanent impacts, and putative temporary impacts to 68.79 acres of herbaceous wetlands (68 different wetlands) are ignored and JSSP and the Corps conclude less than 1/2-acre of wetlands are impacted by the Project.

171.    33 U.S.C. § 1344(e)(1) limits the use of general permits like NWP-12 to those instances where ". . . the activities in such categories are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will only have minimal cumulative adverse effect on the environment."

172.    NWP-12 sets the standard for degradation and impact associated with the activities permitted under it. A pipeline like the JSSP may only utilize NWP-12 "provided the activity does not result in the loss of greater than 1/2-acre of Waters of the United States for each single and complete project."

173.    The JSSP Permit admits 20.04 acres of forested wetlands will be permanently destroyed, only to be "converted" to PME wetlands. By use of the word "converted" JSSP and the

Corps ignore the "loss of greater than 1/2-acre of forested wetlands."

174.   The determination of the applicability of NWP-12 is based on impacts, not mitigated impacts.  Here, 20.04 acres of wetlands will be destroyed.  That, unmitigated number, is over forty times higher than the 1/2-acre of impacts allowed under NWP-12.

175.   The plain terms of NWP-12 prevent this kind of "netting" calculation to assess loss of Waters of the U.S. or impacts.

176.   Section 23(g) of NWP-12 plainly states and is dispositive on the matter:

> "(g) Compensatory mitigation will not be used to increase the acreage losses allowed by the acreage limits of the NWPs.  For example, if an NWP has an acreage limit 1/2-acre, it **cannot** be used to authorize any NWP activity resulting in the loss of greater than 1/2-acre of Waters of the United States, **even if compensatory mitigation is provided that replaces or restores some of the loss waters.**" [emphasis added].[53]

177.   The definitional section for NWP-12 begins on Page 19 and addresses both the definition to be used for compensatory mitigation and for loss of Waters of the United States.

178.   Loss of Waters of the United States is defined to be:

> "Waters of the United States that are permanently adversely affected by filling, flooding, excavation or drainage because of the regulated activity.  Permanent adverse effects include permanent discharges of dredged or film material that change an aquatic area to dry land, increase the bottom elevation of the waterbody, or change the use of the waterbody.  The acreage of Loss of Waters of the United States is a threshold measurement of the impact to jurisdictional waters for determining whether a project may qualify for an NWP; it is not a net threshold that is calculated after considering compensatory mitigation that may be used to offset losses of aquatic functions and services." [emphasis added].[54]

179.   The term "compensatory mitigation" is defined as follows:

> "the restoration (re-establishment or rehabilitation), establishment (creation), enhancement, and/or in certain circumstances preservation

---

[53] Appendix at p. 196 (2017 Nationwide Permits, General Conditions, District Engineer's Decision, Further Information, and Definitions at page 48).

[54] Appendix at p. 198 (2017 Nationwide Permits, General Conditions, District Engineer's Decision, Further Information, and Definitions at page 58).

of aquatic resources for the purposes of offsetting unavoidable adverse impacts which remain after all appropriate and practicable avoidance and minimization have been achieved."[55]

180. By use of its "conversion" artifice, the Corps and JSSP attempt to evade the obligation to provide an impact analysis that satisfies the requirements of NWP-12, and demonstrates the activity "does not result in the loss of greater than 1/2-acre of Waters of the United States."

181. Here, even using the water crossing identified JSSP still fails to satisfy the 1/2-acre loss limit required by NWP-12 at fourteen (14) different water crossings.

182. Section 1.0 of NWP-12 makes clear it may be used only when "the activity does not result in the loss of greater than 1/2-acre of Waters of the United States for each single and complete project."[56]  As a result of the reauthorization of NWP-12 the Corps concluded:

> "We are retaining the 1/2-acre limit for this NWP because we believe it is an appropriate limit . . . ."[57]

The Corps added on the same page:  "The 1/2-acre limit cannot be waived."  *Id*.

183. In its PCN at Section 3.4.1[58] in its chart entitled "Temporary Impacts to Wetlands," JSSP misrepresents the permanent destruction of 20.04 acres of Forested Wetlands as "Temporary." This misrepresentation, embraced by the Corps, is wrong for one important reason: the impacts are not temporary.

184. JSSP, in its PCN,  admits the impact and duration of the destruction to thirteen (13) forested wetlands as "permanent" at the acreage impacts set forth below.[59]  Each results in a loss of greater than 1/2-acre.  They include:

> Wetland 201-7.343 acres, Forested; (on Optimus Property);
> Wetland 221-0.886 acre, Forested;

---

[55] Appendix at p. 197 (2017 Nationwide Permits, General Conditions, District Engineer's Decision, Further Information, and Definitions at page 56).
[56] Appendix at p. 65 (Decision Document p. 1).
[57] Appendix at p. 75 (Decision Document p. 11).
[58] Appendix at p. 171 (FOIA 829).
[59] Appendix at pp. 181-183 (FOIA 839-841).

> Wetland 225-0.572 acre, Forested;
> Wetland 233-0.508 acre, Forested;
> Wetland 23400.643 acre, Forested;
> Wetland 235-0.725 acre, Forested;
> Wetland 240-2.85 acres, Forested;
> Wetland 245-0.902 acre, Forested;
> Wetland 248-0.915 acre, Forested;
> Wetland 250-1.096 acres, Forested;
> Wetland 253-0.620 acre, Forested;
> Wetland 290-0.533 acre, Forested;
> Wetland 401-1.537 acres, Forested

185.   JSSP identified one scrub-shrub wetland, Number 294a as having permanent impacts of 0.505 acre.

186.   The Corps makes clear a party, like JSSP, that exceeds the 1/2-acre limit must obtain an individual permit.[60]  The applicable language reads:

> "If one or more crossings of Waters of the United States for a proposed utility line do not qualify for authorization by NWP, then the utility line would require an individual permit because of 33 C.F.R. 330.6(d)."

187.   In the same manner, the definition of "Loss of Waters of the United States," makes clear JSSP's and the Corps' use of the euphemism "converted" to disguise permanent impacts is to no avail.  It states:

> "The acreage of loss of Waters of the United States is a threshold measurement of the impact to jurisdictional waters for determining whether a project may qualify for an NWP; it is not a net threshold that is calculated after considering compensatory mitigation that may be used to offset losses of aquatic functions and services."[61]

188.   NWP-12 is not available to JSSP here for three (3) other reasons:

> (a) The Verification requires JSSP to obtain from the Corps a Real Estate approval, known as an outgrant, of the impacts potentially caused by JSSP's project to properties in which the Corps has an interest.  The Verification states:
>
> > "If the requested project is approved, a signed outgrant by the Chief of Real Estate will be issued.  The executed outgrant is required before

---

[60] Appendix at p. 80 (Decision Document p. 16).
[61] Appendix at p. 198 (2017 Nationwide Permits, General Conditions, District Engineer's Decision, Further Information, and Definitions at page 58).

this project can begin."[62]

The Response to Plaintiff's FOIA did not include a signed outgrant from the Corps' Chief of Real Estate.  Consequently, JSSP's project cannot yet begin;

(b) NWP-12 may not be used for discharges into "tidal waters or in non-tidal waters adjacent to tidal waters."[63]   JSSP's PCN includes a submission concerning whether the activity offsets coastal, tidal or navigable waters.  JSSP stated "Yes," the project would offset such waters, and explained the waters involved: "Neches  River and tidally influenced wetlands associated with the river system."[64]  JSSP also admitted the Natural Resource Area that may be affected include, "Coastal Wetlands" and "Waters Under Tidal Influence."[65]  The same submission also addresses how JSSP will respond to "tidally influenced wetlands" that are impacted.

(c) JSSP was required to provide a final "Drill Frac-Out and Contingency Plan" to use NWP-12.  It never provided a final plan, only a draft, to be "revised and finalized upon bid and award of construction contract."  The FOIA Response did not include the final Drill Frac-Out and Contingency Plan for HDD requirement.

189.  Because the Verification of the JSSP Permit authorizes permanent loss of Waters of the U.S. exceeding 1/2-acre, NWP-12 is not available for the Project.

190.  The use of both the stream crossing calculation, and the "conversion" of Wetlands calculation, together, for the JSSP Project results in more than the "minimal adverse environmental effects" and more than "minimal cumulative adverse effects on the environment."  These effects prohibit the use of NWP-12.

191.  40 C.F.R. § 230.2(c) specifically states:

"no modifications to the basic application, meaning, or intent to these Guidelines will be made without ruling making by the Administrator under the Administrative Procedure Act (5 U.S.C. § 551 *et. seq.*)."

192.  Use of the Corps' wetland conversion methodology constitutes a "modification to the basic application, meaning, or intent to these Guidelines without a ruling by the Administrator under

---

[62] Appendix at p. 188 (FOIA 1705).
[63] Appendix at p. 133 (Decision Document p. 69).
[64] Appendix at p. 184 (FOIA 891).
[65] Appendix at p. 185 (FOIA 892).

the Administrative Procedure Act" making such modification invalid.

193.    JSSP must seek and obtain an individual permit for the Project and cannot proceed under NWP-12.

194.    The Corps' action in verifying use of NWP-12 for the Project while using such a methodology is contrary to the CWA and the Guidelines and was arbitrary, capricious, an abuse of discretion and not in accordance with law.

## FOURTH CLAIM FOR RELIEF

**The Corps' reauthorization and re-issuance of NWP-12 violated the Clean Water Act, 33 U.S.C. § 1344(e), applicable regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 (Water Crossing)**

195.    Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

196.    Section 404(e) of the CWA allows the Corps to issue NWPs only for categories of projects that the agency determines "are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1).

197.    NWP-12 permits or authorizes the construction and operation of utility lines and associated facilities that do not result in the loss of greater than a half- acre of waters of the United States "for each single and complete project." 82 Fed. Reg. at 1,985.[66]  However, NWP-12 defines "[s]ingle and complete linear project" as "that portion of the total linear project . . . that includes all crossings of a single water of the United States *(i.e., a single waterbody) at a specific location*." *Id.* at 2007 (emphasis added).  The effect of this definition is to artificially treat each water crossing along a proposed linear utility project, as a "single and complete project" that qualifies separately

---

[66] Appendix at p. 158.

under NWP-12, with each crossing allowed impacts up to 1/2-acre.

198.    The use of the stream crossing doctrine is completely at odds with reality and is contrary to the language of 33 CFR 330.2(i) that the term "single and complete project means the **total** [emphasis added] project proposed or accomplished by one owner/developer or other association of owners/developers."

199.    There is no limit to the number of times that a single linear utility project can use NWP-12, nor is there a total maximum number of acres of waters of the United States that a linear project can impact while still being authorized under NWP-12.

200.    NWP-12 relies on the project level discretion of division and District Engineers to ensure, on a project-by-project basis, the activities will have no more than minimal effects.  *See id.* at 1885-86; *see also id.* at 2004.

201.    However, this project-level review by Corps district or division engineers fails to ensure projects permitted by NWP-12 will have only minimal adverse environmental effects because for many or most projects that proceed under NWP-12, an applicant is not required to submit a PCN or notify the Corps at all, and thus the Corps does not have an opportunity to evaluate the adverse environmental effects of those projects or use its discretion to change them.

202.    For those projects where a PCN is required, project-level review by Corps district or division engineers still fails to ensure the multiple water crossings for projects permitted by NWP-12 will have only minimal adverse environmental effects, either individually or cumulatively, because the Corps never considers the effects of multiple water crossings for individual linear projects.

203.    In short, NWP-12 permits linear projects to use the NWP numerous times along a pipeline or utility route—even if there are high concentrations of water crossings in specific areas—with no mechanism to ensure impacts would be determined much less demonstrated to be minimal.

Because the Corps has no way to calculate, much less protect from, adverse impacts, NWP-12 fails to ensure projects it permits "will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment" as required by 33 U.S.C. § 1344(e)(1).

204.    The use of both the stream crossing calculation, and the "conversion" method of calculation, together, for the JSSP Project results in more than the "minimal adverse environmental effects" and more than "minimal cumulative adverse effects on the environment." These effects prohibit the use of NWP-12.

205.    Consequently, an EIS was required to be performed, including an analysis of impacts associated with the use of each crossing as a separate project.

206.    40 C.F.R. § 230.2(c) specifically states:

> "no modifications to the basic application, meaning, or intent to these Guidelines will be made without ruling making by the Administrator under the Administrative Procedure Act (5 U.S.C. § 551 *et. seq.*)."

207.    Use of the Corps' water crossing calculations constitutes a "modification to the basic application meaning or intent to these Guidelines without a ruling by the Administrator under the Administrative Procedure Act" making such modification invalid.

208.    The Corps' action is verifying use of NWP-12 for the Project while being such methodology is contrary to the purpose of the CWA and the Guidelines and was arbitrary, capricious, an abuse of discretion and not in accordance with law.

### FIFTH CLAIM FOR RELIEF

**The Corps' issuance of NWP-12 verifications and other approvals for the Jefferson Southern Star Pipeline, LLC violated the Clean Water Act, 33 U.S.C. § 1344(e), applicable regulations, the terms and conditions of NWP-12, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706**

209.    Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in

the preceding paragraphs.

210.    On October 3, 2019, the Corps issued a verification for the JSSP's crossing of the Certain Waters of the U.S. on Optimus property, which notified JSSP that construction of the project in U.S. waters meets the terms and conditions of NWP-12 and that the project is authorized to proceed under NWP-12 (subject to the condition that an executed outgrant related to crossing federal property be obtained prior to JSSP beginning the Project).

211.    Issuance of the JSSP Permit, and verification approving Waters of the U.S. crossings and impacts are each final agency action reviewable under the APA, 5 U.S.C. §§ 704, 706(2).  In the alternative, the permit and verification constitute agency action unlawfully withheld or unreasonably delayed pursuant to 5 U.S.C. § 706(1), insofar as they failed to evaluate the adverse effects associated with activities under the JSSP Permit.

212.    The Corps' issuance of the permit and verification violates section 404(e) of the CWA, because the Corps approved a project under an invalid NWP-12 and a NWP that has more than minimal environmental effects.

213.    The NWP-12 verified for JSSP's project was an invalid NWP-12 as set forth above. Consequently, JSSP lacks authorization to construct its pipeline over the route approved.

214.    The Corps' issuance of the permit and verification also violates NWP-12 and/or its terms and conditions by failing to evaluate the project's individual and cumulative adverse effects, and failing to include in the respective "District Engineers' Decision(s)" a determination that the cumulative effects caused by all of the crossings authorized by NWP would be no more than minimal, either when measured project-, state-, region-, or watershed-wide.  82 Fed. Reg. at 2,004-05.[67] This omission includes a consideration of both direct and indirect effects (including but not limited to the

---

[67] Appendix at pp. 166-167.

risks and impacts of those activities addressed herein), both nationwide and site-specific factors. *Id.* at 2005.

215.   The Corps' issuance of the permit and verification constitutes de facto or implicit approvals of impacts to and destruction of more than 1/2-acre of Waters of the U.S. and violates NWP-12 and section 404(e) of the Clean Water Act.

216.   Because the adverse environmental effects caused by all of the JSSP water crossings would be more than minimal, and fourteen (14) of such crossings each exceed 1/2-acre, the JSSP is ineligible for authorization under NWP-12 and the Corps' verification of the project under NWP-12 was unlawful.  Instead, the Corps must evaluate the project under the individual section 404 permit process pursuant to 33 U.S.C. § 1344(a) before work on Optimus Property or in Waters of the United States can proceed.

217.   For these reasons, the Corps' permitting and verification of the JSSP under NWP-12 are arbitrary and capricious, an abuse of discretion, and not in accordance with law and must be set aside under the APA, 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court:

a) Declare the Corps' reauthorization and re-issuance of NWP-12 in violation of the Administrative Procedure Act, the Endangered Species Act, the Clean Water Act, the Guidelines, the National Environmental Policy Act, and their applicable regulations;

b) Vacate NWP-12 as it pertains to the JSSP Project and restrain and enjoin its use by JSSP in Waters of the United States or on Optimus Property on this Project.

c) Remand NWP-12 to the Corps for compliance with the National Environmental Policy Act, the ESA, the Guidelines, and the Clean Water Act, including programmatic

consultation under Section 7 of the ESA, and the preparation of a programmatic EIS;

d) Declare the Corps' verifications and/or other approvals, including, specifically Permit No. SWG-2018-00890, of JSSP pursuant to NWP-12 in violation of the Administrative Procedure Act, the Endangered Species Act, the Clean Water Act, the permit's terms and conditions;

e) Vacate all Corps verifications or other approvals, related to including, specifically Permit No. SWG-2018-00890, of the JSSP under NWP-12;

f) Issue a temporary restraining order and preliminary and permanent injunctions enjoining the Corps from using NWP-12 to authorize the construction by JSSP under SWG-2018-00890 or otherwise verifying or approving the JSSP Project under NWP-12, and enjoin any activities in furtherance of pipeline construction;

g) Issue a temporary restraining order, and preliminary and permanent injunctions enjoining JSSP from constructing or continuing construction of the JSSP pipeline in Waters of the United States or on Optimus Property until it obtains a lawfully valid individual permit under the CWA;

h) Award Plaintiff its costs, expenses, and attorneys' fees under applicable law; and

i) Provide for such other relief as the Court deems just and appropriate.

Dated: September 10, 2020                    Respectfully submitted,

/s/ Michael R. Ramsey
Michael R. Ramsey
State Bar No. 16520200
**RAMSEY LAW OFFICE**
6280 Delaware St., Suite A
Beaumont, Texas  77706
Telephone:  (409) 444-2020
Facsimile:  (409) 444-2021

**AND**

/s/ Terry W. Wood
Terry W. Wood
State Bar No. 21907700
**TERRY W. WOOD, P.C.**
2530 Calder Avenue
Beaumont, Texas  77702
Email:  terry@twwoodpc.com
Telephone:  (409) 212-0600

**AND**

/s/ Frederick W. Addison, III
Frederick W. Addison, III
State Bar No. 00903350
Email:  raddison@munsch.com
Claire E. Carroll
State Bar No. 24092224
Email:  ccarroll@munsch.com
**MUNSCH HARDT KOPF & HARR P.C.**
500 N. Akard Street, Suite 3800
Dallas, Texas  75201
Telephone:  (214) 855-7500
Facsimile:  (214) 855-7584

James R. Ray, III
State Bar No. 24079746
Email:  jray@munsch.com
**Munsch Hardt Kopf & Harr P.C.**
1717 W. Sixth Street, Suite 250
Austin, Texas  78703
Telephone:  (512) 391-6100
Facsimile:  (512) 391-6149

**ATTORNEY FOR ALL PLAINTIFFS**

## REQUEST FOR HEARING

Plaintiff does not request *ex parte* relief in this matter.  Plaintiff does request a hearing on its request for temporary restraining order at the Court's earliest convenience.


/s/ Frederick W. Addison, III
Frederick W. Addison, III


## CERTIFICATE OF SERVICE PRIOR TO FILING THIS COMPLAINT

Prior to filing this Complaint on the 10th day of September, 2020, Plaintiff's furnished by electronic means a copy of this Complaint, (along with all supporting materials) to counsel for JSSP in the underlying condemnation action, Thomas A. Zabel, Esq., at Zabel Freeman.  Plaintiff has also furnished prior to filing a copy of the same pleadings provided to Mr. Zabel to Erin K. Zetterstrom, Assistant District Counsel, for the U.S. Army Corps of Engineers and the other Federal Defendants.


/s/ Frederick W. Addison, III
Frederick W. Addison, III