## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

| | |
|---|---|
| OPTIMUS STEEL, LLC | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | § CIVIL ACTION NO. 1:20-cv-00374-MJT |
| | § |
| U.S. ARMY CORPS OF ENGINEERS, | § |
| LIEUTENANT GENERAL TODD T. SEMONITE | § |
| (in his official capacity as Chief of Engineers and | § |
| Commanding General of the U.S. Army Corps of | § |
| Engineers), COLONEL TIMOTHY R. VAIL (in his | § |
| official capacity as U.S. Army Corps of Engineers | § |
| Galveston District Commander), and JEFFERSON | § |
| SOUTHERN STAR PIPELINE, LLC | § |
| | |
| Defendants. | |

### PLAINTIFF'S FIRST AMENDED APPLICATION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, PERMANENT INJUNCTION AND REQUEST FOR HEARING AND MEMORANDUM IN SUPPORT

Plaintiff Optimus Steel, LLC ("Optimus") files *Plaintiff's First Amended Application for Temporary Restraining Order, Preliminary Injunction, Permanent Injunction and Request for Hearing and Memorandum in Support* and would respectfully show the Court as follows:[1]

---

[1] Plaintiff incorporates fully by reference its First Amended Complaint for Declaratory and Injunctive Relief and Request for Hearing ("Complaint") pursuant to FRCP 10(c).

# I.
## INJUNCTIVE RELIEF SOUGHT BY PLAINTIFF[2]

In the Prayer for Relief in the Amended Complaint, Plaintiff seeks the following injunctive relief:

(a) A temporary restraining order and preliminary and permanent injunctions enjoining Defendants U.S. Army Corps of Engineers (the "Corps"), Lieutenant General Todd T. Semonite (in his official capacity), Colonel Timothy R. Vail (in his official capacity) and Jefferson Southern Star Pipeline, LLC ("JSSP") (sometimes collectively, "Defendants") from using NWP-12 to authorize the construction by JSSP under SWG-2018-00890 and enjoin any activities in furtherance of pipeline construction on Optimus's property;

(b) Issuance of a temporary restraining order, and preliminary and permanent injunctions enjoining JSSP from constructing or continuing construction of the JSSP pipeline through, across or under Optimus's property until it obtains a lawfully valid individual permit under the CWA's; or until such time as NWP-12 is properly reauthorized and re-issued as it relates to JSSP's activity through, across or under Optimus's property.

# II.
## INTRODUCTION AND BACKGROUND[3]

1.     This case involves the Corps's 2017 improper re-authorization and re-issuance of Nationwide Permit 12 ("NWP-12"), a general permit issued for pipelines and other utility projects pursuant to section 404(e) of the Clean Water Act, and improper approval and verification of the Jefferson Southern Star Pipeline, LLC ("JSSP") pipeline using NWP-12. The Corps violated the National Environmental Policy Act ("NEPA"), the Clean Water Act ("CWA"), and the Administrative Procedure Act ("APA") by reauthorizing and re-issuing NWP-12 without assessing

---

[2] In its Prayer, other than injunctive relief, Plaintiff seeks, *inter alia*, several other remedies including vacatur of NWP-12 (with respect to the JSSP Project), that NWP-12 be remanded to the Corps with respect to the JSSP Project, and that a declaratory judgment be issued declaring the Corps' verification of Permit No. SWG-2018-00890 to be in violation of the Administrative Procedure Act, the Endangered Species Act and the Clean Water Act.

[3] Plaintiff incorporates herein by reference Plaintiff's *Appendix in Support of First Amended Application for Temporary Restraining Order, Preliminary Injunction, Permanent Injunction and Request for Hearing and Memorandum in Support* ("Appendix"), filed contemporaneously, for all purposes, as though fully set forth herein.

its significant direct, indirect, and cumulative environmental effects and by using the NWP-12 to approve the JSSP impacts to Waters of the United States including wetlands without analyzing its project-specific impacts.  Water bodies crossed by the JSSP pipeline have impacts greater than 1/2-acre, rendering NWP-12 inapplicable, based on fourteen (14) discharges occurring because of the pipeline's construction and existence.

2.      As to reauthorization and re-issuance of NWP-12 in 2017, in previous and other litigation, the U.S. District Court for the District of Montana in *Northern Plains Resource Council, et al. v. U.S. Army Corps of Engineers, et al.*, CV-19-44-GF-BMM, (April 15, 2020) ruled:[4]  (a) "NWP-12 is vacated pending completion of the consultation process and compliance with all environmental statutes and regulations;" and (b) "the Corps is enjoined from authorizing any dredge or fill activities under NWP-12 pending completion of the consultation process and compliance with all environmental statutes and regulations."[5]  On May 11, 2020, the Montana court amended its earlier ruling to authorize continued use of NWP-12, but only "in so far as it authorizes non-pipeline construction activities and routine maintenance, inspection, and repair activities on existing NWP-12 projects."[6]  In the Montana court's May 11 ruling, the NWP-12 remained vacated as it relates to the construction of new oil and gas pipelines.  Under the amended ruling, the Corps remained enjoined nationwide from authorizing any dredge or fill activities for the construction of new oil and gas pipelines.[7]

---

[4] Defective reauthorization and re-issuance of NWP-12 are also the subject of *Sierra Club v. U.S. Army Corps of Engineers*, et al., CA No. 1:20-cv-460, currently pending in the Western District of Texas, Austin Division.  On August 28, 2020, the Court denied Sierra Club's application for a preliminary injunction on irreparable harm grounds not applicable here.
[5] Appendix at pp. 25-26.
[6] Appendix at p. 32.
[7] The decisions of the U.S. District Court for the District of Montana of April 15, 2020, and May 11, 2020, in *Northern Plains Resource Council, et al. v. U.S. Army Corps of  Engineers*, CV-19-44-6F-BMM provide a road map for Plaintiff's First Claim for Relief, and are included in the Appendix at pp. 1-64.

3.      On June 15, 2020, the United States Solicitor General, on behalf of the Corps, pending review of the Ninth Circuit's review of the Montana Court decision, filed an Application for Stay of the Montana Court's decision, as amended, in the United States Supreme Court.

4.      On July 6, 2020, Justice Kagan granted in part and denied in part the Application. The Montana Court's May 11, 2020 order granting a nationwide vacatur and injunction was stayed, except as to the Keystone XL pipeline, the pipeline at issue in this case.  By only limiting the ruling to the project level, the Montana Court's analysis remains valid, and the Court's May 11 decision remains applicable at the project level.  It remains persuasive authority, with the added validity that the Supreme Court permitted its application in the Montana case.

5.      The basis for the Montana's court's ruling in each instance was the Corps' failure to engage in consultation with U.S. Fish and Wildlife Services under Section 7(a)(2) of the Endangered Species Act ("ESA") at the programmatic stage.  In the Corps' December 21, 2016 Decision Document, Nationwide Permit 12 ("Decision Document"), and as a part of the reauthorization and re-issuance of NWP-12, the Corps rejected the need for programmatic consultation, instead electing to rely on "local" procedure.[8] 82 Fed. Reg. 1,874 (Jan. 6, 2017) ("the Corps has not changed its position, as articulated in the June 1, 2016, proposed Rule, that the issuance or re-issuance of the NWPs by Corps Headquarters has "no effect" on listed species or critical habitat.  Therefore, ESA Section 7 Consultation is not required whenever Corps Headquarters issues or re-issues NWPs").[9]

6.      In vacating NWP-12, and enjoining the Corps' use of NWP-12 for new construction, the Montana court found the Corps was required to engage in programmatic

---

[8] Appendix at pp. 127-131 (Decision Document 63-67).
[9] Appendix at p. 156.

consultation with U.S. Fish & Wildlife under the ESA at the Nationwide level as a part of the reauthorization and re-issuance of NWP-12 in 2017.  That failure, led the Montana court to vacate NWP-12, and enjoin its use for new construction.

7.      On October 3, 2019, the Galveston District of the Corps issued Permit No. SWG-2018-00890 under NWP-12 to Jefferson Star Pipeline LLC ("the JSSP Permit") as well as the Verification associated with it.[10]  The JSSP Permit authorized the installation of two (2) pipelines: (1) a 24-inch diameter pipeline running 14.23 miles, and (2) a 10-inch diameter pipeline running 5.78 miles ("the Project").  The pipelines are to be installed by horizontal directional drilling ("HDD") and open-cut trenching.  The JSSP Permit authorizes putatively temporary impacts to 68 palustrine emergent wetlands ("PEM") of 68.79 acres, and 19 palustrine scrub-shrub wetlands ("PSS") of 3.70 acres.  Twenty-two (22) palustrine forested ("PFO") wetlands totaling 20.04 acres would be permanently impacted and destroyed as a part of the their "conversion" to PEM wetlands.[11]  Additional aspects of the Project will result in lesser, though permanent, impacts to wetlands at three (3) different valve sites and access points.  The Project proposes several temporary access roads, HDD workspaces, trenching workspaces, and "pipe laydown yards" in connection with installing the pipelines.

8.      The Project's site is located adjacent to the Neches River east of the City of Beaumont in Orange and Jefferson Counties, Texas.  Optimus owns property which will be taken and impacted by the Project.  The largest forested wetland permanently impacted by the JSSP

---

[10] Appendix at pp. 186-189 (Verification at FOIA 1703-1706).
[11] The JSSP Permit fails to acknowledge the inevitable permanent destruction of some portion of the "temporarily" impacted 68.79 acres because of open-cut trenching, matting, and erosion.  In addition, the "conversion" of 20.03 acres from forested to emergent wetlands is actually the destruction of 20.03 acres of wetlands with insufficient mitigation.  Among other misstatements, Section 3.4 of the Pre-Construction Notice ("PCN") for the Project provided by JSSP mischaracterizes all of the impacts as temporary.  *See* Complaint, ¶ 168 *et seq.*, Third Claim for Relief.

pipeline is 7.343 acres, and is entirely on Optimus Property.

9.      According to the Statement and Petition in Condemnation filed by JSSP, 5.197 acres of Optimus' property will be taken for the pipeline over a centerline link of 4,527.38 feet.[12] On its way between the Jefferson Energy Terminal at Motiva and Shell in Port Neches to Jefferson Energy's Beaumont Terminal, the pipeline will cross Optimus property both through a large marshy area containing wetlands and under Optimus' Steel Mill.[13]  Construction of the pipeline through Optimus's property has not yet begun.

10.     Section 404(e) of the Clean Water Act ("CWA") allows the Corps to issue general nationwide permits ("NWPs") only for activities that will cause "minimal adverse environmental effects" and have only "minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1). Projects using NWPs may proceed without undergoing the comprehensive and transparent project-level environmental review ordinarily required by CWA section 404(a). There is no public notice or opportunity for public involvement when projects are approved under NWPs.

11.     NWP-12 is a final permit authorizing the construction of pipelines and other utility projects nationwide, usually without any further Corps review process.  The Corps estimates NWP-12 will be used for an estimated 11,500 projects per year over its five-year duration.[14] The Corps does not prepare any project-level NEPA analysis for NWP-12 projects because it purports to have discharged all of its NEPA obligations upon issuance of an environmental assessment ("EA") / Finding of No Significant Impact (FONSI) for NWP-12 as a whole (collectively, the "NWP-12

[12] Appendix at pp. 222-244 (Plaintiff's First Amended Original Statement and Petition for Condemnation filed by Jefferson Southern Star Pipeline LLC on 7/29/2020 in the Eminent Domain Proceeding pending in the County Court at Law No. 2, Orange County, Texas).
[13] Optimus has attempted to work with JSSP to move the pipeline to a more suitable location to the north, and farther from the Mill.  JSSP rejected this possibility.
[14] Appendix at p. 134 (Decision Document at p. 70).

EA"). Thus, the NWP-12 EA constitutes the Corps' only NEPA analysis for projects permitted by NWP-12.[15]

12.     The Corps' NWP-12 EA violates NEPA by failing to evaluate adequately the environmental impacts of pipelines and other utility projects permitted by NWP-12.  The EA completely fails to evaluate the risks or impacts of oil spills into waterways. Nor does the EA adequately evaluate the direct, indirect, and cumulative impacts associated with approving all major oil pipelines like the one authorized by the JSSP Permit under NWP-12.  Cumulative direct and indirect impacts, significant water crossings, under counting of impacts, including impacts from the creation of pipeline rights of ways such as the destruction or "conversion" of high-quality forested wetlands ("PFO").

13.     The Corps' reauthorization and re-issuance of NWP-12 in 2017 also violates CWA section 404(e) by authorizing activities that will cause more than minimal adverse environmental effects, either individually or cumulatively.  According to the Corps, NWP-12 will be used 57,500 times over its 5-year life.  NWP-12 authorizes the construction of pipelines and other utility lines that would result in no more than 1/2-acre of loss of Waters of the United States; however, NWP-12 allows linear utility lines such as pipelines to count each water body as a separate "Project." There is no limit to the number of times a utility line can use NWP-12, nor is there a limit to the total number of acres of wetlands that a utility can impact when each water body crossed is less than 1/2 acre.  This repeated use of NWP-12 either causes or likely causes more than minimal adverse environmental effects.  It results in an understating of impacts, and is inconsistent with the Guidelines, and the terms of NWP-12, itself.  Because the JSSP Project results in the permanent

---

[15] The Corps' Decision Document purports to satisfy various statutory requirements including those of the Corps' own public interest review, NEPA, and 40 C.F.R. 230.  *See* Appendix at p. 65 (Decision Document p. 1).

destruction of 20.04 PFO wetlands (euphemistically classified as "converted"), far more than one-half acre of wetlands is impacted and NWP-12 is not available at the project level.[16]  The project requires an individual permit for at least two reasons:  NWP-12 is no longer valid as applied to the JSSP Project, and JSSP's Project does not qualify for it because its permanent wetlands impacts exceed the 1/2-acre limit.

14.     NWP-12 artificially treats the JSSP pipeline project as hundreds or even thousands of "single and complete projects" so as to avoid the more transparent and thorough individual permit process required by section 404, which includes public notice and comment and an analysis of the project's overall impacts and alternatives pursuant to NEPA and the CWA.  *See* 82 Fed. Reg. 1,860-61, 1,985, 1,999-2,000, 2,007.[17]

15.     Even when applying the Corps' inappropriate regulation treating each water body crossing of a pipeline's route as a "separate and complete project" – when it clearly is not, NWP-12 cannot be used by JSSP here.

16.     Here, even using the water crossing identified, JSSP still fails to satisfy the 1/2-acre loss limit required by NWP-12 at fourteen (14) different water crossings.[18]

17.     Section 1.0 of NWP-12 makes clear it may be used only when "the activity does not result in the loss of greater than 1/2-acre of Waters of the United States for each single and complete project."[19]  As a result of the reauthorization of NWP-12 the Corps concluded:

> "We are retaining the 1/2-acre limit for this NWP because we believe it is an appropriate limit . . . ."  Decision Document p. 11.

---

[16] Appendix at p. 198 (2017 Nationwide Permits, General Conditions, District Engineer's Decision, Further Information, and Definitions p. 58).
[17] Appendix at pp. 153-154, 158, 161-162, and 169.
[18] Appendix at pp. 65, 75 (Decision Document pp. 1, 11); Appendix at pp. 190-193, 196 (2017 Nationwide Permits, General Conditions, District Engineer's Decision, Further Information, and Definitions pp. 7-10, 48).
[19] Appendix at p. 65 (Decision Document p. 1).

The Corps added on the same page:  "The 1/2-acre limit cannot be waived."[20]

18.     In its PCN at Section 3.4.1[21] in its chart entitled "Temporary Impacts to Wetlands," JSSP misrepresents the permanent destruction of 20.04 acres of Forested Wetlands as "Temporary."  This misrepresentation, embraced by the Corps, is wrong for one important reason: the impacts are not temporary.

19.     JSSP, in its PCN, admits the impact and duration of the destruction to thirteen (13) forested wetlands as "permanent" at the acreage impacts set forth below.[22]  Each results in a loss of greater than 1/2-acre.  They include:

> Wetland 201-7.343 acres, Forested; (on Optimus Property);
> Wetland 221-0.886 acre, Forested;
> Wetland 225-0.572 acre, Forested;
> Wetland 233-0.508 acre, Forested;
> Wetland 23400.643 acre, Forested;
> Wetland 235-0.725 acre, Forested;
> Wetland 240-2.85 acres, Forested;
> Wetland 245-0.902 acre, Forested;
> Wetland 248-0.915 acre, Forested;
> Wetland 250-1.096 acres, Forested;
> Wetland 253-0.620 acre, Forested;
> Wetland 290-0.533 acre, Forested;
> Wetland 401-1.537 acres, Forested

20.     JSSP identified one scrub-shrub wetland, Number 294a as having permanent impacts of 0.505 acre.[23]

21.     The Corps makes clear a party, like JSSP, that exceeds the 1/2-acre limit must obtain an individual permit.  The applicable language reads:

---

[20] Appendix at p. 65 (Decision Document p. 1).
[21] Appendix at p. 171 (FOIA 829).
[22] Appendix at pp. 181-183 (FOIA 839-41).
[23] Appendix at pp. 181-183 (FOIA 839-41).

"If one or more crossings of Waters of the United States for a proposed utility line do not qualify for authorization by NWP, then the utility line would require an individual permit because of 33 C.F.R. 330.6(d)."[24]

22.     In the Montana case, the Corps attempted to justify its project-by-project approach by relying on Corps' District Engineers to conduct project-level reviews to ensure that projects would have no more than minimal adverse effects. However, most projects permitted by NWP-12 can proceed without notification to the Corps at all, so the District Engineers have no opportunity to conduct any project-level review in those cases. Even when applicants do notify the Corps, the Corps' failure to conduct an appropriate project-level review for the JSSP Permit prior to issuing its verification demonstrates a project-level minimal adverse effects analysis does not always occur.

## III.
## STANDING OF PLAINTIFF

23.     In *Ecosystem Inv., Partners v. Crosby Dredging, LLC*, the Fifth Circuit established the test for standing to be used in connection with a commercial enterprise.  The Plaintiff satisfies both the standard for constitutional standing under Article III of the U.S. Constitution, and also under the APA and NEPA.  It is well settled, Plaintiff suffers a constitutionally cognizable injury by the loss of an opportunity to pursue a benefit . . . even though the Plaintiff may not be able to show that it was certain to receive the benefit that it had been accorded the loss opportunity. *Ecosystem* at 292.

24.     Here, the Affidavit of Optimus Environmental Manager Terese Finn establishes not only Article III Standing, but also that Optimus owns property that is a part of the Project, and uses

---

[24] Appendix at p. 80 (Decision Document p. 16).

and maintains it property for recreational and other beneficial environmental activities.[25]  Plaintiff will lose not only the opportunity to use and develop its land being taken for the JSSP pipeline at the location permitted by the Corps, but also the aesthetic and recreational benefits described in Ms. Finn's Affidavit.[26]

25.     Moreover, the ultimate acquisition of the Optimus property by JSSP involves a constitutional right that private property may only be taken for public use with just compensation.

26.     Even if this harm was small, and it isn't, "for standing purposes, a loss of even a small amount of money is ordinarily an injury."  *See Ecosystems* at 293.

27.     Optimus' injury is fairly traceable to the violations it has asserted.  Were it not for the Corps' actions and failure to act, Optimus would not be suffering both a loss of procedural rights and the irreparable harm of having its property taken through a deficient process.  There is no intervening third-party, and without the Corps conduct, the JSSP project would not go forward. It is clear, Optimus has Article III standing under *Ecosystem*.

28.     Optimus must also demonstrate standing under the APA and/or NEPA.  This, statutory standing is required if the Plaintiff asserts an interest "arguably within the zone of interest to be protected or regulated by the statute that he says were violated."  *Ecosystem* at 294.

29.     As the Fifth Circuit held in *Sabine River Authority v. U.S. Department of Interior*, 951 F.2d 669, 674 (5th Cir. 1992), in order to have statutory standing under NEPA, a Plaintiff must have "a sufficient geographical nexus to the site of the challenged project [such that they can] expect to suffer whatever environmental consequences the project may have."  *See also Ecosystem* at 296.

---

[25] Appendix at pp. 202-221
[26] Appendix at pp. 202-221.

30.     Optimus's burden is not great.  In order to establish a NEPA injury all it must show is a history of recreative activities such as fishing or plans to fish in the general area of the project, owning property that is the subject of the project, or even residing near a bay on which the project would have an impact.  *See Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 640; *Save The Bay, Inc. v. U.S. Army Corps of Engineers*, 610 F.2d 322, 323-25 (5th Cir. 1980).

31.     Optimus is presently a defendant in a condemnation brought by JSSP in the County Court at Law #2, Orange County, Texas, Cause No. 24572, and styled *Jefferson Southern Star Pipeline, LLC v. Optimus Steel, LLC*.[27]  In that action, JSSP seeks to condemn certain portions of Optimus' property for JSSP's pipeline right of way (the "ROW").  The ROW pursued by JSSP traverses areas of wetlands, uplands, and marsh dedicated to the placement of dredged spoil by agreement with the Sabine Neches Navigation District of Jefferson County.  Many of the impacts caused by JSSP's current ROW could have been avoided by moving the location of the pipelines to the North as requested.  Because of the invalidity of NWP-12 and the verification, JSSP's current ROW is unauthorized and cannot be utilized.  Consequently, JSSP's condemnation of Optimus property within the ROW is not available to JSSP because no USACE permit legally authorizes impacts to Waters of the United States on Optimus Property.

32.     The Project threatens Optimus' use and enjoyment, and the economic value, of its property, as well as the waters used and enjoyed both as a resource and for the habitat they provide for plants and animals.

33.     The real property, recreational, aesthetic, business, and/or environmental interests of Optimus have been, and are being, and will be, adversely affected by the actions of the

---

[27] Appendix at pp. 203, 209, 210 (Finn Affidavit ¶¶ 5, 26).

Defendants as set forth herein.

34.     Optimus monitors the use of the Waters of the United States, tests them for water quality certification, and requires compliance with the law respecting these water bodies.  Optimus has educated its relevant representatives concerning the management of these waters bodies and engages in conduct designed to protect these water bodies.[28]

35.     Optimus will suffer concrete injury from the construction and operation of the JSSP pipeline and its impacts on jurisdictional waters without adequate environmental review or adequate opportunities for public notice and comment.  Optimus' use and enjoyment of its waters, including jurisdictional waters, would be diminished by the JSSP pipeline project.  Optimus' steel mill will be crossed by the pipeline and will be subjected to all of the impacts associated both with wetlands, and uplands pipeline construction.[29]

36.     Optimus will be injured as a result of the Corps' authorization of the JSSP project and reauthorization and re-issuance of NWP-12 as it relates to the JSSP Project without the preparation of appropriate environmental analyses required by NEPA.  By this failure, Optimus is deprived of its procedural rights and protections to which it would otherwise be entitled.  Optimus uses, enjoys and depends upon the water bodies affected by the Corps' NWP-12 as well as the verification of the JSSP project.  It relies on those waters for clean, healthy, and usable water, healthy aquatic and upland ecosystems, the presence of wildlife including fish, birds, and other species.  In particular, in connection with the area known as Baird's Bayou, Optimus and/or the public rely on waters that would be impacted for bird watching, fishing, boating, nature study, general recreating, and a variety of other activities.  Optimus' protectable health, recreational,

---

[28] Appendix at p. 204 (Finn Affidavit ¶ 9).
[29] Appendix at p. 204 (Finn Affidavit ¶ 10).

aesthetic, procedural, informational and organizational interests have been and continue to be harmed by the Corps' failure to halt discharge and dredge and fill materials by JSSP; and its failure to fulfill its legal obligation to fully consider the environmental and public health impacts of JSSP's construction, dredge and fill activities in jurisdictional waters under an invalid NWP-12; and illegal verification.  If the Corps vacates JSSP's permit, complies with NEPA, and withdraws its verification, as the law requires, it would readdress Optimus's injuries.  By so doing, the Corps would not be permitting the use of a defectively reauthorized and re-issued NWP-12, would prevent the unlawful discharge of dredge and fill material into jurisdictional waters, and would permit Optimus and the public the opportunity to participate in a proper NEPA process.[30]

37.     The Defendants' actions at issue in this case pose an imminent risk of irreparable harm and in some instances, complete loss of Plaintiff's procedural rights.  Optimus has no administrative remedies required to be exhausted.   The action and inaction of the Corps described herein are either final actions or actions unlawfully held subject to jurisdictional review under the APA.  An actual, jurisdictional controversy exists between Optimus and Defendants.[31]

38.     The Corps' unlawful approval of JSSP's use of NWP-12 threaten the health, recreational, economic, professional, scientific, and aesthetic interests of Optimus.[32]

39.     For example, the Corps' NWP-12 EA did not adequately address the risk of oil spills from JSSP.  A spill on Optimus property would interfere with the use and enjoyment of the property, harm those species present there and threaten Optimus' operations and water supply, and decrease property values.

---

[30] Appendix at pp. 204, 205 (Finn Affidavit ¶¶ 11, 12).
[31] Appendix at p. 205 (Finn Affidavit ¶¶ 14).
[32] Appendix at p. 205 (Finn Affidavit ¶¶ 15).

40.     The use of the "single and complete" water body crossing doctrine, along with the methodology and calculations used to "permanently convert" one kind of wetland to another, together, and separately violate the CWA, and the terms of NWP-12.

41.     By refusing to prepare and publish an adequate and complete environmental review for NWP-12 as applied to JSSP's Project, the Corps failed to analyze and address the Project's negative impacts on and threats to the interests of Plaintiff.

42.     Authorization of the Project to proceed under an invalid Nationwide Permit is illegal; construction of the pipeline pursuant to it is also illegal.  Optimus has standing to bring this action.

43.     The declaratory and injunctive relief Plaintiff seeks in this lawsuit will redress its injuries by setting aside the Corps' approvals of the JSSP project and requiring the Corps to comply with the APA, the CWA, and NEPA prior to authorizing JSSP's activity impacting Optimus's property.  This relief will give Plaintiff, more comprehensive and complete information regarding JSSP's impacts to valued resources.  It will allow Plaintiff, to advocate more effectively for denial of the project or changes to its design and operation that would help mitigate its adverse impacts (including but not limited to measures designed to protect wetlands and waterways and reduce the impacts of oil spills). And it will give federal, state, and local decision-makers the chance to make better-informed decisions about whether and on what terms to approve the project.

44.     Optimus has demonstrated, both Article III Standing and standing under NEPA and the APA.

## IV.
## PLAINTIFF'S ENTITLEMENT TO INJUNCTIVE RELIEF

**A.      Standard of Review – Standard for Injunctive Relief**

45.     Plaintiff seeks to enjoin use of NWP-12 by the Corps on the JSSP project in

connection with new construction until such time as the Corps has engaged in programmatic Section 7 Consultation under Section 7 of the ESA.[33]  Plaintiff also seeks to enjoin JSSP from commencing or engaging in construction in Waters of the United States or on the Optimus Property until it obtains a lawfully valid individual permit under Section 404 of the CWA, or until such time as NWP-12 is reauthorized and re-issued properly.

46.    Issuance of a Temporary Restraining Order, followed by a Preliminary and then Permanent Injunction as sought by Plaintiff is appropriate here because, pursuant to Federal Rule of Civil Procedure 65, Plaintiff:

(1)    Is substantially likely to succeed on the merits;

(2)    Is at serious and immediate risks of irreparably harm;

(3)    Prevails on a balance of harms analysis; and

(4)    The requested relief will enhance, rather than disserve the public's interest.  *See, e.g. Jones v. Bush*, 122 F.Supp.2d 713, 718 (N.D.Tex. 2000) (addressing preliminary injunction standard) (*citing Ruscitto v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 777 F.Supp. 1349, 1353 (N.D.Tex. 1991, *Aff'd.* 948 F.2d 1286 (5th Cir. 1991) (per curiam); *eBay, Inc. v. MercExchange*, L.L.C., 547 U.S. 388, 391 (2006).

47.    The Defendants improper and erroneous actions and/or inactions are expressly made actionable through the APA, or in the alternative, Mandamus and Venue Act, 28 U.S.C. § 1361 ("Mandamus Act").  The Corps' and JSSP's actions in permitting, verifying and constructing the Project are additionally redressable through this Court's powers to preserve its jurisdiction as codified in the All Writs Act (28 U.S.C. § 1651, or this Court's inherent powers).

---

[33] Plaintiff also seeks a declaration that NWP-12 be vacated under the APA because of the Corps' failure to engage in Section 7 Consultation.

**B.      Plaintiff is Substantially Likely to Succeed on the Merits of Its Claims**

**1.      The Corps**

**a.      Invocation of the APA**

48.      The Corps' has engaged in conduct that constitutes "action" or "inaction" or action "unlawfully withheld" under the APA. *See Sierra Club v. U.S. Army Corps of Engineers*, 446 F.3d 808, 816 (8th Cir. 2006).  To succeed on the merits Plaintiffs must demonstrate the Corps' actions or inaction were arbitrary, capricious or not in accordance with law.  5 U.S.C. § 706(2)(A).  Set forth below are certain instances in which the Corps' action or inaction violated the APA.

49.      The Corps' failure to properly reauthorize and reissue NWP-12 constitutes agency "inaction" or "action" unlawfully withheld within the meaning of, and actionable under, the APA.

50.      The Corps' decision not to engage in programmatic consultation with U.S. Fish & Wildlife Service under Section 7 of the Endangered Species Act, likewise, constitutes agency action or inaction unlawfully withheld within the meaning of and actionable through the APA.

51.      The Corps' decision to issue Permit No. SWG-2018-00890 and its corresponding NWP-12 verification to JSSP on October 3, 2019, constitutes agency action or inaction unlawfully withheld within the meaning of an actionable through the APA.

52.      The decision of the Corps to issue Permit No. SWG-2018-00890 and its corresponding verification while utilizing the policy that all crossings of a single Water of the United States at a specific location constitutes its own single and complete linear project, thus allowing up to ½ acre of impact at each Water of the United States so crossed, constitutes agency action or inaction unlawfully withheld within the meaning of an actionable through the APA.

53.      The Corps' decision to issue Permit No. SWG-2018-00890 and its corresponding verification by determining impacts based on conversion of palustrine forested wetlands to lesser

wetlands, and thereby exceeding the 1/2-acre threshold for use of NWP-12 for the pipeline and for fourteen (14) single and complete water body crossings, constitutes agency action or inaction unlawfully withheld within the meaning of an actionable through the APA.

54.     The issuance of Permit No. SWG-2018-00890 and its corresponding verification constitutes final agency action and makes this action ripe because Plaintiff has exhausted administrative remedies.   *Sierra Club v. U.S. Army Corps of Engineers*, 446 F.3d 808, 816 (8th Cir. 2006).

55.     Section 702 of Title V of the United States Code provides:

> "an action in the Court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein denied on the ground that it is against the United States or that the United States is an indispensable party."

56.     Any personal suffering a legal wrong or adversely affected or aggrieved by agency action, such as that taken here, is entitled to judicial review of that agency action.  5 U.S.C. § 702.[34]

57.     The court can hold unlawful and set aside agency action, findings, and conclusions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."  5 U.S.C. § 706(2)(A).  As set forth more fully below, this Court, pursuant to the APA should set aside:

    a.  The 2017 reauthorization and re-issuance of NWP-12 as it applies to the JSSP project;

    b.  The decision of the Corps not to engage in Section 7 consultation with U.S. Fish & Wildlife Service prior to re-issuance or reauthorization of NWP-12, or any other nationwide permit and requiring such consultation prior to reissuance of any NWP-

---

[34] In addition, and with respect to agency inaction, 5 U.S.C. § 706(1) states:  ". . . a reviewing court shall . . . compare agency action unlawfully withheld . . . ."

12 Verification to JSSP;

c. The decision of the Corps to issue the Verification of JSSP Permit pursuant to an invalid NWP-12;

d. The decision by the Corps, contrary to 33 U.S.C. § 1344 and the Guidelines to allow the use of NWP-12 and the associated nationwide permit Verification as it applies to the JSSP project because the determination of impacts for the JSSP project was underestimated by treating each crossing of a single Water of the United States at a specific location as a single and complete linear project; and

e. The decision of the Corps, contrary to 33 U.S.C. § 1344 and the Guidelines to allow the use of Permit No. SWG-2018-00890 and associated nationwide permit verification even though the determination of impacts as it applies to the JSSP project used the conversion of palustrine forested wetlands to palustrine emergent wetlands.

f. The Corps' decision to issue its Verification allowing JSSP to permanently destroy more than 1/2 –acre of Waters of the United States at fourteen (14) different water bodies constitutes agency action and is actionable under the APA.

58.     Each of the above decisions was arbitrary, capricious, an abuse of discretion, and not in accordance with law.

### b.    The Corps' Decision to Not Engage in ESA Section 7 Consultation

59.     Because of its terms, the Supreme Court has recognized the ESA forecloses some of the traditional discretions possessed by an equity court. *Amaco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 543 n.9 (1987).  A "possibility" of irreparable harm cannot support an injunction. The Ninth Circuit, however, in *Cottonwood Environmental Law Center v. U.S. Forest Service*, 789 F.3d 1075, 1091 recognizes "establishing irreparable injury" under the ESA should not "be an onerous task" because of "the stated purposes of the ESA in conserving endangered and threaten species and the ecosystems that support them."  789 F.3d at 1091.  Here, Plaintiff will suffer a constitutionally cognizable injury by its loss of the opportunity to use and develop its property, as well as conserve wetlands.  *See, Ecosystem Inv. Partners v. Crosby Dredging, LLC*, 729 Fed. Appx. 287, 292 (5th Cir. 2018).

60.     One of the ESA's central purposes is to conserve threatened and endangered species.  *See* 16 U.S.C. § 1531(b) (a purpose of the ESA is to provide "a program for the conservation of . . . endangered species and threatened species").  The "plain intent" of Congress in enacting the ESA was to halt and reverse the trend toward species extinction whatever the cost.  To fulfill this important purpose under the ESA, the Corps is required to determine "at the earliest possible time" whether any action it takes" may affect "listed species and critical habitat."  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).  If the Corps' action "may affect" listed species or critical habitat, the Corps must consult with U.S. Fish & Wildlife.  16 U.S.C. § 1536(a)(2).

61.     To determine whether the Corps' "no affect" determination, and decision not to engage in programmatic consultation as a part of the reauthorization and re-issuance of NWP-12 is arbitrary and capricious, the court must look to whether the Corps "considered the relevant factors and articulated a rational connection between the facts found and the choice made."  *See Baltimore Gas & Electric Company v. National Resources Defense Counsel*, 462 U.S 87, 105 (1983).

62.     Here, the Corps' decision not to engage in programmatic consultation in connection with re-issuance of NWP-12 was arbitrary and capricious.  It is unquestioned that federal action subject to programmatic consultation include federal agency programs.  *See* 80 Fed. Reg. 26832, 26835 (May 11, 2015); 50 C.F.R. § 402.02.  The Corps' Nationwide Permit Program has specifically been listed as an example of the type of federal program that provides a national-scale framework and would be subject to programmatic consultation.  *See* 80 Fed. Reg. at 26835.

63.     The Montana court specifically concluded at p. 11 of its Opinion that there is "resounding evidence" the Corps' re-issuance of NWP-12 "may affect" listed species and their habitat.  In its Decision Document, the Corps, itself, acknowledges numerous risks associated with

discharges to be authorized by NWP-12.[35]   Among the impacts the Corps admits NWP-12 will

have are cumulative impacts to endangered and threatened species.  These impacts include habitat

destruction and degradation as the most common threat to endangered and threatened species for

85% of the imperial species analyzed.[36]  Among the leading causes of habitat degradation and loss

were mining and oil gas extraction; infrastructure development; and water development projects.[37]

64.     Among the specific wetlands/habitat impacts acknowledged by the Corps at the

time NWP-12 was reauthorized and re-issued in 2017, was that:

> "the construction of utility line rights-of-way through forested
> wetlands will often result in the conversion of forested wetlands to
> scrub-shrub emergent wetlands.  These conversions are usually
> permanent to maintain the utility line in good operational order."[38]

65.     Within the same paragraph, the Corps also admits:

> "forested wetlands will not be allowed to grow back and the utility
> line right-of-way so that the utility line will not be damaged and can
> be easily maintained.  Only shrub and herbaceous plants will be
> allowed to grow in the right-of-way."[39]

66.     General Condition 18 of NWP-12 prohibits its use for activities that are likely to

directly or indirectly jeopardize, threaten or endanger species under the ESA or destroy or

adversely modify designated critical habitat for such species.[40]

67.     These statements of the Corps, alone, belie JSSP's representation in its PCN that

its "conversion" of forested wetlands to scrub-shrub or emergent wetlands would only be

"temporary."

---

[35] Appendix at pp. 107-119 (Decision Document at pp. 43-55).
[36] Appendix at p. 118 (Decision Document at p. 54).
[37] Appendix at p. 118 (Decision Document at p. 54).
[38] Appendix at p. 121 (Decision Document at p. 57).
[39] Appendix at p. 121 (Decision Document at p. 57).
[40] Appendix at pp. 194-195 (2017 Nationwide Permits, General Conditions, District Engineer's Decision, Further Information, and Definitions pp. 42-43).

68.     At p. 63 of its Decision Document the Corps flatly states, "the terms, conditions, and provisions of the NWP were developed to insure that individual and cumulative adverse environmental effects are no more than minimal."[41]  These and other admissions demonstrate past versions of NWP-12 "have resulted in direct and indirect impacts to wetlands, streams, and other aquatic resources.[42]

69.     The Decision Document, likewise, acknowledges those activities [under NWP-12] may have legacy effects that cumulative effects and affect the quantity and quality of those resources and the functions they provide.  The Corps even acknowledged temporary filling, such as that to be engaged in by JSSP, may cause short-term or permanent partial losses of aquatic resource functions and services.  During construction of utility lines, inadvertent pollution and other impacts may be such that additional authorization under Department of Army permits may be necessary to remedy them.[43]

70.     Against this backdrop of admitted impacts to habitat and ecosystems, the ESA provides a low threshold for requiring Section 7(a)(2) Consultation:  an agency must initiate formal consultation for any activity that "may affect" listed species and critical habitat.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.  The Corps moreover acknowledges that NWP-12 "*will* result in a minor incremental contribution to the cumulative effects to wetlands, streams, and other aquatic resources in the United States."[44]

71.     As the Montana court concluded at page 13 of its decision, these types of discharges, when considered in connection with the number of times NWP-12 will be used during

---

[41] Appendix at p. 127 (Decision Document at p. 63).
[42] *See* Appendix at p. 109 (Decision Document at p. 45).
[43] Appendix at pp. 109-110 (Decision Document at pp. 45-46).
[44] Appendix at p. 116 (Decision Document at p. 52).

its 5-year term, it is clear NWP-12 authorizes discharges that "may affect" listed species and critical habitat.

72.     For these reasons, the Corps is required to engage in Section 7 Consultation at the programmatic level with Fish & Wildlife Service over the potential impacts to threatened and endangered species associated with it use.  Until such time as that consultation occurs, new construction of the JSSP project cannot be authorized, nor can it occur, under NWP-12. Consequently, the Corps must be enjoined from authorizing JSSP's construction under NWP-12; and JSSP must be enjoined from proceeding under verification SWG-2018-00890.

    c.     **The Corps Has Failed To Satisfy The Guidelines In Issuing And Verifying JSSP's Use of NWP-12**

73.     In overseeing the 404 permit process the Corps must also comply with Guidelines promulgated by the U.S.  Environmental Protection Agency (EPA), which are incorporated into the Corps' own regulations.  *Id.* § 1344(b)(1); 33 C.F.R. §§ 320.4(b)(4), 325.2(a)(6).  The objective of these "404(b)(1) Guidelines," set forth at 40 C.F.R. § 230, is to prevent unacceptable adverse impacts to the nation's aquatic ecosystems from the discharge of dredged or fill material.  40 C.F.R. § 230.1(c).

74.     Responsibility for the day-to-day administration of permitting falls to the Corps' district and division engineers.  33 C.F.R. 320.1(a)(2).

75.     The Guidelines provide no discharge of dredged or fill material shall be permitted under an individual permit: (1) if there is a practicable alternative to the proposed discharge; (2) if the discharge causes or contributes to violations of applicable state water quality standards; (3) if the discharge causes or contributes to significant degradation of the environment; and (4) unless all appropriate and practicable steps have been taken to minimize potential adverse impacts.  *Id.* § 230.10.   "Practicable alternatives" include "not discharging into the waters of the U.S. or

discharging into an alternative aquatic site with potentially less damaging consequences." *Id.* § 230.5(c); *see id.* § 230.10(a).   The Corps' regulations also require destruction of wetlands be avoided to the extent practicable.   33 C.F.R. § 320.4(b), (r).

76.     The Guidelines also address general permits such as NWP-12.   In addition to noting the Guidelines have been developed by the EPA and the Corps (40 C.F.R. § 230.2(a), they also establish that it must be demonstrated "a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probably impacts of other activities affecting the ecosystems of concern."   (40 C.F.R. § 230.1(c)).   And that the overriding principle of the Guidelines "should be that degradation or destruction of special sites [such as wetlands] may represent an irreversible loss of aquatic resources."   (40 C.F.R. § 230.1(d)).

77.     40 C.F.R. § 230.2(c) specifically states:

> "no modifications to the basic application, meaning, or intent to these Guidelines will be made without ruling making by the Administrator under the Administrative Procedure Act (5 U.S.C. § 551 *et. seq.*)."

78.     The Guidelines establish various evaluations that must be made in order to authorize a General Permit such as NWP-12 and those evaluations must "be performed at the time of General Permit issuance." (40 C.F.R. § .6(d)).   40 C.F.R. § 230.7(a) sets forth the conditions required to be met by the Corps to issue a general permit.   Among them are that pursuant to the evaluations to be performed by the Corps to issue NWPs, the Corps must demonstrate activities under the Permit "will have only minimal adverse effects" when performed separately, and "will have only minimal cumulative adverse effects on water quality in the aquatic environment."   (40 C.F.R. § 230.7(a)(2)(3)).

79.     Specific determinations, based on required evaluations in 40 C.F.R. § 230.11 must be made concerning physical sub-strata determinations, water circulation fluctuation and solidity,

suspended particulate/turbidity, contaminate determinations, and proposed disposal site determinations.

80.     The Corps' reauthorization and re-issuance of NWP-12 as applied to the JSSP Project including, in particular, its use of the "single and complete project" method of determining wetlands acreage impacts fails to satisfy the Guidelines.  In the same manner, classification of the destruction of forested wetlands as "converted" likewise prevents an impact analysis that satisfies the Guidelines.  In addition to failing to satisfy the requirements of 40 C.F.R. § 230, use of this method to calculate impacts to Waters of the U.S. is arbitrary, capricious and not in accordance with law.  The use of both the stream crossing calculation, and the "conversion" of methods calculation, together, for the JSSP Project results in more than the "minimal adverse environmental effects" and more than "minimal cumulative adverse effects on the environment."  These effects prohibit the use of NWP-12.

### d.     The Corps Illegally Verified NWP-12 for Use On the JSSP Project

81.     The second paragraph of the Galveston District's statement on its website concerning the use of the 2017 Nationwide Permits and regional conditions states:

> "an activity is authorized under a NWP only if that activity and the permitee satisfy all of the NWP's terms and conditions.  Activities that do not qualify for authorization under a NWP still may be authorized by an Individual Permit (IP) or a Regional General Permit (RGP)."[45]

The Galveston Corps failed to follow this standard and requirement when it verified JSSP's use of NWP-12.  Neither the activity nor the permittee (JSSP) satisfied all the NWP-12 terms and conditions for its use.  In the same manner, the Corps' dissection of the pipeline project into sub-

---

[45] Appendix at p. 199 (https://www.swg.usace.army.mil/Business-With-Us/Regulatory/Permits/Nationwide-General-Permits)

projects based on each water body crossed violates the Clean Water Act and NEPA.  In its PCN, JSSP admitted there would be fourteen (14) water bodies crossed where permanent impacts to wetlands would be greater than 1/2-acre at each "single and complete" project.[46]

> (1)    The Corps Use of its Definition for "Single and Complete Project" as
> Applied to the JSSP Project Violates the Clean Water Act and NEPA.

82.    NWP-12 also authorizes discharges into waters of the United States for the construction of related substation facilities, access roads, and overhead utility lines.  82 Fed. Reg. 2,007.

83.    Although NWP-12 is limited to utility projects with impacts of 1/2-acre of loss of U.S. waters for each "single and complete project," for linear projects the Corps defines that term as "that portion of the total linear project . . . that includes *all crossings of a single water of the United States (i.e., a single waterbody) at a specific location*."  *Id.* at 2,007 (emphasis added).  In other words, NWP-12 allows pipelines and other linear utility projects to use NWP-12 separately at each location where the project crosses a river, stream, or wetland.  By contrast, non-linear projects can invoke NWP-12 only once for the overall project, unless the separate components of the project would have "independent utility" (i.e., if the components could function as stand-alone projects).  *Id.* at 2,006.

84.    NWP-12 thus allows the Corps to treat numerous water crossings along a proposed linear utility project—which in larger pipeline projects can number in the hundreds-as separate "single and complete projects" that each qualify separately under the same NWP-12.  The wetlands impacts in the aggregate, and for the complete project are not considered in determining if impacts are great than 1/2-acre.

---

[46] Appendix at pp. 171-183 (FOIA 829-41).

85.     Despite the putative 1/2-acre limitation, there is no limit to the number of times a single linear utility project can use NWP-12, nor is there a maximum number of acres of water that a linear project can impact while still being authorized under NWP-12.  Because the Corps treats each crossing separately, it does not use the total amount of lost acreage attributable to a project to determine whether the half-acre threshold has been met.  Even though, throughout submissions made by JSSP, "the Project" is defined to be the construction and operation its pipelines (2), for purposes of NWP-12, each separate water crossing is defined to be its own project.  JSSP's obligation to obtain an individual permit is consumed by this definitional artifice.

86.     The Corps rationalizes this practice by claiming water crossings on a linear pipeline are usually at "separate and distant" locations and/or separate watersheds along a pipeline route such that cumulative effects are dissipated.  For example, the Final Decision states:

> We do not agree that the [½-acre] limit should apply to the entire utility line because the separate and distant crossings of waters of the United States are usually at separate waterbodies scattered along the length of the utility line, and are often in different watersheds . . . . For utility lines that cross the same waterbody (e.g., a river or stream) at separate and distant locations, the distance between those crossings will usually dissipate the direct and indirect adverse environmental effects so that the cumulative adverse environmental effects are no more than minimal.

*Id.* at 1,885.

The explanation for the Corps' action in the Final Decision makes no sense; it merely expresses the Corps' failure to satisfy 33 U.S.C. § 1344, and the Guidelines, as it relates to the JSSP Project.

87.     NWP-12 does not actually require multiple crossings along a linear project be "separate and distant" or in separate watersheds: it does not define the phrase "separate and distant" or impose any spacing requirements, and it does not require District Engineers to make a "separate and distant" finding. In fact, linear projects permitted by NWP-12, often have multiple water crossings within them.  Worse, there are no limits.  Multiple crossings would add up to tens or

hundreds of acres of impacts, and yet NWP-12 is still available as though no more than 1/2-acre will be affected. The Corps's terminology and characterization does not diminish the aggregate acreage of waters of the U.S. permanently impacted. It merely reclassifies the geographic area to permit the destruction to occur with greater ease and less compliance.  Indeed, because of the relative lack of oversight under NWP-12, the Corps cannot even calculate the total acres of Waters of the U.S. impacted by its use.  Here, using the single water body /single and complete project methodology, the admitted total permanent impacts to forested wetlands, alone (20.04 acres) are over 40 times as great as the 1/2-acre limit.

88.     The Corps further claims District Engineers, upon receipt of a PCN for an NWP-12 project, will conduct a project-level review to ensure all of its water crossings "will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment," as required by 33 U.S.C. § 1344(e)(1).  82 Fed. Reg. at 1,870; *see also id.* at 1,885 ("If the District Engineer determines after reviewing the PCN that the cumulative adverse environmental effects are more than minimal . . . he or she will exercise discretionary authority and require an individual permit.").[47]  Environmental impacts greater than 1/2-acre are by definition "more than minimal."

89.     However, NWP-12 requires a permittee to submit a PCN *only if* the proposed project meets certain criteria.  *See, e.g.*, *id*. at 1,985-86, 1,998-2,008.[48]  If none of these criteria is met, a project proponent may commence with the activity under NWP-12 without notifying the Corps or the public at all.

90.     In fact, although JSSP submitted a PCN here, many project applicants proceed

---

[47] Appendix at p. 155.
[48] Appendix at pp. 158-159, 160-170.

under NWP-12 without ever submitting a PCN or notifying the Corps, and thus the Corps District Engineers lack the opportunity to keep track of all projects (and all uses of Waters of the U.S. impacted) to determine cumulative impacts or to evaluate the environmental effects of those projects in any way.

91.     The Corps' definition, moreover, is contrary to, and in conflict with, the Clean Water Act's purpose of protecting the integrity of Waters of the United States, as well as the entire framework for NEPA, which requires analysis of impacts based on "major federal action" and its scope and definition. 40 C.F.R 1508.18(a), (b), 1508.25.

(2)     The JSSP Project's Impact of Greater than 1/2-acre at Fourteen (14) Water Body Crossing makes NWP-12 Unavailable to JSSP.

92.     When an applicant does submit a PCN, the PCN must include a listing of not only the water crossings that triggered the PCN requirement, but also all water crossings along the project.  82 Fed. Reg.. at 1,986 (Note 8) (stating that the PCN must include "other separate and distant crossings that require Department of the Army authorization but do not require pre-construction notification" (emphasis added)).[49]   The District Engineer must then "evaluate the PCN in accordance with Section D, 'District Engineer's Decision,'" and "may require mitigation to ensure the authorized activity results in no more than minimal individual and cumulative adverse environmental effects."  *Id.*  In turn, Section D, "District Engineer's Decision," states "the District Engineer will determine whether the activity authorized by the NWP will result in more than minimal individual or cumulative adverse environmental effects or may be contrary to the public interest."  *Id*. at 2,004.[50]  "For a linear project, this determination will include an evaluation of the

---

[49] Appendix at p. 159.
[50] Appendix at p. 166.

individual crossings of waters of the United States to determine whether they individually satisfy the terms and conditions of the NWP(s), as well as the cumulative effects caused by all of the crossings authorized by NWP."[51]  *Id.* at 2,004- 05 (emphasis added).[52]  Any legitimate review of the PCN by the District Engineer would have required JSSP to obtain an individual permit.

93.     Here, even using the water crossing identified JSSP still fails to satisfy the 1/2-acre loss limit required by NWP-12 at fourteen (14) different water crossings.

94.     Section 1.0 of NWP-12 makes clear it may be used only when "the activity does not result in the loss of greater than 1/2-acre of Waters of the United States for each single and complete project."[53]  As a result of the reauthorization of NWP-12 the Corps concluded:

> "We are retaining the 1/2-acre limit for this NWP because we believe it is an appropriate limit . . . ."[54]

The Corps added on the same page:  "The 1/2-acre limit cannot be waived."[55]

95.     In its PCN at Section 3.4.1[56] in its chart entitled "Temporary Impacts to Wetlands," JSSP misrepresents the permanent destruction of 20.04 acres of Forested Wetlands as "Temporary."  This misrepresentation, embraced by the Corps, is wrong for one important reason: the impacts are not temporary.

---

[51] The same section provides additional detail about what that analysis should look like:  "When making minimal adverse environmental effects determinations the District Engineer will consider the direct and indirect effects caused by the NWP activity.  He or she will also consider the cumulative adverse environmental effects caused by activities authorized by NWP and whether those cumulative adverse environmental effects are no more than minimal.  The District Engineer will also consider site specific factors, such as the environmental setting in the vicinity of the NWP activity, the type of resource that will be affected by the NWP activity, the functions provided by the aquatic resources that will be affected by the NWP activity, the degree or magnitude to which the aquatic resources perform those functions, the extent that aquatic resource functions will be lost as a result of the NWP activity (*e.g.*, partial or complete loss), the duration of the adverse effects (temporary or permanent), the importance of the aquatic resource functions to the region (*e.g.*, watershed or ecoregion), and mitigation required by the District Engineer."  *Id.* at 2005.
[52] Appendix at pp. 166-167.
[53] Appendix at p. 65 (Decision Document p. 1).
[54] Appendix at p. 75 (Decision Document p. 11).
[55] Appendix at p. 75 (Decision Document p. 11).
[56] Appendix at p. 171 (FOIA 829).

96.     JSSP, in its PCN, admits the impact and duration of the destruction to thirteen (13) forested wetlands as "permanent" at the acreage impacts set forth below.  Each results in a loss of greater than 1/2-acre.[57]  They include:

>     Wetland 201-7.343 acres, Forested; (on Optimus Property);
>     Wetland 221-0.886 acre, Forested;
>     Wetland 225-0.572 acre, Forested;
>     Wetland 233-0.508 acre, Forested;
>     Wetland 23400.643 acre, Forested;
>     Wetland 235-0.725 acre, Forested;
>     Wetland 240-2.85 acres, Forested;
>     Wetland 245-0.902 acre, Forested;
>     Wetland 248-0.915 acre, Forested;
>     Wetland 250-1.096 acres, Forested;
>     Wetland 253-0.620 acre, Forested;
>     Wetland 290-0.533 acre, Forested;
>     Wetland 401-1.537 acres, Forested.

97.     JSSP identified one scrub-shrub wetland, Number 294a as having permanent impacts of 0.505 acre.[58]

98.     The Corps makes clear a party, like JSSP, that exceeds the 1/2-acre limit must obtain an individual permit.  The applicable language reads:

99.     "If one or more crossings of Waters of the United States for a proposed utility line do not qualify for authorization by NWP, then the utility line would require an individual permit because of 33 C.F.R. 330.6(d)."[59]

100.    The Corps action in verifying Nationwide Permit SWG-2018-00890 with respect to the JSSP Project was arbitrary and capricious, not in accordance with law, in violation of the APA, the CWA, and NEPA.

---

[57] Appendix at pp. 181-183 (FOIA 839-41).
[58] Appendix at pp. 181-183 (FOIA 839-41).
[59] Appendix at p. 80 (Decision Document p. 16).

## 2.      JSSP

101.     It is also likely Plaintiff will succeed on the merits of its Clean Water Act claims to restrain JSSP from construction of the JSSP pipeline in Waters of the United States and on Optimus property.  Because NWP-12 was not properly reauthorized and re-issued as to the JSSP Project, it is unavailable for use in connection with new construction by JSSP.  Even the Corps's verified use of NWP-12 by JSSP in connection with Permit No. SWG-2018-00890, an invalid permit, cannot form the basis for discharges into Waters of the U.S.  Consequently, NWP-12 is unavailable for use by JSSP and the discharges that are part of the JSSP pipeline's construction are unauthorized.

102.     Plaintiff is also likely to succeed on the merits of its claim that NWP-12 is unavailable to JSSP because the JSSP pipeline project will permanently destroy more than 1/2-acre of Waters of the United States.  In fact, the 1/2-acre limitation is violated on the face of the Permit when it authorizes the permanent conversion of 20.04 acres of forested wetlands to emergent wetlands.  The conversion of one type of wetlands to another necessarily involves the destruction of the wetlands being "converted."  20.04 acres is more than forty times the 1/2-acre limitation contained in NWP-12. Even though the chart in the PCN at Section 3.4.1 clarifies JSSP's impacts as "temporary"[60], the PCN analysis classifies each of the impacts to forested wetlands as permanent."[61]

103.     Moreover, twice within NWP-12 JSSP's and the Corps' "conversion" is forbidden. First, in Section 23(g) of NWP-12 the section on Compensatory mitigation states:  (g) ". . . for example, if an NWP-12 has an acreage limit 1/2-acre, it cannot be used to authorize any NWP activity resulting in the loss greater than 1/2-acre of Waters of the United States, even if

---

[60] Appendix at p. 171 (FOIA 829).
[61] Appendix at pp. 179-183 (FOIA 837-41).

compensatory mitigation is provided that replaces or restores some of the lost waters."[62]

104.    The term "compensatory mitigation" is defined as follows:

"the restoration (re-establishment or rehabilitation), establishment (creation), enhancement, and/or in certain circumstances preservation of aquatic resources for the purposes of offsetting unavoidable adverse impacts which remain after all appropriate and practicable avoidance and minimization have been achieved."[63]

105.    Loss of Waters of the United States is defined, and includes the following language:

"the acreage of Loss of Waters of the U.S. is a threshold measurement of the impact to jurisdictional waters for determining whether a project may qualify for an NWP; it is not a net threshold that is calculated after considering compensatory mitigation that may be used to offset losses of aquatic functions and services."[64]

106.    It cannot be contested the "conversion" of one kind of wetland to another does not result in the destruction of the wetland being converted.  JSSP's Permit relies on actually what the Permit prohibits in order to putatively fall within the 1/2-acre limitation.

107.    NWP-12 is not available to JSSP here for three (3) other reasons:

(a) The Verification requires JSSP to obtain from the Corps a Real Estate approval, known as an outgrant, of the impacts potentially caused by JSSP's project to properties in which the Corps has an interest.  The Verification states:

"If the requested project is approved, a signed outgrant by the Chief of Real Estate will be issued.  The executed outgrant is required before this project can begin."[65]

The Response to Plaintiff's FOIA did not include a signed outgrant from the Corps' Chief of Real Estate.  Consequently, JSSP's project cannot yet begin;

---

[62] Appendix at p. 196 (2017 Nationwide Permits, General Conditions, District Engineer's Decision, Further Information, and Definitions at page 48).
[63] Appendix at p. 197 (2017 Nationwide Permits, General Conditions, District Engineer's Decision, Further Information, and Definitions at page 56).
[64] Appendix at p. 198 (2017 Nationwide Permits, General Conditions, District Engineer's Decision, Further Information, and Definitions at page 58).
[65] Appendix at p. 188 (FOIA 1705).

(b) NWP-12 may not be used for discharges into "tidal waters or in non-tidal waters adjacent to tidal waters."[66]   JSSP's PCN includes a submission concerning whether the activity offsets coastal, tidal or navigable waters.  JSSP stated "Yes," the project would offset such waters, and explained the waters involved:  "Neches  River and tidally influenced wetlands associated with the river system."[67]   JSSP also admitted the Natural Resource Area that may be affected include, "Coastal Wetlands" and "Waters Under Tidal Influence."[68]  The same submission also addresses how JSSP will respond to "tidally influenced wetlands" that are impacted.

(c) JSSP was required to provide a final "Drill Frac-Out and Contingency Plan" to use NWP-12.  It never provided a final plan, only a draft, to be "revised and finalized upon bid and award of construction contract."  The FOIA Response did not include the final Drill Frac-Out and Contingency Plan for HDD requirement.

108.    Because the Verification of the JSSP Permit authorizes permanent loss of Waters of the U.S. exceeding 1/2-acre, NWP-12 is not available for the Project.

109.    Plaintiff will not repeat the analysis demonstrating the Corps definition of "single and complete project" violates the Clean Water Act and NEPA, and that JSSP's pipeline does not qualify for NWP-12 because of its greater than 1/2-acre permanent impacts to fourteen (14) "single and complete projects" each.  To prevent unnecessary duplication, Plaintiff respectfully refers the Court to Section IVB1 immediately, *supra*.

110.    Plaintiff has a strong likelihood of success that the Corps' has violated the APA and the Clean Water Act and that JSSP's use of NWP-12 does not provide a basis for discharges into the Waters of the U.S., and that construction on Optimus Property under it should be enjoined.

## C.    Plaintiff, The Environment and the Public Are At Serious and Immediate Risk of Irreparable Harm

111.    As set forth above and in the supporting affidavit of Ms. Terri Finn, JSSP has

---

[66] Appendix at p. 133 (Decision Document p. 69).
[67] Appendix at p. 184 (FOIA 891).
[68] Appendix at p. 185 (FOIA 892).

initiated condemnation proceedings against Optimus in an effort to secure and condemn the right-of-way for the JSSP pipeline based on JSSP's Permit.  Should JSSP be allowed to commence construction of the JSSP pipeline without first obtaining a valid, individual permit, and performing the investigations and other activities required under NEPA, the CWA, and ESA, Plaintiff will be irreparably harmed by the taking of a portion of its property for use as a Corps permitted pipeline.

112.    Plaintiff must demonstrate "that [it] is likely to suffer irreparable harm in the absence of preliminary relief."  *Software Dev. Techs. V. TriZetto Corp.*, 590 F.App'x 342, 344 (5th Cir 2014) (*citing Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  In this case the injury is not only likely, it is underway.  JSSP has begun the condemnation process and is ready to enter onto Plaintiff's property to begin clearing for and construction of the pipeline.[69]

113.    The impacts of this threat of clearing and construction constitute irreparable harm and support a preliminary injunction.  *See U.S. v. Marine shale Processors*, 81 F.3d 1329, 1360 (5th Cir. 1996) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable.  If such injury is sufficient likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.") (*quoting Amoco Prod. Co. v. Vill. Of Gambell*, 480 U.S. 531, 545 (1987); S*ee also Sierra Club v. Peterson*, 185 F.3d 349, 374 (5th Cir. 2000), *vacated on other grounds* 228 F.3d 559 (5th Cir. 2000) (granting preliminary injunction to stop Forest Service even-aged timber management practices threatening the environment).

114.    A "procedural injury" arising from a NEPA violation, coupled with concrete injury

---

[69] At a Special Commissioners Hearing on August 12, 2020, the Commissioners awarded Optimus $17,200,000.00 as just compensation.  Once JSSP deposits that amount, it is authorized under Section 21.021 of the Texas Property Code to take Plaintiff's Property.

to aesthetic, environmental, property, or other protected interests, is sufficient to demonstrate irreparable harm.  *Fund for Animals v. Norton*, 281 F.Supp.2d 209, 222 (D.D.C. 2003); *Fund for Animals v. Clark*, 27 F.Supp.2d 8, 14 (D.D.C. 1998); and *See Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989) (Breyer, J.) ("[W]hen a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered.").  "[T]he 'risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation' by the acting federal agency."  *Catron Cty. Bd. Of Commissioners v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1433 (10th Cir. 1996) (quoting *Marsh*, 872 F.2d at 504); *See also Found. On Econ. Trends v. Heckler*, 756 F.2d 143, 157 (D.C Cir. 1985) ("the lack of an adequate environmental consideration looms as a serious, immediate, and irreparable injury").

115.    The harm from the Corps's NEPA violation in this case is real.  Plaintiff's procedural rights will be forever lost should Defendants not be enjoined.  And here, those procedural rights are greater than in most environmental cases because the statutes, regulations and procedures authorizing discharges into Waters of the United States not only result in authorizing that activity, but also are an essential legal component to the condemnation being brought by JSSP, and by which, Plaintiff's property will be taken.  In this regard, Plaintiff is at serious risk that its constitutional rights will be violated by both JSSP and the Corps when Plaintiff's property is taken without following proper procedures.  The end result, moreover, that Plaintiff's property will be taken at the end of the condemnation process, presents a harm in addition to the loss of its procedural rights.  An unconstitutional taking of property includes not only a violation of procedural due process, but also, the unconstitutional, physical taking of Plaintiff's property.  The Corps' failure to satisfy its NEPA, CWA, and ESA obligations with

respect to the JSSP Project directly exposes Plaintiff to these irreparably harms.

116.    In the same manner, Waters of the United States will be destroyed without proper authorization and Plaintiff's recreational and other NEPA interests will be harmed by JSSP continuing under an invalid permit.  Not only would Optimus's property be taken, but its ability to use Waters of the United States for recreational and other NEPA purposes will be harmed.  In addition, threatened and endangered species and their habitat may be harmed by the failure of the Army Corps to engage in programmatic consultation prior to reauthorization and re-issuance of NWP-12 as applied to the JSSP Project.  The fact that the Corps actions, including the failure to consult at the programmatic level, and the issuance of NWP-12 to JSSP, "may affect" endangered species or their habitat also gives rise to a likely harm to Plaintiff.

**D.     Plaintiff Prevails on a Balancing of Harms Analysis**

117.    The actions of the Corps that are arbitrary, capricious, and not in accordance with law, stem from their own conduct and are proved by their own admissions.  They include obligations required by statute, regulation and guidance. They include requirements contained on the face of the Corps' own NWP-12.  The Corps' has not satisfied its mandatory duties; Plaintiff has no such duties.  To the extent Plaintiff's conduct is alleged to cause any harm to Defendants, Plaintiff denies it and points to a complete absence of such proof.  To the extent JSSP and the Corps complain they are harmed by being required to follow laws and regulations – such harm is self-inflicted.  Violation of law in connection with Federal Action can always support injunctive relief.  Plaintiff should prevail in any objective balancing of harms to the parties in this action.

118.    The balance of harms in favor of Plaintiff is appropriate for several reasons:

• It maintains the integrity of the APA, NEPA, CWA and ESA processes by requiring the Defendants to comply with applicable laws, regulations, and guidelines.

---

- The relief sought, specifically requiring JSSP to obtain an Individual Clean Water Act Permit, is in the public's interest.  Unlike a NWP-12, the individual permit remains valid, and it requires enhanced agency review, public notice, and the ability of the public to comment.

- Only injunctive relief, and not money damages or any other relief at law, will remedy the Army Corps' APA violations.

- Plaintiff is entitled to injunctive relief because if JSSP and the Corps are not required, at this time, to perform the statutorily mandated investigations and reviews and obtain, in the case of JSSP, the appropriate Corps permit, approvals and consents, Plaintiff loses forever the procedural rights it is  assured under APA, NEPA, the CWA, and the ESA.

- If Defendants are not required to follow APA, NEPA, CWA and ESA, Defendants will be forever relieved of those obligations and responsibilities – all contrary to law imposed on Defendants, and commitments and obligations independently assumed by Defendants.

- Neither amounts or efforts previously expended or to be expended, by JSSP or the Corps in constructing the project illegally, nor delay penalties or damages that may be incurred, balance the harm in favor of Defendants.  Any funds spent prior to fulfilling APA, NEPA, CWA, and ESA obligations were spent in noncompliance and should be given little weight.  Those funds to be expended in the payment of delay penalties or damages would not have been incurred had JSSP and the Corps completed legally required consultations assessments and investigations prior to commencing construction.  JSSP's harm, if any, is self-inflicted.

- The ultimate outcome of the Corps's invalid reauthorization, re-issuance, and verification of JSSP's Permit, as well as JSSP's illegal use of JSSP's Permit, results ultimately in the taking of Plaintiff's property without the process that is due under the Fifth Amendment.

119.     Where, as here, a plaintiff has shown environmental injury is "sufficiently likely," the Supreme Court has held, "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. Of Gambell*, 480 U.S. 531, 545 (1987); *See also League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (irreparable environmental injuries outweigh temporary economic harms); *Indigenous Envtl. Network v. State Dep't*, 369 F.Supp.3d 1045, 1051-52 (D. Mont. 2018) (concluding potential environmental damage to the public outweighed any energy security and

economic benefits provided by Keystone XL pipeline).  Applying that principle here, it is clear the irreparable harm to the environment, Plaintiff, and the public outweigh any temporary harm that a preliminary injunction may cause the Corps, or JSSP.

120.    JSSP and the Corps will undoubtedly contend the delays associated with the invalidation of JSSP's use of NWP-12 for the JSSP Project, and attendant delays in time and costs, should be balanced against the Corps's and JSSP's failures to follow the law.

121.    In fact, "monetary injury is not normally considered irreparable" absent the threat of being driven out of business.  *hiQ Labs, Inc. v. Linked In Corp.*, 938 F.3d 985, 993 (9th Cir. 2019); *See also American Hospital Association v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) ("injury resulting from attempting compliance with government regulations ordinarily is not irreparable harm.").  Put another way, JSSP has no inherent right to maximize its revenues by using cheaper, quicker permitting processes when the preferred processes do not comply with the ESA or other required laws.  *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (irreparable and environmental injury outweigh temporary economy harms).

122.    Plaintiff would suffer substantial, irreparable harm if the court would allow JSSP to use an invalid NWP-12 for construction.  The fact that the Corps predicts 57,500 uses of NWP-12 during its term compounds any individual harm and confirms cumulative impacts of NWP-12 use may affect endangered species.

123.    Neither costs, timing delays, nor resources to be employed by the Corps' required consultation under the ESA outweigh the harm suffered because of the Corps' failure to so engage. In fact, the equities and public interest factors always tip in favor of the protected species "when evaluating a request for injunctive relief to remedy an ESA procedural violation."  *Cottonwood*

*Environmental Loss Center*, 789 F.3d at 1091.

124. The public interest further weighs in favor of this court issuing injunctive relief.  As the Montana court notes at p. 36 of its Order amending summary judgment of May 11, 2020:

> no public interests exist in allowing the construction of new oil and gas pipelines to proceed before the Corps has completed the legally required programmatic consultation under Section 7 of the ESA.

125. This programmatic consultation allows for a broad-scale examination of NWP-12's potential impacts and safeguards against the "piecemeal destruction" of listed species and critical habitats at risk based on the Corps project only analysis.

126. The public's interest is best served in ensuring the Corps and its applicants for permits such as JSSP, comply with all environmental laws and regulations associated with their actions.

127. As a different Montana court put it, in *Montana Wilderness Association v. Fry*, 408 F.Supp.2d 1032, 1038 (D. Mont. 2006), "the most basic premises of Congress' environmental laws is that the public interest is best served when the law is followed."

128. Meanwhile, there would be no injury to the Corps from an injunction, and any injury to the JSSP would be purely economic and temporary.  As noted, economic harm is not irreparable and does not provide an adequate basis for denying injunctive relief.  *See e.g., Sampson v. Murray*, 415 U.S. 61, 90 (1974) (potential monetary injury is not irreparable).  Moreover, courts have consistently held the "loss of anticipated revenues . . . does not outweigh irreparable damage to the environment."  *Nat'l Parks Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001); *See also League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d at 766 (irreparable environmental injuries outweigh temporary economic harms).

129. That the project might be delayed if the Corps is required to conduct a NEPA

analysis is no injury to JSSP.  *See Alaska Center for the Environment v. West*, 31 F.Supp.2d 711, 723 (D. Alaska 1998) (noting longer permit processing time was "not of consequence sufficient to outweigh irreversible harm to the environment"); *See Wild Earth Guardinas v. Zinke*, 368 F.Supp.3d 41, 84 n.35 (D.D.C. 2019) (citation omitted) ("the risk of economic harm from procedural delay and industrial inconvenience 'is the nature of doing business, especially in an area fraught with bureaucracy and litigation'").  Similarly, the Fifth Circuit has recognized that, where a plaintiff has demonstrated a clear violation of NEPA, the "remedy should be shaped so as to fulfill the objective of the statute as closely as possible," and preliminary injunction is often appropriate to protect the public interest, even if the project has already commenced.  *Envtl. Def. Fund v. Marsh*, 651 F.2d at 1005 (enjoining a federal highway project where the Corps refused to prepare an adequate NEPA analysis addressing "significant environmental impacts," even though the project was "55% complete").

130.    In any event, Optimus's requested injunctive relief would *not* actually require JSSP to cease all construction activities.  Instead, Optimus requests only that the Court stay the Corps' of Engineers' Clean Water Act NWP-12 verifications and enjoin any activity on Optimus Property, or in the water crossings resulting in illegal discharges under section 404 of the CWA which impact Optimus's Property.  This limited injunction would require the Corps under the individual permit process to fully evaluate, and invite public comment on, the direct and cumulative environmental risks and impacts of its decision.  In the meantime, JSSP Pipeline is free to continue construction in the areas *outside* of Optimus Property and Waters of the United states.

131.    Any potential harm to the pipeline owner is self-inflicted because it chose to proceed knowing its project could not qualify for use of NWP-12, and that the Corps failed to conduct the environmental and formal public review process required under NEPA.  *See Davis v.*

*Mineta*, 302 F.3d 1104, 116 (10th Cir. 2002); *See also Swan View Coal v. Weber*, 52 F.Supp.3d 1160, 1161-62 (D. Mont. 2014) (any alleged harm "resulted from [the agency's] failure to follow the law in the first instance").

132.    JSSP cannot now claim a preliminary injunction to complete the environmental and public review process would impose irreparable harm.  *See, e.g., Long v. Robinson*, 432 F.2d 977, 981 (4th Cir. 1970) (finding it "elementary that a party may not claim equity in his own defaults"); *Fund for Animals v. Norton*, 294 F.Supp.2d 92, 116-117 (D.D.C. 2003) (refusing to grant equitable relief where party's actions were "disingenuous at best," and finding that "any economic or emotional harm . . . falls squarely on the defendants' shoulders").

133.    Additionally, "there is no reason to believe that the delay in construction activities caused by the court's injunction will reduce significantly any future economic benefit that may result from the [project's] operation."  *See Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1101 (9th Cir. 2006), *rev'd on other grounds*, 129 S. Ct. 2458 (2009). Moreover, any harm to JSSP from delaying the project sufficiently to ensure compliance with the law is temporary at best.  Granting limited preliminary injunctive relief here would only serve to preserve the *status quo* until JSSP obtains a proper permit and the Corps completes the public review process, and evaluates the direct, indirect and cumulative environmental impacts of allowing JSSP's dredge and fill activities.

**E.    Injunctive Relief Is In The Public Interest**

134.    Injunctive relief is, likewise, warranted to preserve the integrity of the APA, NEPA, CWA and ESA processes.  More than that, injunctive relief sends the message that no party, including governmental agencies, may benefit from agency action not in compliance with law. Here, unlike many NEPA cases, injunctive relief is important because the Corps not only has failed

to comply with laws and regulations imposed upon it, but has also failed to comply with the terms of the NWP-12 invalidly issued by it as applied to the JSSP Project.  The public has a great interest in governments following the law and keeping their commitments.

135.     The public's interest in compliance with environmental laws extends beyond the APA, NEPA, the CWA and the ESA.  For almost 40 years, federal, state and local governments have reflected the public's interest and desire to legislate and enforce environmental laws and regulations, especially those addressing preservation of the nation's waterbodies, and protection of endangered species.  The public's interest in harms to the JSSP Pipeline Project is *de minimis* when compared with the public's interest in a comprehensive, legal and regulatory framework regulating adverse environmental impacts.  Lastly, it is difficult if not impossible to believe the public's interest is benefited in anyway by the under analyzed, misguided decision to authorize the use of a permit allowing for the destruction of over 40-times the amount of wetlands allowed – under the very permit being used.

136.     The public interest analysis also favors issuance of a preliminary injunction staying the Corps' Clean Water Act verifications for the JSSP pipeline, and enjoining any entry onto Plaintiff's Property as well as any ground disturbance in and around the 14 separate stream crossings that have permanent impacts greater than 1/2-acre each.  Until the NEPA process is complete, and an individual CWA Permit obtained for several reasons.

137.     As noted above, the public has an "undeniable interest" in ensuring that public officials comply with the law.  *Colorado Wild v. U.S. Forest Serv.*, 523 F.Supp.2d 1213, 1223 (D. Colo. 2007); S*ee also Seattle Audubon Society v. Evans*, 771 F.Supp. 1081, 1096 (W.I.). Wash. 1991), *aff'd*, 952 F.2d 297 (9th Cir. 1991) ("[t]this invokes a public interest of the highest order: the interest in having government officials act in accordance with the law."); *Mont. Wilderness*

*Ass'n v. Fry*, 408 F.Supp.2d 1032, 1038 (D. Mont. 2006) (The "most basic premise of Congress' environmental laws" is that "the public interest is best served when the law is followed."); *Fund for Animals, Inc. v. Espy*, 814 F.Supp. 142, 152 (D.D.C. 1993) (the public interest is in "meticulous compliance with the law by public officials"); *Fund for Animals, Inc. v. Norton*, 281 F.Supp.2d at 237 (finding a public interest in "compliance with NEPA").

138.    Second, and relatedly, courts have recognized congressional intent and statute's purposes are indicative of the public's interest. *See Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 624 (5th Cir. 1985) (affirming a preliminary injunction under the Utility Reform Act, in part, because the Act "announces the strong public interest involved in the determination" of the legality and fairness of utility rates before passing costs on to consumers). Like the Utility Reform Act in Mississippi Power cited above, NEPA reflects an unambiguous mandate that federal agencies "document the potential environmental impacts of significant decisions *before* they are made, thereby ensuring that environmental issues are considered by the agency and that important information is made available to the larger audience that may help to make the decision or will be affected by it." *Wilderness Watch v. Mainella*, 375 F.3d 1085, 1094 (11th Cir. 2004) (emphasis added).  To that end, "Congress has presumptively determined that the failure to comply with NEPA has detrimental consequences for the environment," and by extension, the public interest. *Davis v. Mineta*, 302 F.3d at 1116, *abrogated on other grounds, Dine Citizens Against Ruining Our Environment v. Jewell*, 839 F.3d 1276 (10th Cir. 2016).

139.    "There is no question that the public has an interest in having Congress' mandates in NEPA carried out accurately and completely." *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F.Supp.2d 1, 26 (D.D.C. 2009) (holding that the public has an interest in ensuring that agency action "does not give way to unintended environmental consequences that have not

(but should have) been evaluated by Defendants," and granting a preliminary injunction); *See also Fund for Animals*, 27 F.Supp.2d at 16 ("the public interest expressed by Congress[] was frustrated by the federal defendants not complying with NEPA.  Therefore, the public interest would be served by having the federal defendants address the public's expressed environmental concerns, as encompassed by NEPA, by complying with NEPA's requirements.").

140.    Third, to give meaning and effect to the public's interest in fully informed decision-making as mandated by NEPA, an injunction is warranted "so that the momentum of additional work and investment does not serve further to bind the agency to its decision."  *Realty Income Trust v. Eckerd*, 564 F.2d 447, 457 (D.C. Cir. 1977).  Although the court cannot turn back time, courts have recognized that fashioning a remedy that restores that choice as much as possible is necessary and appropriate.  *Mont. Wilderness Ass'n v. Fry*, 210 F.Supp.2d 1127, 1156-57 (D. Mont. 2004).  An injunction here would give continuing effect to NEPA's requirement that the Corps conducts a full and complete analysis before completing the project, and before alternatives, *"including the option of taking 'no action,'"* are completely foreclosed.  *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 780 (10th Cir. 2006) (quoting 42 U.S.C. § 4332(2)(C)(emphasis added)); *See also Pennaco Energy Inc. v. U.S. Dept. of Interior*, 377 F.3d 1147, 1159 (10th Cir. 2004) ("Agencies are required to satisfy the NEPA 'before committing themselves irretrievably to a given course of action, so that the action can be shaped to account for environmental values.'").

141.    Likewise, obvious violation of the CWA as reflected by verification of JSSP's use of NWP-12 cannot be endorsed.

142.    Accordingly, the public interest weighs in favor of staying the Corps' Clean Water Act verification for the JSSP Pipeline.  *See Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 326-27

(D.C. Cir. 1987) (affirming district court's finding that an injunction was in the public interest to "protect against further illegal action pending resolution of the merits" and "protect[] the environment from any threat of permanent damage"); *See also, Fund for Animals v. Clark*, 27 F.Supp.2d at 15 (granting a preliminary injunction, in part, because the public's interest would be "served by having the federal defendants address the public's expressed environmental concerns, as encompassed by NEPA."). Finally, the public has a strong interest in "prevent[ing] the judicial process from being rendered futile by defendant's action or refusal to act." *Canal Authority of Fla. State*, 489 F.2d at 573 (citing Wright & Miller, Federal Practice and Procedure: Civil § 2947). Where, as here, a "meaningful decision on the merits would be impossible without an injunction, the district court may maintain the status quo and issue a preliminary injunction to protect a remedy, including a damages remedy." *Janey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) (*quoting Productos Carnic, S.A. v. Cent. Amer. Beef & Seafood Trading Co.*, 621 F.2d 683, 686-87 (5th Cir. 1980)).

143.    Pursuant to Federal Rule of Civil Procedure 65(c), Plaintiff is prepared to post a security bond in an appropriate amount. In cases where, such as here, plaintiffs seek injunctive relief pursuant to NEPA and the CWA, it is common for Courts to impose smaller or nominal bonds in light of the important public interest in the enforcement of NEPA and other environmental laws. A reduced or small bond is warranted here because the injunction sought would not prevent construction of those portions of the project outside of Waters of the United States. A reduced bond is especially justified here because all this Application and Motion seeks to do is require the Corps to follow the law applicable to it, its own requirements for environmental review, the terms of its published permit, and not take Plaintiff's land without due process. Any harm to the Corps

or JSSP in having to correct their mistakes and abide by the law is self-inflicted.[70]

WHEREFORE, Plaintiff Optimus respectfully requests this Court grant:

(1)     Plaintiff's request to vacate the Nationwide Permit previously reauthorized and re-issued by the Corps in 2017 as it relates to the JSSP project only;

(2)     Plaintiff's request to vacate the JSSP Permit because NWP-12 is invalid, and if valid, JSSP fails to satisfy the terms;

(3)     a Temporary Restraining Order and Preliminary Injunction pursuant to the APA—or, in the alternative, All Writs Act, or this Court's inherent powers, preventing the Corps from furthering any action fostering the JSSP Permit;

(4)     a temporary restraining order and preliminary injunction pursuant to the APA—or, in the alternative, All Writs Act, or this Court's inherent powers, compelling the Corps engage in Section 7 Consultation under the ESA prior to using NWP-12 to authorize any activity related to the JSSP Project;

(5)     a temporary restraining order and preliminary injunction pursuant to the APA—or, in the alternative, All Writs Act, or this Court's inherent powers, compelling the Corps to perform an EIS prior to reauthorization and re-issuance of NWP-12 for any activity related to the JSSP Project;

(6)     a temporary restraining order and preliminary injunction pursuant to the APA, All Writs Act, or this Court's inherent powers, forbidding and prohibiting JSSP from engaging in any construction in Waters of the United States or on Optimus Property using SW6-198-00890 as its authority without first submitting to proper individual permit procedures under the CWA or using a newly authorized NWP-12 in accordance with law; and

(7)     such other and further relief, at law or in equity, to which Plaintiff may show itself justly entitled.

---

[70] Plaintiff requests the Court waive the bond requirement or impose a nominal bond under the public interest exception to Fed. R. Civ. P. 65(c).  *See e.g. Kansas v. Adams*, 705 F.2d 1267, 1269 (10th Cir. 1983); *Colo. Wild v. U.S. Forest Serv.*, 299 F.Supp.2d 1184, 1191 n.32 (D. Colo. 2004).  Courts have long declined to impose anything more than a minimal bond in order to avoid frustrating "public-interest" litigation.  *See California ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325-25 (9th Cir. 1985); *Natural Resources Defense Council v. Morton*, 337 F.Supp. 167, 168-69 (D.D.C. 1971).  Plaintiffs' likelihood of success should "tip[] in favor of a minimal bond or no bond at all."  *California ex rel. Van De Kamp*, 766 F.2d at 1326.

Respectfully submitted,

/s/ Michael R. Ramsey
Michael R. Ramsey
State Bar No. 16520200
RAMSEY LAW OFFICE
6280 Delaware St., Suite A
Beaumont, Texas  77706
Telephone:  (409) 444-2020
Facsimile:  (409) 444-2021

AND

/s/ Terry W. Wood
Terry W. Wood
State Bar No. 21907700
TERRY W. WOOD, P.C.
2530 Calder Avenue
Beaumont, Texas  77702
Email:  terry@twwoodpc.com
Telephone:  (409) 212-0600

AND

/s/ Frederick W. Addison, III
Frederick W. Addison, III
State Bar No. 00903350
Email:  raddison@munsch.com
Claire E. Carroll
State Bar No. 24092224
Email:  ccarroll@munsch.com
MUNSCH HARDT KOPF & HARR P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75201
Telephone:  (214) 855-7500

James R. Ray, III
State Bar No. 24079746
Email:  jray@munsch.com
Munsch Hardt Kopf & Harr P.C.
1717 W. 6th Street, Suite 250
Austin, Texas  78703-3924
Telephone:  (512) 391-6100

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

On the 18th day of September, 2020, counsel for Plaintiff furnished by electronic means a copy of this pleading, (along with all supporting materials) to all counsel of record via ECF.

<u>/s/ Frederick W. Addison, III</u>
Frederick W. Addison, III