**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | | |
|---|---|---|
| OPTIMUS STEEL, LLC, | § | |
| | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| U.S. ARMY CORPS OF ENGINEERS, | § | CIVIL ACTION NO.  1:20-CV-00374 |
| TODD T SEMONITE, LIEUTENANT | § | |
| GENERAL (IN HIS OFFICIAL CAPACITY | § | JUDGE MICHAEL TRUNCALE |
| AS CHIEF OF ENGINEERS AND | § | |
| COMMANDING GENERAL OF THE US | § | |
| ARMY OF ENGINEERS; TIMOTHY R | § | |
| VAIL, COLONEL (IN HIS OFFICIAL | § | |
| CAPACITY AS US ARMY CORPS OF | § | |
| ENGINEERS GALVESTON DISTRICT | § | |
| COMMANDER; AND JEFFERSON | § | |
| SOUTHERN STAR PIPELINE, LLC, | § | |
| | § | |
| *Defendants.* | § | |

## ORDER DENYING PRELIMINARY INJUNCTION

Before this Court is Plaintiff Optimus Steel, LLC's Amended Application for Preliminary Injunction.  [Dkt. 31].  Defendants United States Army Corps of Engineers (the "Corps") and several officials[1] at the Corps (collectively, the "Federal Defendants") filed a response in opposition.  [Dkt. 44].  Defendant Jefferson Southern Star Pipeline, LLC ("JSSP") filed a separate response in opposition.  [Dkt. 47].  Plaintiff filed a reply.  [Dkt. 49].  The Court held a preliminary injunction hearing on September 23–24, 2020.  [Dkts. 63, 65].  Having considered the Parties'

---

[1] Lieutenant General Scott A. Spellmon, in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers; and Colonel Timothy R. Vail, in his official capacity as District Commander of the U.S. Army Corps of Engineers Galveston District.  Lieutenant General Scott A. Spellmon has succeeded Todd T. Semonite as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers and, pursuant to Fed. R. Civ. P. 25(d), is automatically substituted as a party in this case.

1

briefing, the arguments presented at the Hearing, the record, and the relevant law, the Court denies Plaintiff's motion [Dkt. 31] for preliminary injunction.

## I.  BACKGROUND

This case concerns the construction of JSSP's Southern Star Pipeline (the "Pipeline"), a 14.2-mile long gas pipeline that will run from Beaumont, Texas to Port Neches, Texas.  [Dkt. 30, pp. 4–5].  Plaintiff seeks declaratory and injunctive relief to stop the construction of the Pipeline, alleging the Corps authorized the Pipeline to be constructed in violation of the Clean Water Act, 33 U.S.C. § 1344(e) ("CWA"); the Endangered Species Act, 16 U.S.C. § 1531, *et. seq.* ("ESA"); the National Environmental Policy Act, 42 U.S.C. § 4321, *et. seq.* ("NEPA"); and the Administrative Procedure Act, 5 U.S.C. §§ 701–06 ("APA").  [*See generally* Dkt. 30].

Accordingly, this case involves the interplay between several statutory and regulatory schemes.  The Court will discuss them below, before turning to the actions undertaken by Federal Defendants and JSSP.

### A.  Controlling Statutory and Regulatory Schemes

#### i.  Clean Water Act

The CWA prohibits the discharge of any "pollutant," including dredged or fill material, into the navigable waters of the United States without a permit.  *See* 33 U.S.C. § 1311(a), (e).  The Corps oversees the permitting process and, to that end, regulates the discharge of any pollutant into jurisdictional waters, including wetlands.  *Id.* § 1362(7); 33 C.F.R. § 328.3(a), (b).

Under Section 404 of the CWA, the Corps may issue permits in one of two ways: (1) it issues individual permits that are tailored to specific projects, or (2) it promulgates general permits and later "verifies" that specific projects of a generally approved category of activity—such as utility lines—qualify thereunder.  *See* 33 U.S.C. § 1344(a), (e).  Individual permits are issued on a case-by-case basis and require resource and time-intensive procedures.  *See id.* § 1344(a).  By

contrast, general permits streamline the permitting process and regulate "with little, if any, delay or paperwork certain activities having minimal impacts."  *Id*. § 1344(e); 33 C.F.R. § 330.1(b).   In 1977, Congress amended the CWA to include general permits for this express purpose.  H.R. Rep. No. 95-830, at 38, 98, 100 (1977) (Conf. Rep.), *reprinted* in 1977 U.S.C.C.A.N. 4424.

General permits may be authorized "for any category of activities involving discharges of dredged or fill material if the [Corps] determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment."  33 U.S.C. § 1344(e)(1). General permits must also comply with the CWA Section 404(b)(1) Guidelines promulgated by the U.S. Environmental Protection Agency.  40 C.F.R. § 230.7(b).  General permits last up to five years, at which point they must be reissued or left to expire.  33 U.S.C. § 1344(e)(2).

For a specific project to qualify under a general permit, a Corps District Engineer must conclude that it complies with the general permit's conditions, will cause no more than minimal adverse effects on the environment, and will serve the public interest.  *Id.* §§ 330.1(e)(2), 330.6(a)(3)(i).  If a District Engineer finds the project does not qualify for a general permit, the project must proceed under an individual permit.  33 C.F.R. § 330.6(a)(2), (d); *see Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 39 (D.C. Cir. 2015).

In some instances, general permits require prospective permittees to submit a pre-construction notification ("PCN") before beginning the regulated activity.  82 Fed. Reg. 1860, 1861 (Jan. 6, 2017).  A PCN enables the District Engineers to make case-specific determinations of general permit eligibility and, when necessary, attach additional, project-specific conditions at the verification stage.  *Id.*; 33 C.F.R. §§ 330.1(e)(2), 330.6(a)(3)(i).  For linear projects like pipelines, the PCN must address all water crossings affected by the project, including the crossings that triggered the PCN as well as the other separate and distant crossings that did not themselves

3

require a PCN.  82 Fed. Reg. at 1986.  The District Engineer evaluates the proposed activity and determines whether the water crossings individually and cumulatively satisfy the general permit's terms and conditions.  *Id.* at 2004–05.

### ii.   Endangered Species Act

Section 7(a)(2) of the ESA requires federal agencies, such as the Corps, to insure that any action it authorizes, funds, or carries out "is not likely to jeopardize the continued existence of any listed species or threatened species or result in the destruction or adverse modification of designated critical habitat."  16 U.S.C. § 1536(a)(2); *see Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 174–75 (1978).  If the agency determines that its action "may affect" endangered species or critical habitat, it must pursue either informal or formal consultation with the appropriate wildlife agency—in this case, the U.S. Fish and Wildlife Services (the "Services").  50 C.F.R §§ 402.13, 402.14(b)(1); 16 U.S.C. § 1536(a)(2).  However, no such consultation is required if the Corps determines that a proposed action is not likely to adversely affect any listed species or critical habitat.  50 C.F.R. § 402.14(b)(1).  Federal agencies must review their actions "at the earliest possible time."  *Id.* § 402.14(a).

### iii.   National Environmental Policy Act

The NEPA is a procedural statute that requires the Corps to assess the likely environmental impacts of its actions before authorizing or issuing permits under the CWA.  *Sierra Club*, 803 F.3d at 36 (citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756–57 (2004)); *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978) (describing NEPA as "essentially procedural").  NEPA prescribes a process whereby federal agencies must take a "hard look" at their proposed actions in advance of deciding whether and how to proceed.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

Specifically, under NEPA, the Corps must produce an Environmental Impact Statement ("EIS") for any proposed "major federal action" that will "significantly affect" the quality of human environment.  42 U.S.C. § 4332(C); 40 C.F.R. § 1508.11.  However, an EIS is not required when the agency conducts an Environmental Assessment ("EA") and issues a Finding of No Significant Impact ("FONSI").  42 U.S.C. § 4332(C); 40 C.F.R. § 1508.9.  The FONSI includes or summarizes the EA and explains why the agency believes its purported action will not have a significant effect on the environment.  40 C.F.R. §§ 1501.4(e), 1508.13.

### B.  The Corps' Reissuance of NWP-12 in 2017

Nationwide permits are a type of general permit that authorize activities on a nationwide basis.  33 C.F.R. § 330.2(b).  The Corps has promulgated a broad range of nationwide permits that regulate a spectrum of economic activity affecting jurisdictional waters.  One such permit is Nationwide Permit 12 ("NWP-12"), which was first issued in 1977 and reissued most recently in 2017.  82 Fed. Reg. at 1985–86.

NWP-12 authorizes discharges of dredged or fill material into jurisdictional waters as required for the construction, maintenance, repair, and removal of utility lines and associated facilities.  *Id.*  Utility lines include oil and gas pipelines.  *Id.* at 1985.  To qualify for NWP-12, an anticipated project may not result in the loss of greater than one-half acre of jurisdictional waters for each single and complete project.  *Id.*  For linear projects like pipelines that cross a single waterbody several times at separate and distant locations, or cross multiple waterbodies several times, each crossing represents a single and complete project.  *Id.* at 2007.  Further, a prospective permittee under NWP-12 must submit a PCN "prior to commencing the activity" if, among other reasons, the "discharges [will] result in the loss of greater than one-tenth acre of waters of the United States."  *Id.* at 1986.

As required by the CWA, the Corps' reissuance of NWP-12 in 2017 was preceded by public notice and comment.  *Id.* at 1863.  The Corps received more than 54,000 public comment letters. *Id*.  Plaintiff did not comment on the Corps' proposed reissuance of NWP-12.  With respect to its NEPA obligations, the Corps completed an EA on December 21, 2016 prior to reissuing NWP-12. [Dkt. 20-1, Ex. J-5 at 80].  Based on the analysis in the EA, the Corps issued a FONSI and determined that no EIS was required.  *Id.* at 79.  Finally, with respect to the ESA, the Corps issued a "no effect" determination which concluded the Corps was not required to consult with the Services before reissuing NWP-12.  *Id.* at 66.  The Corps ultimately memorialized its national-level environmental analyses for NWP-12 in a Decision Document, as it does with all nationwide permits.  *See generally id.*; 33 C.F.R. § 330.5(b)(3).

### C.  JSSP's Pipeline Project and Permitting Process

JSSP submitted a PCN to the Corps for its Pipeline Project (the "Project") on June 10, 2019.  [Dkt. 28-4, Fed. Def. Ex. 5].  On October 3, 2019, the Corps verified the Project under NWP-12 and issued Permit No. SWG-2018-00890 (the "Verification"), subject to added conditions intended to further mitigate the adverse environmental effects.  [Dkt. 28-6, Fed. Def. Ex. 12].  The Corps verified that the Project would result in the following environmental impacts: temporary impact to 68.79 acres of 68 palustrine emergent wetlands; temporary impact to 3.70 acres of 19 palustrine scrub-shrub wetlands; and the permanent conversion of 20.4 acres of palustrine forested wetlands to palustrine emergent wetlands.  *Id.*  JSSP also submitted to the Corps the required Threatened and Endangered Species Review Forms.  [Dkt. 24-7, Ex. J-30].  In these forms, JSSP relayed its findings that no ESA-protected species or habitats are present in the Project area.  *Id.*  After proper review, the Corps verified these findings on January 21, 2020.  [Dkt. 28-6, Fed. Def. Ex. 12].

6

The Project is located adjacent to the Neches River in Beaumont, Texas. *Id.* It includes the installation of a two-pipeline system by horizontal directional drilling and open-cut trenching. *Id.* The first pipeline is the Paline Pipeline, which will run from the Paline Pipeline System to Jefferson Energy's Beaumont Terminal. *Id.* The second pipeline is the Southern Star Pipeline (the "Pipeline"), and it is the relevant pipeline in this matter. *Id.*; [*see* Dkt. 51-1, Declaration of Zachary Wells ("Wells Decl."), Ex. J-34 ¶ 4]. Once constructed, the Pipeline will be a 14.2-mile, 24-inch pipeline that connects the Jefferson Terminal with Motiva Enterprises LLC's facility ("Motiva refinery") near Port Arthur, Texas. Wells Decl. ¶¶ 7, 13. Eleven miles of the Pipeline are already installed. *Id.* ¶ 86. The Pipeline has been under development since 2015 and its total estimated cost according to JSSP is $160 million. *See id.* ¶ 5; [Dkt. 51-2, Declaration of Matthew C. Evans ("Evans Decl."), Ex. J-35 ¶ 20]. To date, JSSP has spent about $80 million in construction. Evans Decl. ¶ 20.

Plaintiff is a steel mill company and owns a 524.5-acre property that is situated east of the Jefferson Terminal on the bank of the Neches River. *See* Wells Decl. ¶¶ 50–51. The Pipeline's route will cross Plaintiff's property for approximately 0.86 miles. *Id.* ¶ 52; [*see also* Dkt. 20-2, Ex. J-6; Dkt. 20-3, Ex. J-7]. About 15% of the Pipeline's total length is on Plaintiff's property. Wells Decl. ¶ 52. As a result, JSSP sought a right-of-way from Plaintiff to build the Pipeline. *Id.* ¶¶ 69–71. After extensive negotiations failed, JSSP filed a condemnation suit in State court in June 2020 to obtain an easement over Plaintiff's property. *Id.* Following the Special Commissioners' Hearing in August 2020, Plaintiff received an award of $17.2 million as compensation for the easement. *Id.* ¶ 71. JSSP now has a valid easement to cross Plaintiff's property. *Id.* ¶ 72; [Dkt. 50-4, Ex. J-37]; *see* Tex. Prop. Code § 21.021(a).

On September 18, 2020, JSSP began conducting non-invasive survey work on Plaintiff's property.  *See* Wells Decl. ¶ 87.  JSSP is presently ready to begin construction on Plaintiff's property, as the Pipeline's in-service date is January 21, 2021.  *See id.* ¶ 78.

### D.  Procedural Background

Plaintiff filed a complaint on September 10, 2020, seeking declaratory and injunctive relief under the Clean Water Act; the Endangered Species Act; the National Environmental Policy Act; and the Administrative Procedure Act.  [Dkt. 1].

That same day, Plaintiff filed an Application for Temporary Restraining Order, Preliminary Injunction, Permanent Injunction and Request for Hearing.  [Dkt. 3].  On September 13, 2020, Defendant JSSP filed a notice of intent to oppose Plaintiff's requested relief.  [Dkt. 5].  After a telephonic Status Conference on September 15, 2020, the Court established various deadlines for the parties and scheduled a Preliminary Injunction Hearing ("the Hearing") for September 23−24, 2020.  [*See* Dkt. 7].  On September 17, 2020, Plaintiff filed an amended complaint.  [Dkt. 30].  On September 18, 2020, Plaintiff filed an Amended Application for Temporary Restraining Order, Preliminary Injunction, Permanent Injunction and Request for Hearing (the "Application").  [Dkt. 31].  On September 21, 2020, Defendants filed separate responses to Plaintiff's Application.  [*See* Dkts. 44, 47].  Plaintiff filed a reply on September 21, 2020.  [Dkt. 49].

Thereafter, the Parties filed a Joint Stipulation Regarding the Scope of Relief for purposes of the Plaintiff's Application.[2]  [Dkt. 33].  The Court held the Hearing on September 23–24, 2020, at which the Parties appeared and had the opportunity to present their arguments.

---

[2] In the Parties' Joint Stipulation, they agree that Plaintiff: "(1) is not seeking nationwide relief; and (2) is only seeking relief related to the specific project involving Optimus Steel and JSSP, and Plaintiff's claims, including those relating to the Corps' compliance with the [NEPA, ESA, and CWA], are solely limited to the Corps' verification and issuance of Permit No. SGW-2018-00890 to JSSP."  [Dkt. 33].  However, at the Hearing, the Parties seem to dispute whether Plaintiff abandoned all claims related to the validity of NWP-12 for purposes of preliminary relief.  [Dkt. 47, p. 22]. The Court need not determine the scope of the Parties' stipulation because, for reasons discussed in depth in this Order, the Court does not reach the merits of Plaintiff's claims regarding the validity of the NWP-12 permitting program.

## II.   STANDARD FOR PRELIMINARY INJUNCTION

There are four requirements that a party seeking a preliminary injunction must prove: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008).  A plaintiff "is not required to prove his case in full" at the preliminary injunction stage.  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  Nevertheless, a plaintiff must "clearly carr[y] the burden of persuasion on all four requirements."  *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 196 (5th Cir. 2003) (internal quotation marks and citation omitted).

The decision to grant a preliminary injunction is within the discretion of the trial court.  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).  It is, however, an "extraordinary remedy" and "never awarded as of right."  *Winter*, 555 U.S. at 24; *Planned Parenthood of Houston & S.E. Tex. v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005) (internal quotations marks omitted).

## III.   DISCUSSION

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule.  *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997).  This is in large part because a preliminary injunction is meant to "preserve the status quo" and "prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits."  *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971).  For the reasons discussed below, the Court finds that a preliminary injunction is not warranted in this case.

## A.  Preliminary Injunction Factors

Each of the *Winter* preliminary injunction factors weigh against granting Plaintiff's requested relief.  Plaintiff has not clearly demonstrated (1) a substantial likelihood of success on the merits of its CWA, ESA, or NEPA claims; (2) a substantial threat that it will suffer irreparable harm; (3) that the threatened injury outweighs any damage that the injunction might cause Defendants; and (4) that the injunction will not disserve the public interest.

### i.   Substantial Likelihood of Success on the Merits

Under the first *Winter* factor, a movant must demonstrate a substantial likelihood of success on the merits of its claims.  *Winter*, 555 U.S. at 20.  Plaintiff alleges that Defendants violated the CWA, ESA, and NEPA and seeks judicial review under the APA.  [*See* Dkt. 30].

The APA provides a "demanding" standard of review, under which the Court will uphold the agency action unless it finds the action to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 696–97 (5th Cir. 2018) (quoting 5 U.S.C. § 706(2)(A)).  This standard evaluates "whether the decision was based on a consideration of the relevant factors and whether there has been clear error of judgment."  *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974).  The party challenging the agency's action bears the burden of proof.  *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 571 (5th Cir. 2017).  "The agency must provide a 'satisfactory explanation' for its action, and 'a court is not to substitute its judgment for that of the agency.'"  *Handley v. Chapman*, 587 F.3d 273, 281 (5th Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Review of the Corps' interpretation of its statutory and regulatory authority is governed by *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) and *Kisor v. Wilkie*, 139 S. Ct. 2400, 2417–18 (2019).

For the reasons discussed below, the Court finds that Plaintiff has failed to demonstrate a substantial likelihood of success on its CWA, ESA, or NEPA claims.  The Court will first address two threshold issues raised by the parties.

### 1.   Plaintiff's Standing

Under Article III of the United States Constitution, federal court jurisdiction is limited to cases and controversies.  U.S. Const. art. III, 2, cl. 1; *Raines v. Byrd*, 521 U.S. 811, 818 (1997).  A key element of the case-or-controversy requirement is that a plaintiff must establish standing to sue.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (citation omitted).  To prove Article III standing, a plaintiff must establish an (1) injury in fact that is (2) fairly traceable to the defendant's challenged action, and (3) redressable by a favorable outcome.  *Croft v. Governor of Tex.*, 562 F.3d 735, 745 (5th Cir. 2009) (citing *Lujan*, 504 U.S. at 560).  The party invoking jurisdiction bears the burden of demonstrating that jurisdiction exists.  *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

Plaintiff asserts it has standing under the CWA, NEPA, and ESA because the Pipeline threatens Plaintiff's "use and enjoyment, and the economic value, of its property, as well as the waters used and enjoyed both as a resource and for the habitat they provide for plants and animals." [Dkt. 31, ¶ 32].  Plaintiff avers its "real property, recreational, aesthetic, business, and/or environmental interests . . . have been, and are being, and will be, adversely affected by the actions of the Defendants."  *Id.* ¶ 33.  Plaintiff allegedly "monitors the use of the Waters of the United States, tests them for water quality certification, and requires compliance with the law respecting these water bodies."  *Id.* ¶ 34.  Plaintiff's claimed concrete injury results "from the construction

and operation of the JSSP pipeline and its impacts on jurisdictional waters without adequate environmental review or adequate opportunities for public notice and comment." *Id*. ¶ 35.

In opposition, Defendants argue that Plaintiff "has not demonstrated the Corps' actions will cause these alleged injuries or that, even if they did, Optimus itself will suffer these alleged harms." [Dkt. 44, pp. 22–23].  Defendants further argue that Plaintiff fails to (1) "explain how the Corps' action will allegedly impact health, water quality, wildlife, recreational activities, or other environmental interest"; (2) "allege facts showing that [Plaintiff] itself has health, recreational, aesthetic, scientific, or other environmental interest"; and (3) establish "representational standing on behalf of its employees or the general public" whom Plaintiff states use its property for recreation.  *See id*. at 23–24.  Defendants also state that Plaintiff cannot claim standing on "a general interest in compliance with [environmental] law" and that its alleged procedural injury is not enough to confer standing.  *See id*. at 24–25.

The Court will address each claim in turn.

  a.  *Clean Water Act Claims*

The standing analysis under the CWA is a constitutional one, not statutory.  *Save Our Cmty. v. United States EPA*, 971 F.2d 1155, 1161 n.11 (5th Cir. 1992) ("Because the CWA . . . specifically provide[s] . . . a private right of action, 33 U.S.C. § 1365(a), we properly employ a constitutional standing analysis, as opposed to a statutory analysis under the APA.").  Thus, a plaintiff bears the burden to prove the three requirements for Article III standing.  Regarding "injury in fact," the claimed harm must be "concrete and particularized . . . actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560 (citations and quotations omitted).  Concrete means the injury must be "real, and not abstract."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (internal quotations omitted).  Particularized means "the injury must affect the plaintiff in a personal and individual way."  *Lujan*, 504 U.S. at 560 n.1.  Additionally, the injury in fact test

"requires more than an injury to a cognizable interest.  It requires that the party seeking review be himself among the injured."  *Id.* at 563 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972)).  The "fairly traceable" requirement "examines the causal connection between the assertedly unlawful conduct and the alleged injury."  *See Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984).  Finally, redressability must be "likely," as opposed to merely "speculative."  *Lujan*, 504 U.S. at 561.

The Court finds that Plaintiff has standing for its CWA claims.  First, Plaintiff asserts a constitutionally cognizable injury because it alleges a "non-illusory opportunity to pursue a benefit."  *See Ecosystem Inv., Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287, 294 (5th Cir. 2018).  Specifically, Plaintiff asserts an economic injury from losing the opportunity to expand and develop its business if the Pipeline were constructed across its land.  [*See* Dkt. 20-4, Ex. J-8 at 7–9; Wells Decl. ¶ 73].  In the coming years, Plaintiff hopes to construct new industrial facilities, including a steel shredder, a melt shop, a rolling mill, and treatment plants.  [*See* Dkt. 20-4, Ex. J-8 at 7–9].  This economic injury is enough to confer standing.  *See Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"); *see also Sierra Club v. Morton*, 405 U.S. 727, 733 (1972) ("[E]conomic injuries have long been recognized as sufficient to lay the basis for standing."); *Tex. Cable & Telcoms. Ass'n v. Hudson*, 265 F. App'x 210, 217–18 (5th Cir. 2008) ("[E]conomic injury . . . [may] provide standing.");

The second standing requirement is also met.  Plaintiff's injuries are fairly traceable to the Corps' reauthorization of NWP-12 in 2017.  Defendants claim that Plaintiff's "economic harm is the result of a condemnation proceeding in a Texas county court."  [Dkt. 44, p. 26].  However, without the reauthorization of NWP-12 in 2017, and the subsequent verification of JSSP's project, the Pipeline could not be built across Plaintiff's property.  *See* 82 Fed. Reg. 1860 (Jan. 6, 2017).

13

In fact, JSSP would have no basis to initiate the State condemnation proceeding but for the Corps' reauthorization of NWP-12. *See Env't Tex. Citizen Lobby v. Exxonmobil Corp.*, 968 F.3d 357 (5th Cir. 2020) (the fairly traceable standard requires a showing that "defendant's violations were of a type that causes or contributes to the kinds of injuries alleged by the plaintiffs") (citation and internal quotations omitted).  Thus, Plaintiff established the requisite causal connection between its injuries and Defendants' actions.

Finally, Plaintiff has shown that a favorable decision would redress its claimed harm.  For example, this Court may invalidate the reauthorization of NWP-12 or enjoin JSSP from starting construction on Plaintiff's property. *See Sierra Club v. U.S. Army Corps of Eng'rs*, No. 1:20-CV-460-RP, 2020 WL 5096947, at *6 (W.D. Tex. Aug. 28, 2020) ("[I]f this Court enjoins the verifications until the Corps [complies with the law], then there is a reasonable possibility those harms could be redressed or mitigated.").  Thus, Plaintiff's harms are redressable by the Court.

For these reasons, Plaintiff has standing to assert its CWA claims.

### b.   *National Environmental Policy Act Claim*

In the context of NEPA, courts have found that the procedural injury "implicit" in an agency's failure to prepare an EIS "is itself a sufficient 'injury in fact' to support standing,"  so long as the plaintiff has "a sufficient geographical nexus to the site of the challenged project [such that they can] expect . . . to suffer whatever environmental consequences the project may have." *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 674 (5th Cir. 1992).  Here, the Corps did not prepare an EIS in 2017 before reissuing NWP-12, and, as the property owner, Plaintiff has a sufficient geographical nexus to the site of the challenged area.  Thus, Plaintiff properly asserts an injury in fact under its NEPA violation.

However, the Supreme Court has explained that plaintiffs asserting claims under NEPA have standing obligations "beyond the [three] constitutional standing requirements." *Id.* 675.  A

14

Plaintiff must also establish its claimed injury "falls within the 'zone of interest' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Id.* (internal quotations omitted) (quoting *Lujan*, 504 U.S. at 883); *see also Ecosystem Inv.*, 729 F. App'x at 294.  Thus, in this case, "[t]he only people who may sue to enforce [NEPA] are people who belong to the class that the law was designed to protect." *Sabine River Auth.*, 951 F.2d at 675 (quoting *North Shore Gas v. EPA*, 930 F.2d 1239, 1243 (7th Cir. 1991)).  While not "especially demanding," the zone of interest test forecloses suit "when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Ecosystem Inv.*, 729 F. App'x at 294 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)).  This zone of interest requirement is where Plaintiff's NEPA claim fails.

The NEPA was enacted to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; . . . promote efforts which will prevent or eliminate damage to the environment and biosphere . . . ; [and] enrich the understanding of the ecological systems and natural resources important to the Nation." *Ecosystem Inv.*, 729 F. App'x at 294 (quoting 42 U.S.C. § 4321).  Therefore, "NEPA's zone of interests covers environmental injuries and not purely economic ones." *Id.*

Here, Plaintiff's loss is purely economic.  Plaintiff does assert general environmental injuries, stating it "uses and maintains" the property at issue "for recreational and other beneficial environmental activities."  [Dkt. 31, ¶ 24].  But for reasons discussed below, the Court finds these claimed injuries unavailing.  Plaintiff also asserts that its geographical nexus alone is enough to establish it will suffer whatever environmental consequences the project may have. *Id.* ¶ 29.  This may be true in the case of a resident person, but for a business "proximity can sometimes be a poor proxy for injury." *Ecosystem Inv.*, 729 F. App'x at 297.  As the Fifth Circuit explained in

*Ecosystem Investment*, it is not an "obvious inference" how the plaintiff, "a Delaware LLC with its principal place of business in Maryland[,] uses or enjoys its wetlands located in Louisiana in any way a resident would." *Id.* at 297–98. Similarly, here, Plaintiff's geographical nexus alone is not enough to show environmental injury.

Plaintiff attaches the affidavit of Terese Finn, the Environmental Manager of Plaintiff's company, to establish environmental injury. [Dkt. 31-1, Aff. Terese Finn, at App. 202–10]. The affidavit states a portion of Plaintiff's property is used for "fishing, boating, and other activities." *Id.* at 203–04. The affidavit continues, "Optimus and/or the public rely on waters that would be impacted for bird watching, fishing, boating, nature study, general recreating, and a variety of other activities." *Id.* at 204–05. These allegations are generalized and unsupported by what Plaintiff is, a steel mill company.

Plaintiff fails to explain exactly how a steel mill can enjoy or participate in these activities. *See Wyo. Timber Indus. Ass'n v. United States Forest Serv.*, 80 F. Supp. 2d 1245, 1252 (D. Wyo. 2000) ("[C]orporate entities, cannot hunt, fish, or participate in wildlife photography" and cannot therefore suffer "recreational or aesthetic injuries" to provide a basis for standing); *26 Crown Assocs., LLC v. Greater New Haven Reg'l Water Pollution Control Auth.*, No. 3:15-cv-1439, 2017 WL 2960506, at *5, 2017 U.S. Dist. LEXIS 106989, at * 14 (D. Conn. 2017) ("Companies do not suffer aesthetic injuries from harm to the environment."); *Citizens Coordinating Comm. on Friendship Heights, Inc. v. Washington Metro. Transit Auth.*, 765 F.2d 1169, 1173 (D.C. Cir. 1985) (denying the extension of standing to corporate entities based on aesthetic harm because "[a]esthetic injury presupposes the ability to sense one's surroundings").

Without more detail on how Plaintiff enjoys or participates in these activities, the Court finds it problematic to rely on them for standing purposes. *See Superior MRI Servs. v. All. HealthCare Servs.*, 778 F.3d 502, 504 (5th Cir. 2015) ("[A] plaintiff must assert his own legal

rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."). Plaintiff's only remaining injuries are economic, which fall outside the zone of interests protected by NEPA. Accordingly, Plaintiff is not the proper party to bring this claim.

To the extent Plaintiff seeks to assert representational standing, this too is unsuccessful. Plaintiff is unable to assert a NEPA claim on behalf of its employees or the public because the interests Plaintiff seeks to protect—the alleged environmental injuries—are not germane to its purpose as a steel mill. *Ass'n of Cmty. Orgs for Reform Now v. Fowler*, 178 F.3d 350, 365 (5th Cir. 1999) (noting that representational standing requires "the interests it seeks to protect [be] germane to the organization's purpose"). As a result, Plaintiff also fails to prove representational standing for its NEPA claim. *See Ecosystem Inv.*, 729 F. App'x at 294; *see also Sabine River Auth.*, 951 F.2d at 675.

For these reasons, the Court finds that Plaintiff does not have standing to bring its NEPA claim. Thus, Plaintiff is unlikely to succeed on this basis.

### c. *Endangered Species Act Claim*

The three requirements of injury in fact, causation, and redressability form the "irreducible constitutional minimum" of standing. *See Lujan*, 504 U.S. at 560. However, as with NEPA claims, the "zone of interests" test must also be applied to ESA claims. *See Markle Interests, L.L.C. v. United States Fish & Wildlife Serv.*, 827 F.3d 452, 464 (5th Cir. 2016), *rev'd on other grounds*, 139 S. Ct. 361 (2018); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (prudential considerations of standing require "that a plaintiff's complaint fall within the zone of interests protected by the law invoked") (citations and internal quotations omitted). The ESA requires federal agencies to ensure that its actions are not likely to jeopardize the continued existence of any endangered species or critical habitat. *Bennett v. Spear*, 520 U.S. 154, 158 (1997) (quoting 16 U.S.C. § 1536 (a)(2)). When Congress enacted the ESA, it "intended

17

endangered species to be afforded the highest of priorities." *Ten. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978).

Plaintiff's failure to allege that a single ESA-protected species or critical habitat is present on its property is fatal to its ESA claim. Plaintiff makes vague allegations of harm to "plants and animals" on its property and asserts that the Pipeline may "harm those species present." [Dkt. 31, pp. 12, 14, 37]. These generalized grievances fall short of establishing Article III standing.

Defendants argue that Plaintiff has no concrete interest in ESA-protected species and that Plaintiff's claims are not within the "zone of interest" protected by the ESA. *Id*. at 26–29. Courts are clear that any alleged procedural injury, such as under the ESA, must be coupled with a concrete interest. *See Lujan*, 504 U.S. at 572. Plaintiff is a steel mill and has not demonstrated a concrete interest in ensuring the protection of endangered species or critical habitat. Perhaps if Plaintiff's business relied on a species or habitat, it could meet this standing requirement. *See Bennett*, 520 U.S. at 167–68 (ranch operators had standing to bring suit because they relied on affected waters for irrigation). However, "raising only a generally available grievance about government . . . does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573–74.

Further, Plaintiff is unable to establish that it falls within the "zone of interests" sought to be protected by the ESA. *See Bennett*, 520 U.S. at 158. Plaintiff has not alleged there is any critical habitat, endangered species, or threatened species located on its property. Rather, JSSP determined that no protected species or critical habitat are present in the Project action area. [Dkt. 23-9, Fed. Def. Ex. 10]. The Corps reviewed and verified these findings. *Id*. Without any evidence to rebut Defendants, Plaintiff has failed to establish its interests fall within the zone of those protected by the ESA. *See Markle Interests*, 827 F.3d at 464. Therefore, Plaintiff does not have standing to bring suit under the ESA and thus is not likely to succeed on this claim.

### 2.  Plaintiff's Delay

Defendants argue that Plaintiff's delay in seeking an injunction undermines its fear of irreparable harm and bars Plaintiff's claim for equitable relief.  [Dkt. 44, p. 47; Dkt. 47, p. 20].  The Court finds this argument unpersuasive.  Courts have held that only "absent a good explanation" should a delay militate against the issuance of a preliminary injunction.  *See Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 570 (S.D. Tex. 2014).

In this case, Plaintiff sought relief on September 10, 2020, about eleven months after the Corps issued JSSP's Verification.  [Dkt. 1].  While it is true that a delay may weigh against a finding of irreparable harm, courts in the Fifth Circuit have accepted delays of several months or more.  *See, e.g.*, *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 698–99 (N.D. Tex. 2015) (finding an eight-month delay did not impact irreparable harm when the plaintiff was investigating the claims in good faith); *Sierra Club*, 2020 WL 5096947, at *7 (accepting a delay in a case involving a materially similar challenge to a project verified under NWP-12).

In their briefs, the Parties detail their lengthy and unsuccessful efforts to negotiate a right-of-way across Plaintiff's property.  [*See* Dkt. 30, pp. 5, 10; Dkt. 31, pp. 6, 12; Dkt. 47, pp. 5–9].  The Parties again discussed these negotiations at the Hearing and informed the Court of a recent State condemnation proceeding in which Plaintiff received a monetary award on August 12, 2020.  *See* Wells Decl. ¶ 71.  Plaintiff filed for injunctive relief approximately one month later.  [*See* Dkt. 1].  This delay can hardly be found unreasonable.  In considering these events, Plaintiff provides the Court with the requisite "good explanation."  *See Daily Instruments*, 998 F. Supp. 2d at 570.

Further, as the Court heard at the Hearing, Plaintiff is still collecting evidence from the government through Freedom of Information Act requests.  At the very least, the Court can presume that Plaintiff needed ample time to evaluate its claims.  Therefore, Plaintiff proceeded

diligently, and the Court rejects Defendants' argument that Plaintiff's delay militates against its claim for equitable relief.

### 3.   Plaintiff's Remaining Claims Under the CWA

Plaintiff's remaining claims allege violations of the CWA in relation to the Corps' re-issuance of NWP-12 in 2017 and JSSP's Verification in October 2019.  [Dkt. 30] (*see* third, fourth, and fifth claims for relief).  The Court will address each below.

#### a.   The "one-half acre rule"

NWP-12 authorizes utility line construction activities only if "the activity does not result in the loss of greater than 1/2-acre of waters of the United States for each single and complete project" (the "one-half acre rule").  82 Fed. Reg. 1860, 1985 (Jan. 6, 2017).

As disclosed in JSSP's PCN and approved by the Corps' District Engineer, the construction of the Pipeline will convert a portion of Plaintiff's property from forested and scrub-shrub wetlands to herbaceous wetlands.  [Dkt. 28-6, Fed. Def. Ex. 12].  The Pipeline will also cause a "loss" of U.S. Waters at two separate and distant water crossings.  *Id.*  At each "loss," JSSP will install aboveground features that will result in 0.12-acre loss at one site and a separate 0.13-acre loss at a second site.  *Id.*  Neither site is on Plaintiff's property.  *Id.*  Each of these individual losses is less than a half-acre, and even when combined create a total loss of only 0.25-acres.  *Id.*

Plaintiff disputes this calculation, arguing that the conversion of wetlands from one type to another "necessarily involves the[ir] destruction" and should constitute a "loss" of waters.  [Dkt. 41, pp. 29–33].  Plaintiff claims the Corps violated the CWA by issuing an NWP-12 verification to JSSP because the Pipeline exceeds the half-acre limitation at fourteen different water crossings—thereby creating an aggregate loss of 20.4 acres, more than forty times the permissible "loss."  *Id.* at 32.

Plaintiff is correct that certain portions of its forested wetlands will be permanently converted by the Pipeline.  There is no doubt that the construction of pipelines invariably causes some level of environmental impact.  However, according to the unambiguous terms of the Corps' regulations, the "conversion" of wetlands does not constitute a "loss" of U.S. Waters for purposes of NWP-12 verification.  *See* 82 Fed. Reg. at 2006.  Rather, a "loss" of a wetland occurs only when the wetland ceases to function as so.  *See id.*  The definition of "[l]oss of waters of the United States" is:

> Waters of the United States that are permanently adversely affected by filling, flooding, excavation, or drainage because of the regulated activity. Permanent adverse effects include permanent discharges of dredged or fill material that change an aquatic area to dry land, increase the bottom elevation of a waterbody, or change the use of a waterbody.

*Id.*  This definition identifies three "permanent adverse effects" that may constitute a "loss," and Plaintiff fails to allege that any are present here.  In fact, the areas of Plaintiff's property that were waters and wetlands before Pipeline construction will remain waters and wetlands afterwards.  [*See* Dkt. 28-6, Fed. Def. Ex. 12, at 1]; Wells Decl. ¶ 83.

The definition of "loss" further states, "Waters of the United States, temporarily filled, flooded, excavated, or drained, but restored to pre-construction contours and elevations after construction, are not included in the measurement of loss of waters of the United States."  82 Fed. Reg. at 2006.  Because JSSP will restore the converted wetlands to their pre-construction contours and elevations, the regulatory text specifically excludes Plaintiff's alleged "loss."  *See* Wells Decl. ¶ 84.  In sum, Plaintiff conflates the "permanent conversion" of wetlands with the "loss" of jurisdictional waters.  Yet, as discussed, the regulatory text distinguishes the two.  Thus, the Court finds that Plaintiff's arguments are contrary to the plain regulatory text and the clear language of NWP-12.

To the extent Plaintiff also argues that the Corps' interpretation of "loss" is arbitrary and capricious, the Court disagrees. The Corps' interpretation of "loss" is long-standing, unambiguous, entitled to deference under the APA, and has been upheld by other courts.  *See, e.g.*, *Ouachita Riverkeeper, Inc. v. Bostick*, 938 F.Supp.2d 32, 37–38, 45–46 (D.D.C. 2013) (upholding the Corps' interpretation of "loss" in the 2007 reissuance of NWP-12 and refusing to find that a pipeline's conversion of 16.6 acres of forested wetlands fell within that interpretation); *Sierra Club, Inc. v. Bostick*, No. 12-cv-742, 2013 WL 6858685, at 21 (W.D. Pkla. Dec. 30, 2013), *aff'd*, 787 F.3d 1043 (10th Cir. 2015) (reviewing a verification under the 2012 reissuance of NWP-12 for a pipeline project and holding that "the Corps reasonably determined that the conversion of forested wetlands to another type of wetlands is not loss of waters of the United States").  Indeed, Plaintiff offers no grounds on which the Court could conclude that the Corps' interpretation of "loss" is "plainly erroneous or inconsistent with the regulations being interpreted."  *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007).  Thus, the Court concludes that the Corps' interpretation is reasonable in light of the clear regulatory text.

Plaintiff also briefly contends that JSSP cannot use NWP-12 for three other reasons: (1) it failed to obtain a real estate approval, known as an outgrant, as required by the Verification; (2) it utilized NWP-12 for a prohibitive use, namely for discharges into "tidal waters or in non-tidal waters adjacent to tidal waters"; and (3) it failed to submit to the Corps a final copy of its "Drill Frac-Out and Contingency Plan."  [Dkt. 31, pp. 33–34].

As argued at the Hearing, and further explained in the briefing, Plaintiff's arguments lack merit.  First, JSSP already received the required real estate outgrant from the Corps.  [*See* Dkt. 24-8, Ex. J-31].  Second, although NWP-12 does prohibit certain discharges into tidal or tidal-adjacent waters, this prohibition applies only to "the construction of utility line substations."  [Dkt. 20-1, Ex. J-5 at 80].  Plaintiff omits this language in its argument.  The Pipeline's utility substations do

not involve any discharge into tidal waters or their adjacent non-tidal wetlands.  *See* Wells Decl. ¶ 47.  Finally, JSSP already submitted to the Corps a final copy of its Horizontal Directional Drill Frac-Out & Contingency Plan.  *See id.* ¶ 41; [Dkt. 20-5, Ex. J-9 at 129].  Therefore, Plaintiff's claimed defects fail.

For these reasons, Plaintiff is not likely to succeed on this basis.

### b.  "Single and Complete Project"

Next, Plaintiff alleges that the Corps' definition of "single and complete project" as applied to the Pipeline violates the CWA.  [Dkt. 31, pp. 26–29].  For purposes of NWP-12, the Corps determined that for utility line activities crossing "a single waterbody more than one time at separate and distant locations," or "multiple waterbodies at separate and distant locations," each crossing is considered a distinct "single and complete project."  82 Fed. Reg. 1860, 1986; *see also* 33 C.F.R. § 330.2(i).  In other words, the Corps interprets its regulations to mean that each separate water crossing by a pipeline is a "single and complete project" with its own half-acre limit.

Plaintiff criticizes the Corps' interpretation and proposes that a "single and complete project" should, instead, encompass all of a pipeline's separate water crossings.  [Dkt. 31, pp. 26–28].  Plaintiff asserts that the Corps' current interpretation improperly allows for "limitless" crossings on a single linear project, will result in more than the "minimal adverse environmental effect" prohibited by NWP-12, and runs contrary to the CWA's purpose.  *Id.*

To begin, Plaintiff's preferred interpretation would not change the outcome here.  As the Court addressed above, the aggregate "loss" of wetlands caused by the Pipeline is only 0.25 acres.  [*See* Dkt. 28-6, Fed. Def. Ex. 12].  Therefore, even if the Corps treated all of the Pipeline's separate water crossings as one single and complete project, the total "loss of waters" would still qualify under NWP-12 and not violate the CWA.  *See Quachita Riverkeeper*, 938 F. Supp. 2d at 46 n.7 ("[T]he Plaintiffs' contention that the pipeline project is a 'single and complete' project for

23

purposes of the NWP-12 is irrelevant: whether considered as a single and complete project or multiple projects, the pipeline project satisfies the acreage-loss threshold of NWP-12."). Nevertheless, the Court will address Plaintiff's remaining theories under this argument.

The Corps' interpretation does not allow for "limitless" wetland impacts as Plaintiff contends.  In support, Plaintiff argues that NWP-12 does not require multiple crossings along a linear project be "separate and distant."  This is incorrect.  NWP-12 explicitly requires this.  *See* 82 Fed. Reg. at 1986.  It is true that the Corps did not define the phrase "separate and distant" or impose specific spacing requirements between "single and complete projects."  82 Fed. Reg. at 1888, 1979.  However, the Corps explained that a national threshold for determining when water crossings are "separate and distant" is not appropriate given various factors, including "topography, geology, hydrology, soils, and the characteristics of wetlands, streams, and other aquatic sources."  *Id.* at 1888.  Instead, the regulations state that Corps district offices "may establish local guidelines" in identifying "separate and distant" water crossings.  *Id.*  Additionally, the District Engineers themselves can use their discretion to identify whether a crossing is "separate and distant" or whether a project proponent needs an individual permit.  Fed. Reg. at 1885.  As Defendants describe, any impact on jurisdictional waters is further mitigated by the Corps' national-level safeguards, as well as by its regional divisions and District Engineers.  [Dkt. 44, pp. 6–8]; *see generally* 82 Fed. Reg. 1860; 33 C.F.R. 330.

Congress could have limited the number of times a particular nationwide permit may be used under Section 404 of the CWA, but it did not.  Nor did Congress define the term "minimal" for purposes of Section 1344(e).  Instead, Congress entrusted the Corps with the authority to make those determinations so long as the authorized activities "are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effects on the environment."  33 U.S.C. § 1344(e).  In doing so, the Corps

24

established the current definition of "single and complete project."  As Federal Defendants point out, this definition was first articulated in 1988, codified in the Code of Federal Regulations in 1991, and the Corps has never deviated from it.  [Dkt. 44, p. 34].  As far as the Court is aware, no court has rejected this definition, and Plaintiff refers to no such authority.

In *Kisor v. Wilkie*, the Supreme Court recently made clear that an agency has "leeway" to interpret its own regulatory language if "genuinely ambiguous" and is entitled to "fill out the regulatory scheme Congress has placed under its supervision."  139 S. Ct. at 2415, 2418.  As such, the Corps' construction of CWA is entitled to deference so long as the Court finds the construction reasonable and not in conflict with Congressional intent.  *City of Shoreacres v. Waterworth*, 420 F.3d 440, 445 (5th Cir. 2005); *Enron oil & Gas Co. v. Lujan*, 978 F.2d 212, 215 (5th Cir. 1992).

Here, the Corps' longstanding interpretation is reasonable.  Even Plaintiff, in its Application, lays out the Corps' rationale for adopting this definition:

> We do not agree that the [1/2-acre] limit should apply to the entire utility line because the separate and distant crossings of waters of the United States are usually at separate waterbodies scattered along the length of the utility line, and are often in different watersheds . . . . For utility lines that cross the same waterbody (e.g., a river or stream) at separate and distant locations, the distance between those crossings will usually dissipate the direct and indirect adverse environmental effects so that the cumulative adverse environmental effects are no more than minimal.

82 Fed. Reg. at 1885; [*see* Dkt. 31, p. 27].  At a minimum, this is a "satisfactory explanation," and as such, the Court refuses to substitute its own judgment for that of the Corps.  *See Motor Vehicle*, 463 U.S. at 43.  Other courts have held the same.  *See, e.g.*, *Sisseton-Wahpeton Oyate of Lake Traverse Res. v. Corps of Eng'rs*, 888 F.3d 906, 1055–56 (8th Cir. 2018) (deferring to the Corps' interpretation of applying the "single and complete project" definition at separate and distant locations for linear projects); *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1055–56 (10th Cir. 2015) (affirming the Corps' use of the half-acre threshold for each separate and distant crossing on a pipeline).

The Court also concludes that the Corps' reasonable interpretation does not conflict with the environmental objectives contemplated by Congress.  *See* 33 U.S.C. § 1251(a) (listing that an objective of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters").  Therefore, the Court finds no reason to upend the Corps' long-standing approach for applying NWP-12 to separate and distant water crossings for each "single and complete" project.

For these reasons, Plaintiff is not likely to succeed on this basis.

### c.  *Section 404(b)(1) Guidelines*

Finally, Plaintiff argues that the Corps failed to satisfy the Section 404(b)(1) Guidelines (the "Guidelines") when it verified JSSP's use of NWP-12.  [Dkt. 31, p. 23].  The Guidelines establish various evaluations that must be made in order to authorize a general permit such as NWP-12.  40 C.F.R. § 230.7(a).

Again, Plaintiff's argument is based on a misunderstanding of the relevant statutory and regulatory provisions in this case.  The Guidelines are applied only once—at the national level when a general permit is authorized and issued.  *See id.* § 230.7(b).  They are not reapplied each time a specific project is verified under a general permit.  *See* 82 Fed. Reg. at 1966 ("The Corps complied with the 404(b)(1) Guidelines when it issued or reissued the NWPs.  For a specific activity authorized by an NWP, a separate 404(b)(1) Guidelines analysis is not required.").  Moreover, Plaintiff cites regulations that by their very terms only apply to individual permits.  [Dkt. 31, pp. 23–24 (citing 33 C.F.R. §§ 320.4(b)(4), 325.2(a)(6))].  NWP-12 is a general permit, and therefore that portion of Plaintiff's cited authority has no bearing on this case.  The Corps complied with the Guidelines and performed the appropriate analysis when it reissued NWP-12 in 2017.  The Corps was not required to conduct a separate Guidelines analysis for JSSP's Verification.  Accordingly, Plaintiff is not likely to succeed on this ground.

For these reasons, Plaintiff has not demonstrated a substantial likelihood of success on the merits as to any of its claims, and the Court may deny Plaintiff's Application on this basis alone. *See Sepulvado v. Jindal*, 729 F.3d 413, 420 (5th Cir. 2013) (noting denial of injunctive relief based solely on failure to demonstrate likelihood of success); *Litcherman v. Pickwick Pines Marina Inc.*, 308 F. App'x 828, 835 n.5 (5th Cir. 2009) (same).  Nonetheless, the Court will address the three remaining *Winter* factors for the sake of completeness and out of an abundance of caution.

### ii.  Substantial Threat That Plaintiff Will Suffer Irreparable Harm

Under the second *Winter* factor, a substantial threat of irreparable harm must exist.  *See Winter*, 555 U.S. at 20.  To satisfy this requirement, there must be "a significant threat of injury from the impending action," the injury must be "imminent," and "money damages [can]not fully repair the harm.  *Humana Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986).  Plaintiff must further demonstrate that irreparable harm is not merely possible, but "likely."  *Winter*, 555 U.S. at 21–22.  "Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant."  *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).

In this case, Plaintiff points to three distinct types of harm that it claims will occur if construction of the Pipeline is not halted during the pendency of Plaintiff's legal challenges.  First, Plaintiff insist that the environment will be irreparably injured by the Pipeline's construction.  [Dkt. 31, pp. 38, 40].  Second, Plaintiff insists it will suffer impending economic harm, and at the Hearing, discussed its plans for future development that can no longer transpire if the Pipeline is constructed.  *Id.* at 12.  Third, Plaintiff insists that the NEPA procedural violations in this case constitute irreparable harm when combined with a showing of environmental or aesthetic injury.  *Id.* at 38.

None of these contentions clear the "irreparable harm" hurdle.  Notwithstanding Plaintiff's threadbare allegations of concrete injury to the environment, the record does not clearly establish that the Pipeline will have a significant environmental impact.  The Corps already confirmed the opposite is true.  In verifying the Pipeline, the Corps found that its impact on jurisdictional waters will be minimal and that Plaintiff's property contains no ESA-protected species or critical habitats. [*See* Dkt. 24-7, Ex. J-30 at 1–2]; Wells Decl. ¶¶ 36, 42.  To the extent that the Pipeline impacts jurisdictional waters, such an impact will be minimal, temporary, and not irreparable.  *See Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 39 (D.D.C 2013) ("Plaintiffs' sound and fury regarding the land that must be cleared and the wetland that may be altered does not signify that any of these environmental effects will be permanent or irreversible, as the preliminary injunction standard requires.").  Plaintiff offers little proof of the type of permanent, devastating impact on the environment that has convinced other courts to enjoin construction projects.  As such, Plaintiff's alleged harm is unsupported and speculative.  *See Friends of Lydia Ann Channel v. U.S. Army Corps of Eng'rs*, 701 F. App'x 352, 357 (5th Cir. 2017) ("Speculation built upon further speculation does not amount to a 'reasonably certain threat of imminent harm.'") (citations omitted).

Similarly, Plaintiff contends that the threats of clearing and construction of the pipeline constitute irreparable harm.  [Dkt. 31, p. 35].  At least two courts have rejected this argument.  *See Sierra Club*, 990 F. Supp. 2d at 39 (refusing to find irreparable harm on the basis of plaintiff's "bald allegations" that pipeline construction involving "clearing trees and plants to create a right-of-way" will "kill fish and wildlife and endanger critical wetlands"); *Sierra Club v. U.S Army Corps of Eng'rs*, No. 1:20-CV-460-RP, 2020 WL 5096947, at *12 (W.D. Tex. Aug. 28, 2020) (finding that plaintiff's alleged harm from a pipeline's permanent fixtures, continued maintenance, and disturbance of the right-of-way were "too small to justify an injunction").

Injunctions are forward looking remedies that may be issued "only if *future* injury is certainly impending."  *Aransas Project v. Shaw*, 775 F.3d 641, 664 (5th Cir. 2014) (emphasis added).  Plaintiff alleges environmental harms that have largely already occurred.  *See* Wells Decl. ¶ 86.  According to JSSP, construction of the Pipeline is approximately 81% complete overall and 95% complete with respect to the portions that do not involve Plaintiff's property.  *Id.*  As a result, approximately 89% of the wetland impacts along the project corridor have already occurred.  *Id.* These past harms cannot form the basis for injunctive relief.  *See Sierra Club*, 2020 WL 5096947 at *8 ("The Court cannot remedy any harm that resulted from [defendant's] past clearing and construction activities" because the "clearing [was] 98 percent complete along the entire pipeline.").

Next, Plaintiff's concerns about its economic harms cannot, as a matter of law, constitute irreparable harm.  By definition, "a harm is irreparable where there is no adequate remedy at law, such as monetary damages."  *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011); *see also Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) ("An irreparable injury is one that cannot be remedied by an award of economic damages.").  Only in narrow circumstances may monetary loss establish irreparable harm, such as "where the loss threatens the very existence of the movant's business."  *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  Plaintiff does not allege it is on the verge of bankruptcy.

Although Plaintiff can establish standing based on its future economic losses, these claimed injuries cannot form the basis of irreparable harm.  This is particularly true where, as here, a legal remedy not only exists but has already benefited the plaintiff directly.  *See* Wells Decl. ¶ 71–72; [*See* Dkt. 50-4, Ex. J-37]; *Wildmon v. Berwick Universal Pictures*, 983 F.2d 21, 24 (5th Cir. 1992) (finding no irreparable injury where plaintiff had access to "compensatory damages"); *Sampson v. Murray*, 415 U.S. 61, 88 (1974) ("[T]he basis of injunctive relief in the federal courts has always

been irreparable harm and inadequacy of legal remedies."). Thus, these claimed economic harms are insufficient to establish irreparable injury.

Plaintiff's final argument—that a NEPA violation constitutes irreparable harm—is equally unpersuasive. Plaintiff is correct that an *established* NEPA violation may rise to the level of irreparable harm when accompanied with sufficient evidence of environmental injury. *See, e.g.*, *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 674 (5th Cir. 1992); *Funds for Animals. v. Norton*, 281 F. Supp. 2d 209, 220 (D.D.C. 2003); *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989). Here, however, Plaintiff has thus far failed to demonstrate it is likely to succeed on its NEPA claim. Thus, Plaintiff's unproven procedural violation cannot establish irreparable harm.

Although Plaintiff's concerns are genuine, and the Court finds they are credible, the Court is unable to conclude there is a definitive threat of irreparable harm.

### iii.    Balance of Harms and Public Interest

The final two *Winter* factors that the Court must consider are the balance of the harms and the public interest. *See Winter*, 555 U.S. at 20. "When "balanc[ing] the competing claims of an injury, the Court must "consider the effect on each party of the granting or withholding of the requested relief." *Id.* at 24 (citations omitted). Additionally, "courts of equity [have] particular regard for the public consequences in employing the extraordinary remedy of injunction." (internal quotation marks and citations omitted). *Sierra Club*, 990 F. Supp. 2d. 9, at 41 (noting how "harm can also flow from enjoining an activity" and that "the public may benefit most from permitting [an activity] to continue").

Here, Plaintiff contends that the balance of harms and the public interest weigh in favor of granting an injunction. [*See* Dkt. 31, pp. 37–46]. According to Plaintiff, the environmental harms it has identified outweigh any harms alleged by Defendants. Plaintiff reiterates its vague grievances of environmental harm and spends a substantial portion of its briefing on this issue

arguing that Defendants will suffer no injury from an injunction and that any harm JSSP may suffer would be purely economic, temporary, and "self-inflicted." *See id.*

On the other hand, JSSP has identified under seal the severe harms to its business that would result from enjoining the construction of a $160 million pipeline that is substantially complete.   [Dkt. 47, pp. 42–47]; Wells Decl. ¶ 86.   JSSP argues that any further delay in construction would result in lost revenue and unduly jeopardize its relationships with its suppliers and customers, as well as affect other business operations.   [Dkt. 47, pp. 44–46].   In addition, JSSP claims that a delay would cause it to incur increased construction costs and to continue paying a significant "idle-fee" per day to its construction contractors.   *Id.* at 45.   Federal Defendants primarily point to the public interest.   *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that the balance of harms and public interest factors "merge when the Government is the opposing party").

In the Court's view, the balance of the harms weighs in favor of JSSP.   The record as it currently stands supports a finding that JSSP has committed significant resources to the Pipeline, including navigating the various state and federal environmental regulations the project implicates, as well as the construction itself.   *See Amoco Prod. Co. v. Vill. Of Gambell*, 480 U.S. 531, 545–46 (1987) (weighing economic investment in development of energy resources against potential environmental harm and holding preliminary injunction was not appropriate). This evidence substantiates JSSP's argument that it will suffer harm if the Pipeline is delayed.   By contrast, Plaintiff relies only on general harms and fails to allege with specificity that an injunction is warranted in this case.   Therefore, the balance of harms tips in favor of JSSP.

With respect to the public interest, the Court finds Defendants' arguments particularly compelling.   Federal Defendants argue that continued construction of the Pipeline will serve the public's interest in several respects.   [Dkt. 44, p. 49].   First, the public has an interest in "regulatory

efficiency" and the orderly administration of a system "carefully designed . . . to minimize the costs of approving projects that the Corps has already determined will not adversely impact the environment." *Id.* at 50 (quoting *Sierra Club*, 990 F. Supp. 2d at 43).  Second, the public has an interest in the U.S national policy of "promot[ing] private investments in the Nation's energy infrastructure."  *Id.* (citing Exec. Order 13868 § 2, 84 Fed. Reg. 15,495, 15,495 (Apr. 10, 2019)).

According to JSSP, the Pipeline will also serve the public interest as a significant source of local jobs and will benefit the Texas economy, the local and national oil-and-gas industries, and JSSP's clients and consumers.  [Dkt. 47, p. 5].  Once constructed, the Pipeline will be capable of delivering 288,000 barrels of crude oil per day to Motiva Refinery, the largest refinery in North America.  *See* Wells Decl. ¶¶ 11, 13.  Thus, JSSP argues that the Pipeline will reduce marine vessel traffic on the Neches River, leading to more efficient, reliable, and safer transportation of crude oil.  [Dkt. 47, p. 5]; *see* Evans Decl. ¶ 13; Wells Decl. ¶¶ 11, 15.

Like other courts in the Fifth Circuit, this Court recognizes that pipelines are built to provide a service to customers and that there is a strong public interest in allowing energy infrastructure to develop, provided the proper environmental procedures are followed.  *See Gulf S. Pipeline Co. v. Douglas*, No. 19-cv-02890, 2020 WL 2771191, at *4 (S.D. Tex. May 28, 2020) ("The public interest is properly served by improvements to pipeline infrastructure and addition of outlets for the transmission of requisite natural resources.").  The Texas Legislature has conferred eminent domain authority on common-carrier pipelines and found such pipelines to be in the public interest as required by the Texas Constitution.  [*See* Dkt. 47, p. 48 (citing Tex. Nat. Res. Code §§ 111.002, 111.011, 111.019; Tex. Bus. Code § 2.105)].  Thus, Defendants' arguments undermine the position that enjoining the construction of the Pipeline is in the public interest.

Plaintiff argues that there is a significant public interest in ensuring that federal agencies comply with their statutory duties.  [Dkt. 31, pp. 37–38, 41–42].  This may be so.  But, here, there

is no "clear" violation of the law as Plaintiff contends.  *See id.* at 41.  Plaintiff's public interest arguments depend in large part on the success of its merits arguments.  Plaintiff at this point is not likely to succeed on the merits of its claims.  The Court weighs the public's interest in the Corps' compliance with its statutory duties accordingly.  *See Friends of Lydia Ann Channel v. U.S. Army Corps of Eng'rs*, 701 F. App'x 352 (5th Cir. 1979) (finding no preliminary injunction where plaintiff was unlikely to succeed on the merits and other factors were "totally dependent" on the plaintiff's merits theory); *Serono Laboratories, Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998) (finding that the public interest factor offered plaintiff "no support because it is [was] inextricably linked with the merits of the case").  For these reasons, the Court finds that an injunction is not in the public interest.  *See Monsanto v. Geertson Seed Farms Co.*, 561 U.S. 139 (2010) (finding no "thumb on the scales" favoring an injunction in environmental cases).

To warrant a preliminary injunction, Plaintiff must clearly demonstrate that it meets all four *Winter* factors.  As discussed, the Court finds that Plaintiff fails to carry its burden on a single factor.  Thus, there is no basis to issue a temporary restraining order or a preliminary injunction.

## IV.   CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff's Amended Application for Temporary Restraining Order and Preliminary Injunction [Dkt. 31] is hereby **DENIED**.

Accordingly, **IT IS FURTHER ORDERED** that Plaintiff's original Application for Temporary Restraining Order and Preliminary Injunction [Dkt. 3] is hereby **DENIED** as moot.

**SIGNED this 4th day of October, 2020.**

Michael J. Truncale
United States District Judge